| | |
|---|---|
| LELAND KIM MCCUBBIN, JR. and DANIEL JOSEPH LUCERO, <br><br> Plaintiffs, <br><br> vs. <br><br> WEBER COUNTY, OGDEN CITY, CHRISTOPHER ALLRED, in his official capacity, and DOES 1-10 <br><br> Defendants. | **MEMORANDUM DECISION & ORDER DENYING IN PART, GRANTING IN PART WEBER COUNTY'S SECOND MOTION FOR JUDGMENT ON THE PLEADINGS** <br><br> Consolidated Case Nos. 1:15-cv-132 & 1:15-cv-133 <br><br> Judge Clark Waddoups |

These consolidated actions challenge a now-voided "gang injunction" secured by Ogden City and Weber County targeting the Ogden Trece gang. Weber County and Weber County Attorney Christopher Allred (hereinafter Weber County, unless otherwise indicated) filed a Second Motion for Judgment on the Pleadings seeking dismissal of all claims brought against Weber County in this case on various legal theories. (Dkt. No. 60.) On May 24, 2017, the court heard oral argument on the Motion. (*See* Dkt. No. 74.) For the reasons discussed below, the court now **DENIES** the Motion in all respects, except as to the state tort claims. The court **GRANTS** the Motion dismissing Plaintiffs' Eighth and Ninth Claims for Relief.

## BACKGROUND

For the purpose of resolving this Motion, the court must accept all well-pled, non-conclusory factual allegations and all reasonable inferences from the pleadings as true. *See Park Univ. Enterprises, Inc. v. Am. Cas. Co. Of Reading, PA*, 442 F.3d 1239, 1244 (10th Cir. 2006), *abrogated on other grounds by Magnus, Inc. v. Diamond State Ins. Co.*, 545 F. App'x 750, 753

(10th Cir. 2013) (noting courts apply the same standard to motions for judgment on the pleadings as motions to dismiss, and "accept all facts pleaded by the non-moving party as true and grant all reasonable inferences from the pleadings in favor of the same"). Moreover, because the gang injunction was previously challenged in the Utah Supreme Court, *see Weber Cty. v. Ogden Trece*, 2013 UT 62, 321 P.3d 1067, this court will cite to the Utah Supreme Court's opinion where it recounts similar or identical facts.

### A. The Gang Injunction

In August 2010, Weber County lodged a complaint for a permanent injunction against the Ogden Trece street gang. (Am. Compl. ¶ 20, Dkt. No. 50; *Trece*, 2013 UT 62, ¶ 7.) Weber County sought the injunction "under a public nuisance theory pursuant to section 76–10–806 of the Utah Code, which empowers a county attorney 'to institute an action in the name of the county ... to abate a public nuisance.'" *Trece*, 2013 UT 62, ¶ 2 (quoting Utah Code Ann. § 76–10–806).[1] The district court entered a temporary restraining order that same day. (Am. Compl. ¶ 23; *Trece*, 2013 UT 62, ¶ 7.)

Weber County served the nuisance suit personally on five alleged Trece members, mailed process to twelve others, and attempted to serve the Trece itself by publication. (Am. Compl. ¶ 24; *Trece*, 2013 UT 62, ¶¶ 8–10.) Weber County did not serve either Mr. Lucero or Mr. McCubbin with the complaint, temporary restraining order, or any other motion in the nuisance suit. (Am. Compl. ¶ 26.) Following an evidentiary hearing on September 14 and 27, 2010, the state district court converted the temporary restraining order to a preliminary injunction. (Am. Compl. ¶¶ 28, 30; *Trece*, 2013 UT 62, ¶ 11.) Two Ogden police officers testified at the hearing about the criminal and nuisance activity of the Trece gang. (*Trece*, 2013 UT 62, ¶ 11; *see* Am.

---

[1] The nuisance suit was a civil proceeding, requiring a lower burden of proof on the claims asserted than a criminal proceeding.

Compl. ¶ 21-22 (alleging cooperation among Weber County and Ogden City in pursuing the nuisance action).)

Weber County then began serving the preliminary injunction on more than three hundred alleged members of the Trece. (Am. Compl. ¶ 63; *Trece*, 2013 UT 62, ¶ 12.) Though individuals served sought to intervene in the nuisance suit and challenge the injunction, the district court denied all motions to intervene, reasoning that service of the injunction satisfied due process because it placed those served on notice of the injunction. (Am. Compl. ¶¶ 65-67; *Trece*, 2013 UT 62, ¶ 13.)

The injunction restricted anyone served from engaging in an array of activities within the "Safety Zone," a twenty-five square-mile area encompassing nearly all of Ogden City. (Am. Compl. ¶¶ 28, 30; *Trece*, 2013 UT 62, ¶¶ 3, 16–17.) First, the injunction prohibited association with any "known member" of the Trece in public, including "[d]riving, standing, sitting, walking, gathering, or appearing together with any known member of Ogden Trece anywhere in public view or anyplace accessible to the public." (Am. Compl. ¶ 33 & Ex. 1 at 2; *Trece*, 2013 UT 62, ¶ 16.) The injunction did not, however, identify or otherwise define "known" Trece members, apparently leaving the determination of who was a "known member" to the discretion of law enforcement. (Am. Compl. ¶ 34; *see id.* ¶ 49.)

Next, the injunction prohibited intimidation of witnesses, victims, or complainants, including "[c]onfronting, intimidating, annoying, harassing, threatening, challenging, provoking, [or] assaulting any person known to be a witness to any activity of Ogden Trece, known to be a victim of any activity of Ogden Trece, or known to have complained about any activity of Ogden Trece." (Am. Compl. ¶ 36 & Ex. 1 at 2-3; *Trece*, 2013 UT 62, ¶ 16.) The injunction also prohibited a served person from possessing or being in the presence of firearms and other

weapons; creating graffiti or possessing tools that could be used to create graffiti; selling, possessing, using, or being in the presence of drugs or drug paraphernalia; consuming or being in the presence of alcohol consumption except at home or in licensed establishments; and trespassing. (Am. Compl. ¶¶ 37, 39 & Ex. 1 at 3-4; *Trece*, 2013 UT 62, ¶ 17.) The injunction did not require that the person being prohibited from possessing a firearm be a convicted felon or convicted of any crime that would abrogate his rights under the Second Amendment. (*See* Am. Compl., Ex. 1 at 3.)

The injunction imposed a curfew between the hours of 11 p.m. and 5 a.m.—with exceptions for travel to and from work, and from any non-gang related entertainment event, school activity, or religious service, as well as for "legitimate emergenc[ies]," including disasters, accidents, and situations that require "immediate action to prevent serious bodily injury or loss of life." (Am. Compl. ¶ 38 & Ex. 1 at 4; *Trece*, 2013 UT 62, ¶ 17.) It further required served persons "to obey all laws." (Am. Compl. ¶ 40 & Ex. 1 at 4; *Trece*, 2013 UT 62, ¶ 17.)

The injunction contained an "opt-out" provision under which a served person could seek dismissal of, and thereby render unenforceable, the injunction against them by declaring that he or she is a former, non-active member of the Trece, and submitting proof of his or her lack of recent criminal history, lack of association with known active Trece members, lack of new gang-related tattoos, and gainful employment. (Am. Compl. ¶¶ 41 & Ex. 1 at 5-6; *see Trece*, 2013 UT 62, ¶ 18.) Notably, never having been a gang member was not a basis to opt out. Plaintiffs contend that such a procedure shifted the costs of "opting out" of possible criminal sanctions to those served, and forced served persons who were never members of the Trece gang to perjure themselves in attempting to opt out. (Am. Compl. ¶¶ 42-43.) The injunction also contained a "hardship exemption process" by which a served person could request exceptions to the curfew

and association restrictions via a written application to the Weber County Attorney and, thereafter, by application to the district court. (*Id.* ¶ 44; *Trece*, 2013 UT 62, ¶ 19.) Remarkably, if a parson successfully opted out, the person remained subject to the prohibition on association with known active Trece gang members and getting arrested for "any crime . . . determined to be . . . gang-related," thus effectively extending the injunction's core prohibitions indefinitely. (Am. Compl., Ex. 1 at 7.)

Finally, the injunction contained a "no third-party beneficiaries" provision, stating that a served person's eligibility to "opt-out" was not a defense to a civil or criminal case for violation of the injunction. (Am. Compl. ¶ 45 & Ex. 1 at 6.) Plaintiffs allege that this provision precluded them from using the fact that they were not members of the Trece as a defense if, and when, they were criminally charged with violating the preliminary injunction. (*Id.* ¶ 46.)

Because the injunction did not require Weber County to establish in court that a person intended to be served was, in fact, a Trece member, Plaintiffs allege that Weber County engaged in a policy or practice of permitting its representatives and agents unfettered discretion as to which individuals they chose to serve with the preliminary injunction. (*Id.* ¶¶ 49-50, 55.) This policy resulted in Weber County serving persons it knew were *not* gang members, as well as disproportionately targeting Hispanics living in Ogden. (*Id.* ¶¶ 55-59.) Plaintiffs contend the complete discretion allowed ethnic prejudice and subjective criteria to play a part in identifying those to be served, and observe that Hispanics constituted the vast majority of those served. (*Id.* ¶¶ 61-62, 64.) Plaintiffs allege that Weber County and Ogden City law enforcement had actual knowledge that neither Mr. Lucero nor Mr. McCubbin was a member of the Trece when served with the preliminary injunction, and thus assert that impermissible ethnic prejudice, rather than Trece membership, informed the decision to serve them. (*Id.* ¶ 88.) Moreover, Weber County

and Ogden City allegedly jointly maintain a non-public gang database that contains Plaintiffs' names and other names of individuals believed to be members, associates, or agents of criminal organizations, including the Trece. (*Id.* ¶¶ 51-53, 92, 149, 155.)

On June 14, 2012, after another evidentiary hearing,[2] the district court entered a permanent injunction against the Trece that was substantially identical to the preliminary injunction. (Am. Compl. ¶¶ 69, 71; *Trece*, 2013 UT 62, ¶¶ 14-16.) Plaintiffs allege that Weber County and Ogden City continued to arrest individuals served with the preliminary injunction only, even after the district court had entered the permanent injunction. (Am. Compl. ¶ 72.)

### B. *The Plaintiffs*

Mr. Lucero was served with the preliminary injunction in September or October 2010. (*Id.* ¶¶ 98, 105.) Mr. Lucero denied being a member of the Trece when served, and had denied being a member of the gang in previous interactions with law enforcement. (*Id.* ¶¶ 91, 93, 99.) Officers disbelieved Mr. Lucero because he had family members identified as Trece members, and because they believed a nickname his family used for him—"Fat Boy"—represented a gang moniker. (*Id.* ¶¶ 93-94, 100.) They also told Mr. Lucero that they were recording him in a gang database available to Ogden and Weber County law enforcement. (*Id.* ¶ 92.) Mr. Lucero alleges that ethnic prejudice explains, at least in part, the officers' refusal to believe his denials of gang membership. (*Id.* ¶ 101.) On October 10, 2012, Weber County charged Mr. Lucero with violating the injunction, along with other charges. (*Id.* ¶ 106.) The violation stemmed from allegations that Mr. Lucero was in public in Ogden City after 11 p.m. and in possession of drugs. (*Id.* ¶ 107.) On

---

[2] No one representing the Trece appeared at the hearing. *Trece*, 2013 UT 62, ¶ 14.

July 16, 2013,[3] Mr. Lucero was convicted of violating the preliminary injunction and another charge. (*Id.* ¶ 108.)

In June 2011, Mr. McCubbin was served with the preliminary injunction while in the Utah State Prison. (*Id.* ¶ 119.) Mr. McCubbin does not deny having once been a member of the Trece. (*Id.* ¶ 111.) In April 2008, however, Mr. McCubbin decided to leave the gang and was subjected to a ritual physical assault that left him hospitalized. (*Id.* ¶¶ 112-13.) Members of the Ogden police investigated that assault, and Mr. McCubbin informed officers during that time that the assault resulted from his decision to leave the Trece. (*Id.* ¶¶ 114-15.) Mr. McCubbin had been placed in restrictive housing while serving his prison sentence in part because prison officials knew that he had left the Trece, which raised security concerns. (*Id.* ¶ 118.) Mr. McCubbin alleges that law enforcement's decision to serve him with the injunction while knowing he was no longer a Trece member is explained in part by ethnic prejudice. (*Id.* ¶ 122.) On August 31, 2011, Mr. McCubbin was released from prison and still subject to the injunction. (*Id.* ¶¶ 123-24.) On December 5 and 27, 2011, Ogden City and Weber County charged Mr. McCubbin with violating the injunction, based on allegations that he was in public after 11 p.m., along with other charges. (*Id.* ¶¶ 126-28, 130-31.) On January 4, 2012, Mr. McCubbin was convicted of violating the preliminary injunction and two other charges. (*Id.* ¶¶ 129, 132.) Later, on a motion to reduce his sentence for violating the injunction, the court suspended 60 days from his sentence. (*Id.* ¶ 133.) Moreover, in April 2012, Mr. McCubbin undertook proceedings to "opt-out" of the injunction and proved to the nuisance court that he was not a member of the

---

[3] The Amended Complaint alleges Mr. Lucero's conviction occurred in July 2012, but, considering that he was only charged in October 2012, this order of events is implausible. Looking at other documents in the record, however, the court concludes that Mr. Lucero's conviction occurred on July 16, 2013. (*See* Mr. Lucero's PCRA Mem., Dkt. No. 79-2 at 4.)

Trece. (*Id.* ¶¶ 135-56.) The nuisance court dismissed the injunction against him without prejudice. (*Id.* ¶ 137.)

### C. The Utah Supreme Court's Decision & Post-Conviction Proceedings

On October 18, 2013, the Utah Supreme Court voided the permanent injunction *ab initio*, holding that Weber County failed to properly serve the Trece. *Trece*, 2013 UT 62, ¶ 64. The *Trece* court did not reach any of the constitutional issues on appeal. *See id.* ¶¶ 4–5, 64. The Supreme Court remitted its decision to the district court on November 6, 2013 and filed the remittal order the following day. (Am. Compl. ¶ 75.) Plaintiffs did not receive notice of the Supreme Court's decision because they were not parties to the nuisance suit, and Weber County did not attempt to inform Plaintiffs that the injunction was no longer effective. (*Id.* ¶¶ 76-78.) On September 19, 2014—nearly a year after the Supreme Court's decision—and upon Weber County's motion, the nuisance court dismissed the injunction. (*Id.* ¶ 81.)

Mr. Lucero petitioned the state court to vacate his injunction-related conviction, but the court found his petition untimely and denied post-conviction relief. (*Id.* ¶¶ 109-10.) Mr. McCubbin's injunction-related convictions, however, were vacated by a state court on June 5, 2015. (*Id.* ¶¶ 133-40.)

Weber County and Ogden City officials, including the Weber County Attorney, have publicly stated in various media interviews that they intend to remedy the service issues, refile a nuisance suit against the Trece, and obtain another injunction identical to the one voided. (*Id.* ¶¶ 82-84.)

## PROCEDURAL HISTORY

Mr. McCubbin and Mr. Lucero filed separate civil rights cases seeking, among other relief, a declaration that the gang injunction obtained by Weber County and Ogden City violated

their due process and First Amendment rights under the United States Constitution and the Utah state constitutional counterparts. (Dkt. No. 2.) The court consolidated their cases on March 24, 2016, finding substantially similar parties and questions of law in both. (Dkt. No. 30.) Ogden City filed motions to dismiss, and Weber County filed a motion for judgment on the pleadings. (*See* Dkt. Nos. 17, 31, 35.) Meanwhile, Plaintiffs sought leave to amend their complaints. (*See* Dkt. No. 38.) After a hearing, the court granted Plaintiffs leave to amend without prejudice to any dismissal arguments. (*See* Dkt. Nos. 48, 49.)[4]

Plaintiffs' Amended Consolidated Complaint asserts six constitutional claims against all Defendants (Weber County/Attorney Allred, Ogden City, and Doe Defendants), pursuant to 42 U.S.C. § 1983 and the Utah Constitution:

1. Violation of procedural due process (First Claim for Relief);
2. Violation of substantive due process (Second Claim for Relief);
3. Violation of First Amendment right to free association (Third Claim for Relief);
4. Violation of First Amendment right to free expression (Fourth Claim for Relief);
5. Violation of Utah constitutional right to due process (Sixth Claim for Relief);
6. Violation of Utah constitutional right to free expression (Seventh Claim for Relief).

(Am. Compl. 19-24, Dkt. No. 50.) Plaintiffs also assert a conspiracy claim under 42 U.S.C. § 1985(3) (Fifth Claim for Relief) against all Defendants. (*See id.* at 22-23.) Finally, Plaintiffs assert a state law wrongful injunction claim against Weber County (Eighth Claim for Relief) and an abuse of process claim against all Defendants (Ninth Claim for Relief). (*Id.* at 24-25.) And Plaintiffs seek a declaratory judgment against all Defendants (Tenth Claim for Relief) stating that "any attempt to serve them in the future with an injunction identical to the one issued by the district court in the nuisance suit would violate their civil rights." (*Id.* at 25.)

---

[4] The court had stayed briefing on Weber County's motion for judgment on the pleadings pending resolution of Ogden's earlier-filed motions to dismiss and Plaintiffs' motion to amend. (Dkt No. 40.) After the hearing, the court mooted Weber County's motion. (*See* Dkt. No. 72.)

On December 14, 2016, Weber County filed a Second Motion for Judgment on the Pleadings.[5] (*See* Dkt. No. 60.) After a round of briefing, the court heard argument and took the Motion under advisement.

## LEGAL STANDARD

Courts review motions for judgment on the pleadings under the same legal standard as motions to dismiss. *See Corder v. Lewis Palmer Sch. Dist. No. 38*, 566 F.3d 1219, 1223 (10th Cir. 2009). The court accepts all well-pled factual allegations in the complaint as true and considers them in the light most favorable to the plaintiff. *See Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009). Where a defendant has challenged the sufficiency of the claims, the court must determine whether the plaintiff has provided "enough facts to state a claim to relief that is plausible on its face." *Hogan v. Winder*, 762 F.3d 1096, 1104 (10th Cir. 2014) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"The motion for a judgment on the pleadings only has utility when all material allegations of fact are admitted or not controverted in the pleadings and only questions of law remain to be decided by the district court." 5C Charles Alan Wright et al., *Federal Practice & Procedure* § 1367 (3d ed.). The Tenth Circuit has stated that "[j]udgment on the pleadings should not be granted 'unless the moving party clearly establishes that no material issue of fact remains to be resolved and the party is entitled to judgment as a matter of law.'" *See Park Univ.*, 442 F.3d at 1244 (quoting *United States v. Any & all Radio Station Transmission Equip.*, 207 F.3d 458, 462 (8th Cir. 2000)). In ruling on a motion for judgment on the pleadings, the court may consider the complaint, any material attached to the complaint or incorporated by reference, other pleadings, and matters central to a claim or defense. *See Park Univ.*, 442 F.3d at 1244; 5C

---

[5] Ogden City has not moved to join Weber County's Motion and has not renewed its dismissal arguments.

*Federal Practice & Procedure* § 1367. Additionally, the court may take judicial notice of state court documents. *Denver Health & Hosp. Auth. v. Beverage Distrib. Co., LLC*, 546 F. App'x 742, 747 n.3 (10th Cir. 2013) (unpublished).[6]

## ANAYLSIS

Accepting the pleadings as true and drawing all inferences in Plaintiffs' favor, the court finds Weber County's arguments as to immunities, justiciability, and failure to state a claim all fail at this stage of the proceedings. The court agrees, however, that the Utah Governmental Immunity Act (UGIA) bars Plaintiffs' Eighth and Ninth Claims for Relief (state law wrongful injunction and abuse of process). Thus, the court dismisses those two claims against Weber County.

The court addresses each of Weber County's arguments in logical order, starting with threshold issues that implicate the court's jurisdiction.

### A.    Justiciability Doctrines

Weber County argues that Plaintiffs do not have standing in this case because the gang injunction has been voided, any future injunction is too speculative, and Weber County did not "directly cause" any injury because it did not serve or arrest the Plaintiffs. (*See* Mot. 6-7, Dkt. No. 60; Reply 2-3, Dkt No. 73.) Weber County also suggests that Plaintiffs waived their constitutional claims by pleading guilty and that Plaintiffs real dispute lies with the state court that entered the injunction. (*See* Mot. 7-9.) Although Weber County blends several legal challenges at this point, these arguments implicate issues of justiciability.

Standing, mootness, and ripeness are related jurisdictional doctrines. "Standing concerns whether a plaintiff's action qualifies as a case or controversy when it is filed; mootness ensures it

---

[6] This and all other unpublished decisions are not precedential, but are cited for their persuasive value. *See* Fed. R. App. 32.1; 10th Cir. App. R. 32.1.

remains one at the time a court renders its decision." *Brown v. Buhman*, 822 F.3d 1151, 1163 (10th Cir. 2016). Courts describe mootness as "standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Id.* at 1164 (quoting *Arizonans for Official English v. Arizona*, 520 U.S. 43, 68 n. 22 (1997)). Meanwhile, the ripeness doctrine "aims to prevent courts from entangling themselves in abstract disagreements by avoiding premature adjudication." *Buhman*, 822 F.3d at 1164 n.13 (quoting *Cellport Sys., Inc. v. Peiker Acustic GMBH & Co. KG*, 762 F.3d 1016, 1029 (10th Cir. 2014)).

In this case, Plaintiffs seek (1) an award of monetary damages against Weber County, Ogden City, and Doe Defendants named in their individual capacities for constitutional violations stemming from being served with and prosecuted under the injunction; (2) a declaration that obtaining and enforcing a new injunction identical to the now-vacated injunction would violate Plaintiffs' constitutional rights; (3) a declaration that "maintaining Plaintiffs on a list of people to be treated as if they are members of a criminal organization, including being served with [a] nuisance injunction against that organization," would violate Plaintiffs' constitutional rights; and (4) an injunction requiring removal of Plaintiffs' names from Weber County and Ogden City's gang database. (Am. Compl. 19-26, Dkt. No. 50.)

After describing some general principles relevant to each justiciability doctrine, the court will analyze each type of relief sought to determine whether Plaintiffs' claims survive justiciability challenges.

### 1. Standing

The principle that plaintiffs must have standing to bring a case is rooted in Article III, which limits the federal courts' exercise of judicial power to cases and controversies. *Town of*

*Chester, N.Y. v. Laroe Estates, Inc.*, ___ U.S. ___, 137 S. Ct. 1645, 1650 (2017); *see* U.S. Const. art. III, § 2, cl. 1. To demonstrate Article III standing, a plaintiff must plausibly allege (1) an injury in fact, (2) fairly traceable to defendants' conduct, (3) that is redressable by a favorable judicial ruling. *Rector v. City and Cty. of Denver*, 348 F.3d 935, 942 (10th Cir. 2003). Moreover, "a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Laroe Estates*, 137 S. Ct. at 1650 (quoting *Davis v. Federal Election Comm'n*, 554 U. S. 724, 734 (2008)). In conducting this analysis, the court must accept as valid the constitutional violations alleged. *Am. Humanist Ass'n, Inc. v. Douglas Cty. Sch. Dist. RE-1*, 859 F.3d 1243, 1253 n.2 (10th Cir. 2017).

"The injury-in-fact element requires 'an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical.'" *Jordan v. Sosa*, 654 F.3d 1012, 1019 (10th Cir. 2011) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). Thus, for a retrospective damages claim, "[a] plaintiff who has suffered a concrete and particularized injury possesses standing to seek retrospective relief." *Am. Humanist*, 859 F.3d at 1250. But "[a]lthough a plaintiff may present evidence of a past injury to establish standing for retrospective relief, he must demonstrate a continuing injury to establish standing for prospective relief," *Sosa*, 654 F.3d at 1019, or show he is "under a real and immediate threat of being injured in the future." *Am. Humanist*, 859 F.3d at 1250 (quoting *Tandy v. City of Wichita*, 380 F.3d 1277, 1283 (10th Cir. 2004)). "Past injuries are relevant to showing a risk of future harm, but 'past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief if unaccompanied by any continuing, present adverse effects.'" *Am. Humanist*, 859 F.3d at 1250 (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)).

When a plaintiff's alleged injury arises from potential future enforcement of a criminal sanction, "an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law." *Buhman*, 822 F.3d at 1165 (quoting *Susan B. Anthony List v. Driehaus*, ___ U.S. ___, 134 S. Ct. 2334, 2342 (2014)). Courts may conduct "pre-enforcement review" of a law when circumstances demonstrate the threatened enforcement is "sufficiently imminent." *Susan B. Anthony*, 134 S. Ct. at 2342. Thus, "a plaintiff satisfies the injury-in-fact requirement where he alleges an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Buhman*, 822 F.3d at 1165 (quoting *Susan B. Anthony*, 134 S. Ct. at 2342).

The second element requires that the alleged injury be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976)) (alterations in the original). A fairly traceable connection must be more than "an attenuated connection," *Robbins v. U.S. Dep't of Housing & Urban Dev.*, 72 F. Supp. 3d 1, 7 (D.D.C. 2014), but need not rise to the level of proximate cause, *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1156 (10th Cir. 2005) (citing *Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1273 (11th Cir. 2003)), and may include "harms that flow indirectly from the action in question," *Focus on the Family*, 344 F.3d at 1273.

Finally, redressability requires that it "be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561.

2. *Mootness*

While standing ensures a case has "concrete adverseness" at its inception, *Awad* v. Ziriax, 670 F.3d 1111, 1120 (10th Cir. 2012) (quoting *Massachusetts v. E.P.A.*, 549 U.S. 497, 517 (2007)), a case can become moot during the course of its proceedings "[i]f an intervening circumstance deprives the plaintiff of a personal stake in the outcome of the lawsuit." *Buhman*, 822 F.3d at 1165 (quoting *Campbell-Ewald Co. v. Gomez*, ___ U.S. ___, 136 S.Ct. 663, 669 (2016)). For mootness, "[t]he crucial question is whether granting a present determination of the issues offered will have some effect in the real world. Put another way, a case becomes moot when a plaintiff no longer suffers actual injury that can be redressed by a favorable judicial decision." *Buhman*, 822 F.3d at 1165–66 (quotations omitted); *see Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012) ("A case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." (internal quotation marks and citations omitted)).

The mootness doctrine has exceptions "notwithstanding the seeming extinguishment of any live case or controversy." *Buhman*, 822 F.3d at 1166. Relevant here, a defendant's "voluntary cessation of challenged conduct does not ordinarily render a case moot because a dismissal for mootness would permit a resumption of the challenged conduct as soon as the case is dismissed." *Id.* (quoting *Knox*, 567 U.S. at 307). "A defendant's voluntary cessation may moot a case, however, if the defendant carries 'the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur.'" *Buhman*, 822 F.3d at 1166 (quoting *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013)). The voluntary cessation exception poses a question that mirrors "credible threat" inquiry in standing doctrine:

"Could the allegedly wrongful behavior reasonably be expected to recur?" *Already*, 568 U.S. at 92.

### 3. Ripeness

The ripeness doctrine aims to prevent courts from attempting to resolve abstract disagreements that "rest[] upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998). This doctrine "addresses a *timing* question: *when* in time is it appropriate for a court to take up the asserted claim." *United States v. Supreme Court of N.M.*, 839 F.3d 888, 903 (10th Cir. 2016) (alteration in original) (quoting *Kan. Judicial Review v. Stout*, 519 F.3d 1107, 1116 (10th Cir. 2009)). "Ripeness reflects constitutional considerations that implicate Article III limitations on judicial power, as well as prudential reasons for refusing to exercise jurisdiction." *Awad*, 670 F.3d at 1124 (quoting *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 670 n.2 (2010)). Of course, "[i]f a threatened injury is sufficiently imminent to establish standing, the constitutional requirements of the ripeness doctrine will necessarily be satisfied." *Awad*, 670 F.3d at 1124 (quoting *Am. Civil Liberties Union v. Johnson*, 194 F.3d 1149, 1154 (10th Cir. 1999)). But the court may also consider whether the claims are prudentially ripe by examining "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Texas*, 523 U.S. at 301 (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)).[7]

---

[7] The Supreme Court has recently noted "some tension" between the prudential ripeness doctrine and the "virtually unflagging" obligation federal courts have to hear cases within their jurisdiction. *Susan B. Anthony*, 134 S. Ct. at 2347 (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. ___ , 134 S.Ct. 1377, 1386 (2014)). The Tenth Circuit has noted the Supreme Court's concern and continued to apply the doctrine. *Fourth Corner Credit Union v. Fed. Reserve Bank of Kan. City*, 861 F.3d 1052, 1059 n.1 (10th Cir. 2017) (per curiam) (opinion of Matheson, J.).

The court now examines each form of relief Plaintiffs seek to determine if they survive these justiciability concerns.

### a. Monetary Damages

Plaintiffs suffered a number of injuries in fact to their constitutionally protected due process and First Amendment rights for which they seek damages. Plaintiffs allege they were injured by being subjected to, prosecuted under, and convicted of violations of the gang injunction by the Defendants, including agents of Weber County and Ogden City in coordination, despite the Defendants' direct knowledge that neither of the Plaintiffs were Trece gang members at the time and without any notice or meaningful process for contesting the injunction. (Am. Compl ¶¶ 143-44, 152, 157, 162.) Plaintiffs also allege Weber County and Ogden City injured their due process rights by negatively altering their legal status by maintaining their names in a nonpublic database tracking members of the Trece gang, even though they knew Plaintiffs were not Trece members and provided no process to challenge their inclusion. (*Id.* ¶ 145.) Absent the prior existence and continuing threat of an injunction limiting protected constitutional rights, the database may be a legitimate police tool to enforce the law and investigate crime. But when combined with the injunction, the database becomes a vehicle to deprive Plaintiffs of their protected rights without due process. This is particularly so because the injunction allows unfettered discretion, influenced by ethnic animus, to identify "known gang members." The court finds these injuries are sufficiently concrete and particularized to these Plaintiffs.

The Defendants' actions had a causal relationship to Plaintiffs' alleged injuries because the Defendants were responsible for the policies and practices that permitted broad discretion and alleged ethnic animus in identifying who would be served and later prosecuted, and are

responsible for maintaining the gang list or database. Weber County protests that it did not personally serve or arrest the Plaintiffs. That circumstance, even if true, does not change this analysis, for Plaintiffs' allegations are broader than the service or prosecution. Plaintiffs allege injury flowing from a *policy or practice* of unfettered discretion about who to serve with the injunction, including individuals that Weber and Ogden knew were not gang members. (Am. Compl. ¶¶ 6, 55, 56, 104, 120, 182.) Plaintiffs also allege this policy or practice invited subjectivity that lead to the use, in part, of ethnic prejudice to identify gang members, (*id.* ¶¶ 61, 168), and permitted the formation of a nonpublic list or gang database that includes the Plaintiffs, who are not gang members, with no process for challenging the list and/or database, (*id.* ¶¶ 51-54, 83, 92). The court must accept these allegations as true at this stage. Weber County provides no sworn statements or other evidence to create a factual dispute around these allegations. The court concludes that Plaintiffs' injuries are fairly traceable to Weber County's actions in permitting and enforcing the alleged policies and practices resulting in constitutional injury.

Finally, an award of damages would redress Plaintiffs' injuries. Therefore, Plaintiffs have standing to assert their claim for monetary damages as retrospective relief. Nothing in this action can moot such past injuries and they are ripe for review.

### b. Declaration regarding future injunction

Whether Plaintiffs have standing to seek declaratory judgment that a future injunction identical to the prior one would violate their constitutional rights is a closer call. Weber County argued in its brief and during the motion hearing that Plaintiffs' claims are too speculative because (1) Weber County has not reinitiated the nuisance suit since the injunction was voided in 2013, and (2) even if Weber County does file a new nuisance suit, the court cannot know if the state court judge will approve a similar or identical injunction.

The court recognizes that Plaintiffs' alleged injury—future prosecution under an identical injunction—remains contingent on events that have not yet occurred. But after considering the history of this case and Plaintiffs' allegations, the court finds the Plaintiffs have standing to seek such declaratory relief because they have plausibly pled a credible threat of future prosecution and "can demonstrate a good chance of being likewise injured in the future." *Sause v. Bauer*, 859 F.3d 1270, 1277 (10th Cir. 2017) (quoting *Barney v. Pulsipher*, 143 F.3d 1299, 1306 n.3 (10th Cir. 1998)).

Plaintiffs have pled a "good chance" that they will be subject to a substantially similar, if not identical, gang injunction in the future. In the aftermath of the Utah Supreme Court's voiding the injunction for ineffective service, Weber and Ogden officials publically signaled in press statements their intent to remedy the service issues and obtain and enforce the same injunction "on many occasions since the Utah Supreme Court's decision." (Am. Compl. ¶ 82-84.) Nothing in the Utah Supreme Court's decision bars Weber County from seeking a renewed injunction with identical or similar terms. Indeed, Weber County does not deny that it intends to seek the same injunction against these Plaintiffs, and may be hesitating only because of the pendency of this action. Weber County has not, at any point during the briefing or arguments on this motion, disavowed the intention to seek a similar injunction. During argument, Weber County's counsel simply did not know what the County Attorney would do going forward, but implied that, because they have not yet renewed the nuisance suit, the court could discount the public statements of its agents and read into the lapse of time the disavowal of a similar injunction in the future. Weber County's silence on this point, and failure to present any evidence (besides inaction) creating an issue of fact about Weber County's intentions, is not sufficient to undermine the credible threat of service and prosecution under a future similar injunction that the

Plaintiffs face. *Compare Buhman*, 822 F.3d at 1168 (finding the case moot after the Utah County Attorney's Office submitted a declaration announcing a policy that forbid enforcement of the allegedly unconstitutional statute against the plaintiffs, making it clear that prosecution of the plaintiffs "could not reasonably be expected to recur" (quoting *Already*, 568 U.S. at 91)).

Plaintiffs have demonstrated a history of successful prosecution and enforcement of the prior injunction. *Susan B. Anthony*, 134 S. Ct. at 2345 (observing that "past enforcement against the same conduct is good evidence that the threat of enforcement is not 'chimerical'" (quoting *Steffel v. Thompson*, 415 U.S. 452, 459 (1974))). The only court to have passed on the constitutionally of the prior injunction, the state nuisance court, found it constitutional because "law enforcement is required to serve the injunction on gang members, thus placing them on notice of the injunction." *Trece*, 2013 UT 62, ¶ 13 (quoting state district court). That decision was made prior to the Supreme Court's ruling that the service was ineffective to give constitutional notice, and its vacating the state nuisance court proceedings below. If Weber County seeks an identical injunction, which it has stated it will, Plaintiffs have plausibly pled that they themselves would be subject to it. Plaintiffs allegedly remain on Weber County's database tracking Trece members, even though Weber County knows they are not Trece members and Plaintiff McCubbin was able to prove in court that he was not a Trece member. And Plaintiffs have alleged their intent "to engage in a course of conduct arguably affected with a constitutional interest." *Susan B. Anthony*, 134 S. Ct. at 2342. The prior injunction's broad terms criminalized otherwise constitutionally protected activities such as associating with "known gang members" in public, including family members, or being in public between 11 p.m. and 5 a.m. *Trece*, 2013 UT 62, ¶¶ 16-17. Even if Weber County does not ultimately prosecute Plaintiffs under a future identical injunction, Plaintiffs have plausibly pled a "good chance" that

they will be served with it and immediately subject to restrictions on various constitutional rights. Compounding the issue, Plaintiffs allege the former injunction did not provide a meaningful opt-out process and removed as a defense to prosecution a person's opt-out eligibility. (Am. Compl. ¶¶ 42-43, 45-46.)

Thus, the Plaintiffs have shown a threat of being served and prosecuted under a future injunction that is "not imaginary or wholly speculative," *Buhman*, 822 F.3d at 1165 (10th Cir. 2016) (quoting *Susan B. Anthony*, 134 S. Ct. at 2342). Absent a declaration from the court that an identical or substantially similar injunction would be unconstitutional, Plaintiffs are threatened with service of the same injunction in the near future, despite their non-membership in the gang, which would immediately cause concrete injury to their constitutional rights and would arise from Weber County's obtaining, serving, and enforcing the injunction as a tool to combat Trece gang crime. The court finds the Plaintiffs have standing to pursue this prospective relief.

While nothing has happened since this case's inception that would moot the Plaintiffs' standing for prospective relief, Weber County's arguments regarding the speculative nature of a future injunction also allude to prudential ripeness considerations.[8] The court should first consider the fitness of hearing Plaintiffs' claims now, and then what hardship would accrue to Plaintiffs from withholding judicial review.

The fitness analysis focuses on "whether determination of the merits turns upon strictly legal issues or requires facts that may not yet be sufficiently developed." *Awad*, 670 F.3d at 1124 (quoting *Kansas Judicial Review v. Stout*, 519 F.3d 1107, 1118 (10th Cir. 2008)). Plaintiff challenges a future injunction as a violation of his due process and First Amendment free association and free expression rights. The Tenth Circuit has noted that First Amendment

---

[8] Because the court finds Plaintiffs have standing to pursue prospective relief against a future injunction, the constitutional ripeness requirement is also fulfilled. *See Awad*, 670 F.3d at 1124.

challenges to the facial validity of a law are "generally considered to be strictly legal questions that do 'not involve the application of [the law] in a specific factual setting.'" *Id.* (alteration in original) (quoting *Stout*, 519 F.3d at 1118); *see also ACORN v. City of Tulsa, Okla.*, 835 F.2d 735, 740 (10th Cir. 1987) ("In determining the facial validity of a statute or ordinance the court does not consider any specific type of conduct. Rather, the facial validity of a statute is decided by reference to all of the conduct that is proscribed by the statute."). As to the due process claims, the court finds sufficient factual development in the complaint as pled. In finding the Plaintiffs have standing to pursue this relief, the court found a credible threat that Weber County would use the same restrictions as in the prior injunction, pursuant to the same type of action (nuisance), against the same entity (the Trece gang), and that Plaintiffs would likely be served and subject to the same injunction because of their inclusion on the gang database and the history of service and successful prosecution in the past. The court finds the issues raised in Plaintiffs' case are fit for judicial review at this point.

Second, the court must assess the hardship to Plaintiffs from withholding review, that is, "whether the challenged action creates a direct and immediate dilemma for the parties." *Awad*, 670 F.3d at 1125 (quoting *New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495, 1499 (10th Cir. 1995)). While the court cannot determine on this record what hardship, if any, the Plaintiffs would suffer from withholding review on this claim for relief, they have shown a credible threat of being re-served and prosecuted under a future injunction if the court withholds review. The court finds the Plaintiffs face a sufficiently "direct and immediate dilemma" to show hardship in this case. *See Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 814–15 (2003) (Stevens, J., concurring in the judgment) (explaining fitness "is the more important" inquiry and hardship is "less clear and less important").

Thus, the court concludes that Plaintiffs' claim for relief as to a future injunction satisfies prudential ripeness considerations.

### c. Declaration regarding the database

Plaintiffs also have standing to pursue prospective relief in the form of a declaratory judgment that maintaining the Plaintiffs' names on a nonpublic list of gang members, despite knowledge that they are not gang members, would be a violation of Plaintiffs' right to due process. (*See* Am. Compl. ¶ 145, 155.) Weber County objects that Plaintiffs' have no constitutional right to challenge a nonpublic list of criminals maintained by law enforcement, but whether Plaintiffs have a valid constitutional claim is an issue on the merits, not of standing. *Am. Humanist*, 859 F.3d at 1253 n.2.

Plaintiffs' suffer a concrete and particularized injury in fact to their due process rights by Weber County's inclusion of their names on the gang database, without process to challenge their inclusion and despite knowledge that they are not gang members. This injury includes the threat of being served with a similar gang injunction due to their inclusion on this database, and the immediate criminalization of otherwise constitutional activities. This injury is causally connected to Weber County and Ogden City's alleged joint maintenance of and control over the database. A declaration from the court that maintaining such a nonpublic database violates Plaintiffs' due process rights would redress the injury.

The court sees no mootness or prudential ripeness concerns with this prospective relief because the injury is ongoing and the injury is not contingent on future events that may or may not occur. *See Texas*, 523 U.S. at 300.

**d. Injunction for removal of names from database**

Finally, Plaintiffs have standing to pursue injunctive relief instructing Defendants to remove their names from the gang database. (Am. Compl. ¶ 149.) As discussed above, Plaintiffs allege injury in fact from Weber County and Ogden City's joint maintenance of the gang database with their names included, and an order from this court to remove the Plaintiff's names from the database would redress the injury. *See Am. Humanist*, 859 F.3d at 1252 ("[A]nyone with 'a direct stake in the outcome of a litigation—even though small' has standing." (quoting *United States v. Students Challenging Regulatory Agency Procedures* (SCRAP), 412 U.S. 669, 689 n.14 (1973))).

\* \* \*

In sum, the court concludes Plaintiffs have standing to pursue monetary, injunctive, and prospective declaratory relief in this case.

**B.  Immunities**

Weber County next argues that Weber County Attorney Christopher Allred is entitled to Eleventh Amendment immunity, prosecutorial immunity, and quasi-judicial immunity. (Mot. 1-6, Dkt. No. 60.)

*1.  Personal Immunities*

Weber County's arguments on prosecutorial and quasi-judicial immunity miss the mark because Plaintiffs sue Mr. Allred solely in his official capacity. "The Supreme Court has determined that an official-capacity suit brought under § 1983 'generally represent[s] only another way of pleading an action against an entity of which an officer is an agent,' and as long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Moss v. Kopp*, 559

F.3d 1155, 1168 n.13 (10th Cir. 2009) (quoting *Kentucky v. Graham*, 473 U.S. 159, 161, 165–66, (1985)). Thus, while an official in a personal-capacity action may be able to claim personal immunity defenses, "[i]n an official-capacity action, these defenses are unavailable." *Graham*, 473 U.S. at 166–67; *e.g.*, *Burge v. Parish of St. Tammany*, 187 F.3d 452, 466–68 (5th Cir. 1999) (finding a district attorney could not invoke prosecutorial immunity in an official-capacity suit "because that form of personal or individual immunity is not available in" such a suit).[9]

Plaintiffs may sue Mr. Allred in his official capacity, as an agent of Weber County, for injunctive and declaratory relief. *See* Ivan E. Bodensteiner & Rosalie Berger Levinson, *Absolute immunity—Prosecutorial functions*, 2 State and Local Government Civil Rights Liability § 2:5 ("It is, however, well established that prosecutors are not shielded from suits for injunctive relief, declaratory relief, or attorney's fees."). Because Plaintiffs sue Mr. Allred solely in his official capacity, the court treats the official-capacity claims against Mr. Allred as brought against Weber County, and any relief obtained against Mr. Allred in his official capacity must be recovered against Weber County itself. *See, e.g.*, *Graham*, 473 U.S. at 166 (noting that "a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself"). And municipalities are not immune to suits under § 1983 for monetary, injunctive, or declaratory relief. *Supreme Court of Virginia v. Consumers Union of U. S., Inc.*, 446 U.S. 719, 736 (1980); *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690 (1978); *Moss*, 559 F.3d at 1168 ("Municipal entities and local governing bodies are not entitled to the traditional common law immunities for § 1983 claims.").

---

[9] For example, Mr. Allred may be protected from a damages suit brought against him *personally* by prosecutorial immunity for actions taken within the scope of his prosecutorial duties, *e.g.*, *Imbler v. Pachtman*, 424 U.S. 409 (1976), or by quasi-judicial immunity for actions taken pursuant to a facially-valid court order, *e.g.*, *Moss*, 559 F.3d at 1163. But these issues are not before the court in this suit, and the court makes no comment on them here.

2. *Sovereign Immunity*

Resolving Weber County's argument for Eleventh Amendment immunity requires more discussion. It is well-settled that "municipalities (e.g., local officials in their official capacity and counties, among others) do not enjoy absolute immunity from suit under § 1983." *Moss*, 559 F.3d at 1168; *accord Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 166 (1993); *Monell*, 436 U.S. at 690. Weber County argues, however, that it should be considered an arm of the state in this case because Mr. Allred acted on behalf of the state in serving and prosecuting violations of the gang injunction. (*See* Mot. 2-3, Dkt. No. 60.)

The Eleventh Amendment bars actions in federal court against states. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98–100 (1984). "Eleventh Amendment immunity extends to governmental entities that are considered arms of the state," *Colby v. Herrick*, 849 F.3d 1273, 1276 (10th Cir. 2017), as well as to § 1983 damages actions against state officials sued in their official capacities, *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989); *accord Colby*, 849 F.3d at 1278. But the Supreme Court "has repeatedly refused to extend sovereign immunity to counties," even when "such entities exercise a slice of state power." *N. Ins. Co. of N.Y. v. Chatham Cty., Ga.*, 547 U.S. 189, 193–94 (2006) (citations omitted) (quoting *Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency*, 440 U.S. 391, 401 (1979)).

Plaintiffs sue Mr. Allred solely in his official capacity and do not seek damages against him in that capacity. As discussed, Mr. Allred is not protected by immunity for prospective injunctive or declaratory relief.[10] But Plaintiffs do seek damages against Weber County, Ogden

---

[10] In fact, a § 1983 action for forward-looking injunctive or declaratory relief can be brought against a *state* official sued in his or her official capacity, and such actions "are not treated as actions against the State." *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 n.10 (1989) (quoting *Graham*, 473 U.S. at 167 n.14 & *Ex parte Young*, 209 U.S. 123, 159–60 (1908)); *accord Cornforth v. Univ. of Okla. Bd. of Regents*, 263 F.3d 1129, 1134 (10th Cir. 2001) ("[T]he

City, and as-yet unidentified Doe Defendants. (*See, e.g.*, Am. Compl. ¶¶ 147, 169, "Prayer for Relief" subsection B.)[11] A fundamental issue with Weber County's absolute immunity argument is that it ignores the nature and thrust of the Plaintiff's complaint: that Weber County's policy and practice of unfettered discretion in identifying those to be served with the injunction, and its maintenance of a non-public gang database, violate the Constitution. As a political subdivision, Weber County does not enjoy sovereign immunity from such claims. *See Chatham*, 547 U.S. at 193; *Monell*, 436 U.S. at 690; *Moss*, 559 F.3d at 1168.

Separating Mr. Allred's acts to prosecute the injunction from the policy and practice allegations, Weber County contends it may be protected by Eleventh Amendment immunity by Mr. Allred's role as a prosecutor, at least in some instances, on behalf the state. Weber County cites two cases suggesting that the court should dismiss official-capacity claims against county attorneys shown to be arms of the state. In *McMillian v. Monroe Cty., Ala.*, 520 U.S. 781 (1997), the Supreme Court dismissed an official-capacity suit against an Alabama sheriff on Eleventh immunity grounds because the Court found the sheriff acted on behalf of the state when he acted in a law enforcement capacity. *Id.* at 793. In arriving at this conclusion, the Court first emphasized that it did not "seek[] to make a characterization of Alabama sheriffs that will hold true for every type of official action they engage in" and then stated that the inquiry turned on an analysis of state law. *Id.* at 785–86. After an exhaustive review of Alabama law and history

---

Supreme Court made it clear that a private individual may sue a state official for prospective injunctive relief in federal court even if the Eleventh Amendment bars such claims from being brought against the state itself."); *Buchwald v. Univ. of New Mexico Sch. of Med.*, 159 F.3d 487, 494–95 n.3 (10th Cir. 1998).

[11] In each § 1983 claim for relief, the pleadings state: "Plaintiffs are entitled to damages against all Defendants not named in their official capacities caused by these violations." (*See, e.g.*, Am. Compl. ¶ 147.) This language is ambiguous because Weber County and Ogden City can only be sued in an official capacity. Plaintiffs' counsel clarified at oral argument that Plaintiffs are seeking damages against Weber County and Ogden City, and that any implication otherwise was simply unartful pleading.

unique to Alabama sheriffs, *see id.* at 787–95, the Court agreed with the Eleventh Circuit's determination that, under Alabama law, "a sheriff acting in his law enforcement capacity is not a policymaker for the county" and represents the state, "at least for some purposes." *Id.* at 786–87. The Court was unconcerned about any regional inconsistencies this conclusion might create, remarking that "since it is entirely natural that both the role of sheriffs and the importance of counties vary from State to State, there is no inconsistency created by court decisions that declare sheriffs to be county officers in one State, and not in another." *Id.* at 795. The Court also noted that its precedent safeguarded against local officials "manipulat[ing]" their titles to shield local governments from liability for unconstitutional policies because plaintiffs could still prove "widespread practices . . . established by custom or usage with the force of law." *Id.* at 796 (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (plurality opinion)).

Next, in *Nielander v. Bd. of Cty. Comm'rs of Cty. of Republic, Kan.*, 582 F.3d 1155 (10th Cir. 2009), the Tenth Circuit found prosecutorial immunity protected a Kansas county attorney from suit in his individual capacity. *Id.* at 1164. The court went on to say that, under Kansas law, Eleventh Amendment immunity would also shield the county attorney in his official capacity because his prosecutorial acts were attributable to the state. *Id.* The *Nielander* court did not elaborate on the point, which the defendants had not raised. *Id.*

The Tenth Circuit has also dismissed an official-capacity suit against an Oklahoma district attorney. *Arnold v. McClain*, 926 F.2d 963, 965–66 (1991) (holding that the Eleventh Amendment protected the district attorney because, under Oklahoma law, the district attorney is an arm of the state).

These cases clearly instruct that whether a county official acts as an arm of the state is firmly rooted in state law. Moreover, *McMillian* acknowledges that a county official's

classification as a state or county official may change depending on the challenged action, and that an official cannot insulate a county from § 1983 actions alleging unconstitutional policies or practices. Indeed, this court detects a fundamental irony in Weber County's attempt to immunize itself from the § 1983 claims by characterizing its agent's actions in carrying out unlawful policies or practices as actions attributable to the state. Such a theory directly conflicts with *Monell*'s long-standing principle that plaintiffs can bring § 1983 damages actions against counties and their agents where plaintiffs allege unconstitutional policymaking.

*McMillian*, *Nielander*, and *McClain* direct this court to examine Utah law regarding the county attorney's position. "Whether [an entity] is an arm of the [s]tate must be assessed in light of the particular function in which the [entity] was engaged when taking the actions out of which liability is asserted to arise." *Walker v. Jefferson Cty. Bd. of Educ.*, 771 F.3d 748, 757 (11th Cir. 2014) (alterations in original) (quoting *Manders v. Lee*, 338 F.3d 1304, 1308 (11th Cir. 2003)). Weber County does not bear its burden to show Mr. Allred acted as an arm of the state for actions that are the subject of this case. *See Burns v. Reed*, 500 U.S. 478, 486 (1991) (noting the "official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question"). Upon careful analysis of Utah law and relevant cases, the court concludes that Mr. Allred's role in securing and prosecuting the gang injunction, as a Weber County agent, does not convert Weber County into an arm of the state.

First, Weber County obtained the gang injunction pursuant to Utah Code Ann. § 76–10–806, which states:

> The county attorney of the county where the public nuisance exists, upon direction of the county executive, or city attorney of the city where the public nuisance exists, upon direction of the board of city commissioners, or attorney general, upon direction of the governor, or any of the above attorneys without the necessity of direction, is empowered to institute an action in the name of the county, city, or state, as the case may be, to abate a public nuisance.

*Id.* This law clearly places the power to seek to abate a public nuisance independently in counties and cities. In this case, Mr. Allred appears to have initiated the nuisance suit on behalf of Weber County. *See Trece*, 2013 UT 62, ¶ 2. From the allegations of the Amended Complaint, there is no basis to conclude that Mr. Allred was acting upon the direction of the attorney general or the governor, as opposed to the direction of Weber County. Additionally, violations of the injunction were only valid within the safety zone identified in Weber County, not the entire state. Moreover, Mr. Allred appears to have prosecuted violations of the injunction in Weber County's name.

Weber County contends that a public prosecutor in Utah acts on behalf the state when prosecuting offenses committed within a county, citing Utah Code Ann. § 17-18a-401(1). Section 17-18a-401 states:

> An attorney who serves as a public prosecutor shall:
>
> (1) . . . conduct, on behalf of the state, all prosecutions for a public offense committed within a county or prosecution district;
>
> (2) conduct, on behalf of the county, all prosecutions for a public offense in violation of a county criminal ordinance; . . .

*Id.* Weber County cites to the first subpart to support its argument, while conveniently ignoring the second subpart. (*See* Mot. 2-3, Dkt. No. 60.) Subpart two, stating a prosecutor acts on behalf of the *county* in prosecuting violations of county criminal ordinances, appears more applicable to the facts of this case. Weber County pursued and obtained a nuisance injunction in its own name that was exclusively enforceable in a specific zone within Weber County and that criminalized many otherwise lawful behaviors. Weber County served the injunction and maintained a gang database pursuant to its own allegedly unlawful policy or practice. In this case, Weber County "appears much more akin to a county" in Utah than an arm of the state. *Cash v. Granville Cty.*

*Bd. of Educ.*, 242 F.3d 219, 226 (4th Cir. 2001) (finding county board of education was not an arm of the state and denying the county board sovereign immunity).

As the *McMillian* Court suggested, many courts have concluded, after reviewing the relevant state law and function at issue, that district attorneys, sheriffs, and other local officials are not state officials. *See, e.g.*, *Burge*, 187 F.3d at 469 (holding that "for purposes of Eleventh Amendment immunity, a [Louisiana] district attorney, sued in his official capacity, is a local, not a state, government official and, therefore, is not entitled to such immunity"); *Duke v. Grady Mun. Sch.*, 127 F.3d 972, 978 (10th Cir. 1997) (holding that "school districts and their governing boards in New Mexico are not arms of the state entitled to Eleventh Amendment immunity"); *Harter v. Vernon*, 101 F.3d 334, 342 (4th Cir. 1996) (holding that "sheriffs in North Carolina are not state officials"). Furthermore, one court in this district has previously concluded that a Utah county attorney is not a state officer under Utah law. *Allison v. Utah Cty. Corp.*, 335 F. Supp. 2d 1310, 1316–17 (D. Utah 2004) (holding that, based on its analysis of Utah law relating to the county attorney position, a county attorney was "properly classified as a county officer, rather than a state officer"); *but see Blazier v. Larson*, No. 2:09-cv-1132-DAK, 2011 WL 776208, at *2 (D. Utah Feb. 25, 2011) (unpublished) (holding that a Utah county attorney acted as an agent of the state while prosecuting the plaintiff and thus had Eleventh Amendment immunity).

This court has found no Utah case squarely addressing the issue, but finds persuasive *Allison*'s conclusion that a Utah county attorney is not a state officer, at least for the actions identified in this case. The court declines to construe Mr. Allred's prosecutorial acts in this case so broadly as to convert the serving and enforcing of a County-obtained nuisance injunction as action on behalf of the state—particularly where Weber County points to no Utah statute or Utah-specific case law suggesting otherwise.

Indeed, Weber County's citation to one Utah statute does not demonstrate Mr. Allred's function as an arm of the state here. *See Burns*, 500 U.S. at 486 (stating burden of justifying immunity sought lies on the official). Rather, § 17-18a-401 is either inconclusive, or else points toward a finding that Mr. Allred acted on behalf of Weber County. *See also* Utah Code Ann. § 17-18a-202(1)(a) (making the county attorney a "public prosecutor for the county"). Even if Weber County's prosecutions of the injunction were conducted on behalf of the state of Utah — a finding the court cannot make based on the current record—Weber County has failed to present evidence of or argument on the several other factors courts utilize to determine if a governmental entity should be considered an arm of the state. *See Colby*, 849 F.3d at 1276 (laying out five factors courts consider, including how the entity is characterized under state law, the guidance and control the state exercises over the entity, the funding the entity receives from the state, and whether the state would be liable to pay a judgment against the entity). For example, Weber County does not explain what guidance or control the state exercises over it in prosecuting violations of a county-obtained injunction. Nor does it contend that a victory for Plaintiffs in this case would impose liability on the state.

In sum, the court rejects Weber County's motion to dismiss this action on grounds of Eleventh Amendment, prosecutorial, or quasi-judicial immunity.

### C.    Failure to Sufficiently Plead Federal Constitutional Claims

Weber also challenges the sufficiency of Plaintiffs' § 1983 and § 1985 claims. Weber County first argues that Plaintiffs do not sufficiently identify the county actors who allegedly violated their constitutional rights. Then Weber County argues that Plaintiffs failed to plead that the final county policymaker, Mr. Allred, acted with "deliberate indifference" to Plaintiffs' constitutional rights, or that any policy or practice "had the force of law." Finally, Weber County

argues that Plaintiffs have not sufficiently alleged the elements of a § 1985 conspiracy claim. (*See* Dkt. No. 60 at 9-16.) After viewing the Complaint's allegations as a whole, the court finds that Plaintiffs allege sufficient plausible facts to support their § 1983 and § 1985 claims.

A pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *SEC v. Shields*, 744 F.3d 633, 640 (10th Cir. 2014). Moreover, a plaintiff "must plead facts sufficient 'to state a claim to relief that is plausible on its face.'" *Slater v. A.G. Edwards & Sons, Inc.*, 719 F.3d 1190, 1196 (10th Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Burnett v. Mortg. Elec. Registration Sys., Inc.*, 706 F.3d 1231, 1235 (10th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678). "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Sutton v. Utah Sch. for the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999) (quoting *Miller v. Glanz*, 948 F.2d 1562, 1565 (10th Cir. 1991)). "Determining whether a complaint states a plausible claim for relief is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Burnett*, 706 F.3d at 1236 (quoting *Iqbal*, 556 U.S. at 679). In evaluating a claim's plausibility, the court accepts as true all well-pleaded allegations and views them in the light most favorable to the plaintiff. *Colby*, 849 F.3d at 1279.

### 1. Section 1983 Claims

Section 1983 provides, in relevant part, that a person acting under color of state law who "subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any

rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983. "To establish a claim for damages under § 1983 against municipal entities or local government bodies, the plaintiff must prove (1) the entity executed a policy or custom (2) that caused the plaintiff to suffer deprivation of constitutional or other federal rights." *Moss*, 559 F.3d at 1168; *accord Jenkins v. Wood*, 81 F.3d 988, 993 (10th Cir. 1996) ("To establish municipal liability, a plaintiff must show (1) the existence of a municipal custom or policy and (2) a direct causal link between the custom or policy and the violation alleged.")

Because the arguments of the parties demonstrate confusion about the elements the Plaintiffs must plead to pursue a municipal liability claim, the court will carefully describe the various principles underlying municipal liability and the elements or tests that arise therefrom. The Supreme Court and Tenth Circuit have made clear that vicarious (*respondeat superior*) liability is not available to impute liability for the unconstitutional acts of an employee to a municipality in a § 1983 case. *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 403 (1997); *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013). Thus, a municipality is not liable under § 1983 simply because its employee(s) may have caused injury. *Monell*, 436 U.S. at 694; *Mocek v. City of Albuquerque*, 813 F.3d 912, 933 (10th Cir. 2015).

Instead, for a municipality to be liable under § 1983 a plaintiff must allege sufficient facts to show that a municipality's *own* unconstitutional or illegal policy or custom caused his injury. *Connick v. Thompson*, 563 U.S. 51, 60 (2011). That is, a plaintiff must show a municipality's "*deliberate* conduct" was the "moving force" behind the violation. *Mocek*, 813 F.3d at 933 (quoting *Brown*, 520 U.S. at 404); *see Graham*, 473 U.S. at 166. The policy or custom requirement remains regardless of the nature of the relief sought. *Los Angeles County, Cal. v.*

*Humphries*, 562 U.S. 29, 37–39 (2010) ("For whether an action or omission is a municipality's 'own' has to do with the nature of the action or omission, not with the nature of the relief that is later sought in court.").

The Tenth Circuit has identified three elements a plaintiff must show to establish municipal liability: (1) an official policy or custom, (2) a direct causal link, and (3) the requisite state of mind. *Schneider*, 717 F.3d 760, 769–71.[12] At this stage, Plaintiffs need simply plead sufficient factual content supporting the elements of this claim to allow the court to draw the reasonable inference that the defendants are liable for the misconduct alleged. *See Iqbal*, 556 U.S. at 678.

"Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Id.* at 61. An official municipal policy or custom, then, can encompass "a formally promulgated policy, a well-settled custom or practice, a final decision by a municipal policymaker, or deliberately indifferent training or supervision." *Schneider*, 717 F.3d at 770; *see Bryson v. Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) (describing the various forms a municipal policy or custom can take, including those identified above and a final policymaker's ratification of subordinates' decisions where authority has been delegated). A final policymaker

---

[12] Correspondingly, to hold a supervisor liable, a plaintiff must demonstrate the supervisor's personal responsibility for the constitutional violation, causation, and the state of mind, but need not identify an official policy or custom as the "moving force" behind the conduct. *See Schneider*, 717 F.3d at 767–69. Plaintiffs do not allege supervisory liability in this case. As discussed previously, official capacity claims actually target the government entity itself. *See McDonald v. Wise*, 769 F.3d 1202, 1215 (10th Cir. 2014) ("Because Mr. McDonald sued the municipality, it was not necessary to sue Ms. Miller and Mayor Hancock in their official capacities because official capacity suits are simply 'another way of pleading an action against an entity of which an officer is an agent.'" (quoting *Monell*, 436 U.S. at 690 n.55)). Here, Plaintiffs sue Weber County (also naming Weber County Attorney Allred) and Ogden City for damages, declaratory, and injunctive relief. At least in the court's understanding of the pleadings, supervisory liability is not at issue here.

need not have taken the challenged action to establish municipal liability. *See Melton v. City of Okla. City*, 879 F.2d 706, 724 (10th Cir. 1989) (describing two situations where a municipality may be liable when an individual other than the final policymaker acts: (1) "egregious attempts by local government to insulate themselves from liability for unconstitutional policies" shown by widespread practices so persistent as to have the force of law, and (2) ratifications of subordinates' decisions subject to review by authorized policymakers (quoting *Praprotnik*, 485 U.S. at 127)).

Next, a plaintiff must show that the challenged policy or practice and the constitutional violation are "closely related," such that the municipality, and not simply its employee, can be said to be the "moving force" behind the injury. *Schneider*, 717 F.3d at 770 (quoting *Brown*, 520 U.S. at 404). Demonstrating this element becomes more difficult when the municipality does not directly inflict injury or the challenged policy or practice "is itself not unconstitutional, for example, when the municipal liability claim is based upon inadequate training, supervision, and deficiencies in hiring." *Schneider*, 717 F.3d at 770 (quoting Martin A. Schwartz, *Section 1983 Litigation Claims & Defenses*, § 7.12 (2013)).

Finally, a plaintiff must establish the requisite state of mind. Where a plaintiff alleges municipal liability based on "facially lawful municipal action," the plaintiff "must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences." *Schneider*, 717 F.3d at 770 (quoting *Brown*, 520 U.S. at 407). This requirement ensures the requisite state of mind, or culpability, is established with the municipality itself and is not simply a single inadequate decision or bad employee. *See Melton*, 879 F.2d at 723 ("The touchstone for determining 'official policy' is 'distinguish[ing] acts of the municipality from acts of employees of the municipality, and thereby mak[ing] clear that municipal liability is limited to

action for which the municipality is actually responsible.'" (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479–80 (1986) (alterations in original)).

> The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm. In most instances, notice can be established by proving the existence of a pattern of tortious conduct. In a narrow range of circumstances, however, deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction[.]

*Schneider*, 717 F.3d at 770 (quoting *Barney*, 143 F.3d at 1307).

Here, Plaintiffs allege that Weber County and Ogden City maintained a policy and/or practice associated with its efforts regarding the gang injunction that permitted complete discretion in identifying who to serve with the injunction, knowing that agents would serve non-gang members and improperly take ethnicity into account. (*See, e.g.*, Am. Compl. ¶¶ 6, 50, 55, 56, 59, 61, 104, 120.) At this early stage, without discovery from Weber and Ogden, who possess the most relevant information on this issue, it is difficult to discern whether the alleged policies or practices amounted to deliberate acts on the part of Weber and Ogden, or rather failures to act resulting in widespread and persistent practices. Nonetheless, the court finds the alleged policy and/or custom plausibly implicates deliberate acts, or failures to act, when viewing the Amended Complaint as a whole. This is particularly so considering the allegations that non-gang members were in fact served, subject to, and ultimately convicted of the injunction despite being known to be non-members, that Hispanics were disproportionately targeted with the service and enforcement of the injunction, and that Weber and Ogden allegedly still maintain non-gang members' names on an alleged gang list for future enforcement. (*See, e.g.*, *id.* at ¶¶ 57-64, 90-101, 104, 111-122, 145.) Such circumstantial evidence supports Plaintiffs' claim that some form of official policy or custom emanates directly from the municipality, not simply from errant

employees. *See Schneider*, 717 F.3d at 770 ("The official policy requirement was intended to distinguish acts of the municipality from acts of employees of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." (quoting *Pembaur*, 475 U.S. at 479)).

Plaintiffs also plausibly allege a direct causal link from Weber and Ogden's policy or practice to the alleged due process and First Amendment injuries. Weber County and Ogden City's policies or practices were the "moving force" behind the obtaining, serving, and enforcement of the injunction. Weber and Ogden's service of the injunction subjected Plaintiffs to immediate restrictions on several protected civil rights, most notably the rights of association and expression, and the right to due process, thereby criminalizing otherwise constitutional activities. Weber County's enforcement of the injunction doubled down on those injuries, resulting in actual criminal penalties while ostensibly restricting the Plaintiffs' means for contesting the injunction's applicability to them. The municipality can be said to have directly inflicted these injuries.

Finally, these allegations, if true, suggest that the policy or practice was facially unconstitutional and, thus, Weber and Ogden's deliberate indifference is plausibly shown. *See Brown*, 520 U.S. at 405 ("[P]roof that a municipality's legislative body or authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably. Similarly, the conclusion that the action taken or directed by the municipality or its authorized decisionmaker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains."). Even if the policy or practice could be said to be facially lawful, Plaintiffs' allegations still demonstrate the requisite state of mind because Weber and Ogden had at least

constructive, if not actual, notice that "its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately [chose] to disregard the risk of harm." *Schneider*, 717 F.3d at 771. Such notice is established by the pattern of conduct alleged, including the disproportionate service of Hispanics in Ogden, the successful prosecution of several non-gang members under a gang injunction, and the maintenance of the gang database with non-gang members included. Plaintiffs have plausibly pled their claims for municipal liability for injuries to their First Amendment and due process rights.

Before turning to the conspiracy claim, the court pauses to specifically address Weber County's contentions on the municipal liability claims. Weber County points the court to *Brown* and *Connick* for the propositions that (1) Plaintiffs must plead that Weber County acted with "deliberate indifference" in violating Plaintiffs' constitutional rights, *Brown*, 520 U.S. at 404, and (2) any persistent practice alleged must be so widespread "as to practically have the force of law," *Connick*, 563 U.S. at 61.

As to the issue of a widespread practice having the "force of law," as discussed earlier, Plaintiffs have sufficiently identified a municipal policy or custom that injured their constitutional rights. Whether Plaintiffs' allegations will ultimately encompass a formal policy promulgated by Weber County, a widespread practice that is so persistent as to have the force of law, or some other form of municipal policy or custom, the contours will become clear after discovery. The parties may revisit this specific point at summary judgment, for instance, if the evidence shows the County tolerated a widespread practice rather than a formal policy or other decisionmaking and if Weber County detects a lack of evidence on whether the practice was so settled or established as to have the force of law.

As to deliberate indifference, Plaintiffs plead plausible allegations demonstrating the requisite state of mind for municipal liability, even if they do not use the words "deliberate indifference" in the Amended Complaint. Weber County glosses over the nuance in the Supreme Court's application of the state of mind requirement in the cases cited. Supreme Court jurisprudence makes clear that there are multiple ways a municipality can be shown to have the requisite culpability, and that the level of proof necessarily depends on the action challenged. Because municipalities can only be liable for their own unconstitutional or illegal policies, the Supreme Court has noted the "much more difficult problems of proof" associated with allegations that attempt to frame single incidents of bad decisionmaking as municipal "policy" or "practice," and has been careful to "test the link" between a decision and the injury. *Brown*, 520 U.S. at 406, 410.

Thus, in *Brown*, the Court faced a § 1983 claim based on the inadequate screening and hiring of an employee in the county sheriff's department who later violated a plaintiff's rights by allegedly using excessive force in arresting her. *Id.* at 399–400. The only relevant policy or practice identified in the case was the county's hiring practices, which were ordinary and facially lawful. *Id.* at 408. The plaintiff did not identify any pattern of injuries linked to the hiring practices. *Id.* The court was concerned that a single, facially lawful decision that in fact deviated from ordinary hiring practices could not provide notice to the municipality that any policy or practice was failing to prevent tortious conduct. *Id.* Therefore, such a decision could not "establish the conscious disregard for the consequences of their action—the 'deliberate indifference'—necessary to trigger municipal liability." *Id.* at 407.

Likewise, in *Connick*, the court considered an admitted *Brady* violation by prosecutors that caused a man to be wrongfully convicted and imprisoned on death row before he was

exonerated. *See* 563 U.S. at 54. The Court found that the district attorney's office could not be held liable under a failure-to-train theory for a single *Brady* violation. *Id.* The jury had rejected the plaintiff's claim that an unconstitutional office policy caused the *Brady* violation, but found the district attorney's office liable for failure to train the prosecutors. *Id.* at 57, 68 n.10. The Court distinguished between a failure-to-train claim and the formal policy at issue in *Monell*, noting that a "policy of inadequate training is far more nebulous, and a good deal further removed" than a formal municipal policy. *Id.* at 61 (quoting *Oklahoma City v. Tuttle*, 471 U.S. 808, 822–23 (1985)). Thus, the plaintiff bore the burden to prove that the municipality was "deliberately indifferent to the need to train the prosecutors about their *Brady* disclosure obligation with respect to evidence of this type," "lest municipal liability under § 1983 collapse into *respondeat superior*." *Connick*, 563 U.S. at 59, 70.

Both *Brown* and *Connick* used the "deliberate indifference" language to capture the "stringent standard of fault" required for municipal liability in those cases where the plaintiff suffers injury at the hands of an employee rather than the municipality directly, *see Brown*, 520 U.S. at 406–07; *Connick*, 523 U.S. at 70, and the Tenth Circuit has adopted it as an element of municipal liability "regardless of the nature of the underlying constitutional violation," *Schneider*, 717 F.3d at 771 n.5. More broadly, however, these cases stand for the proposition that the evidence of such culpability a plaintiff must gather to sustain a municipal liability claim depends on the nature of the *action* challenged and *who* can be said to have committed it. The Supreme Court has emphasized that "[w]here a plaintiff claims that a particular municipal action itself violates federal law, or directs an employee to do so, resolving these issues of fault and causation is straightforward." *Brown*, 520 U.S. at 404. Thus, proof of a municipality or authorized decisionmaker's intentional deprivation of constitutional rights or an action taken that itself

violates federal law shows that municipal action was the "moving force" behind the constitutional injury. *Id.* at 405. In contrast, "[c]laims not involving an allegation that the municipal action itself violated federal law, or directed or authorized the deprivation of federal rights, present much more difficult problems of proof." *Id.* at 406. *Connick* and *Brown* applied these principles to claims of failure to screen and failure to train, where proof of fault and causation was fraught and approached the point of collapsing into vicarious liability for municipalities. These cases did not turn on an identified policy, directive, or custom that *itself* could be considered unconstitutional.

In this case, Plaintiffs' allegations hue much more closely to municipal action or inaction that *itself* violated federal law, rather than a single bad decision tied to a facially valid policy or practice. Thus, issues of fault and causation are less difficult here. Plaintiffs allege that Weber County's policy of identifying who to serve with the gang-specific injunction *itself* violated the Constitution by being wholly discretionary, and inviting subjectivity and improper ethnic considerations into the service and enforcement of the injunction. Plaintiffs' allegations also appear to involve a pattern of tortious conduct by Weber and Ogden agents: Hispanics were disproportionately targeted and served, at least two non-gang members were successfully prosecuted under the injunction, and at least two non-gang members remain on a gang database for future enforcement actions. Whether these pattern allegations simply reinforce the claim that municipal policy or practice itself violated the constitution, or also suggest some other, narrower theory of liability, such as failure to train or supervise, the allegations plausibly support an inference of deliberate indifference on the part of the municipality itself to the consequences of the policy or practice, that is, injury to the Plaintiffs' First Amendment and due process rights. And whether these allegations more appropriately support that a decisionmaker, like Mr. Allred,

promulgated an actual policy attributable to the County, or that the County permitted a practice so persistent as practically to have the force of law—or whether the evidence fails to live up to either view—will become apparent as discovery proceeds. *See, e.g.*, *Melton*, 879 F.2d at 724 (recognizing that a municipality may be liable under § 1983 if the final policymaker takes the unconstitutional action or when a "widespread practice" exists).

For now, the allegations on the whole support both theories. Plaintiffs have stated plausible § 1983 claims for municipal liability in these circumstances.

### 2. *Section 1985(3) Conspiracy*

Section 1985 prohibits a conspiracy to interfere with civil rights. *See* 42 U.S.C. § 1985. More specifically, and relevant here, § 1985(3) provides a cause of action where "two or more persons" conspire to deprive "either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws" and "do, or cause to be done, any act in furtherance of the object of such conspiracy." *Id.*

"The essential elements of a § 1985(3) claim are: (1) a conspiracy; (2) to deprive plaintiff of equal protection or equal privileges and immunities; (3) an act in furtherance of the conspiracy; and (4) an injury or deprivation resulting therefrom." *Tilton v. Richardson*, 6 F.3d 683, 686 (10th Cir. 1993) (citing *Griffin v. Breckenridge*, 403 U.S. 88, 102–03 (1971)).

"To demonstrate the existence of a conspiratorial agreement it simply must be shown that there was a single plan, the essential nature and general scope of which was know[n] to each person who is to be held responsible for its consequences." *Snell*, 920 F.2d at 702 (quoting *Hampton v. Hanrahan*, 600 F.2d 600, 621 (7th Cir. 1979)). Notably, "proof of an agreement to deprive often will require examination of conduct occurring prior to the deprivation." *Snell v. Tunnell*, 920 F.2d 673, 702 (10th Cir. 1990). Conspiratorial agreement may be "based on

circumstantial evidence" and a factfinder "may infer conspiracy from the defendants' conduct and other circumstantial evidence indicating coordination and concert of action." *United States v. Dazey*, 403 F.3d 1147, 1159 (10th Cir. 2005); *accord Snell*, 920 F.2d at 702.

Additionally, "[t]he language requiring intent to deprive of equal protection, or equal privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin*, 403 U.S. at 101. The Tenth Circuit has noted that § 1985(3) "was intended, perhaps more than anything else, to provide redress for victims of conspiracies impelled by a commingling of racial and political motives." *Brown v. Reardon*, 770 F.2d 896, 907 (10th Cir. 1985) (quoting *Hampton*, 600 F.2d at 623).

After considering the Plaintiffs' allegations, the court finds Plaintiffs have sufficiently pled a § 1985(3) conspiracy claim. Plaintiffs allege that Weber County, Ogden City, and unknown individual defendants conspired to interfere with the lawful exercise of their First Amendment rights and other civil rights on the basis of ethnic animus. Circumstantial allegations support the animus alleged, including that Weber and Ogden had a policy or practice of knowingly allowing their representatives to select individuals as gang members or associates for serving the injunction based in part on ethnic prejudice; that Hispanics were, in fact, disproportionately targeted with service and enforcement of the injunction; and that two Hispanic non-gang members were served and prosecuted under the injunction despite Weber and Ogden's knowledge that they were not gang members. (*See* Am. Compl. ¶¶ 18-19, 57-59, 61-64, 88, 101, 122, 167-68.) The service and enforcement of the injunction constitute acts in furtherance of the alleged conspiracy. Plaintiffs can show various injuries and the deprivation of their First Amendment rights and other civil rights.

Weber County's argument that Plaintiffs have not alleged any specific persons engaged in this conspiracy falls short because (1) Plaintiffs plead this cause of action against individual doe defendants who will be revealed during discovery, and (2) Weber County and Ogden City qualify as "persons" subject to this statute, *see Owens v. Haas*, 601 F.2d 1242, 1247 (2d Cir. 1979) ("Since under Monell, a local body is a 'person' for the purposes of s 1983, we assume that the same definition of 'person' would apply to s 1985 . . . ."), and Plaintiffs link Weber's policy and practice regarding the injunction to their constitutional injuries.

Finally, Weber County's argument that the conspiracy claim fails because the conspiracy was not to commit an "unlawful act," owing to the injunction having been lawfully obtained, ignores the statutory language and, once again, the core of the Plaintiffs' case. Plaintiffs allege a policy or custom of targeting Hispanics with the injunction and interfering with the exercise of their civil rights under the guise of a lawfully-acquired gang injunction. Even where the means was lawful, if the conspiracy was driven by ethnic animus with the purpose of depriving the plaintiff of equal protection or equal protections of the laws, § 1985(3) provides redress for the resulting injuries and deprivations. *See Tilton*, 6 F.3d at 686; *see also Jones v. Norton*, 809 F.3d 564, 578 (10th Cir. 2015) ("The focus of the racial animus inquiry is the government actor's 'intent, motive, or purpose.'" (quoting *Pueblo Neighborhood Health Ctrs., Inc. v. Losavio*, 847 F.2d 642, 647 (10th Cir. 1988)).

### D.     State Law Claims

Weber County makes a number of arguments for why the state law claims should be dismissed. The court examines these arguments by the type of claim and addresses only those arguments that it finds dispositive.

*1. Utah Constitutional Claims*

Weber County argues that the one-year notice of claim provision in the Utah Governmental Immunity Act (UGIA), Utah Code Ann. § 63G-7-402, applies to bar all of the state law claims, both constitutional and tort. (*See* Dkt. No. 60, pp. 16-18.)[13] Weber also argues that Plaintiffs' state constitutional claims are not cognizable under *Spackman ex rel. Spackman v. Board of Education*.

First, the UGIA does not apply to state constitutional claims. *See Jensen v. Cunningham*, 2011 UT 17, ¶ 51, 250 P.3d 465 ("Dr. Wagner and Dr. Albritton claim immunity under a provision of the Utah Governmental Immunity Act . . . . Their argument is without merit and requires little analysis because the Utah Governmental Immunity Act does not apply to claims alleging state constitutional violations." (citation omitted)); *Tiscareno v. Anderson*, 421 F. App'x 842, 843 (10th Cir. 2011) (unpublished) ("[W]e conclude that the Utah Supreme Court meant precisely what it said [in *Jensen*], and determine that the Tiscarenos' state law claim, alleging a violation of the Utah Constitution, is not barred by her failure to file a notice of claim."). The court declines Weber County's invitation to find the Utah Supreme Court's holding in *Peak Alarm Co. v. Shanna Werner*, 2013 UT 8, ¶ 21, 297 P.3d 592, 597, implicitly overruled its earlier statements in *Jensen* distinguishing state constitutional claims as not subject to the UGIA.

Turning to *Spackman*, the Utah Supreme Court has urged caution in awarding damages for violations of the Utah Constitution and restraint in favor of existing remedies. *Spackman ex rel. Spackman v. Bd. of Educ. of Box Elder Cty. Sch. Dist.*, 2000 UT 87, ¶ 21, 16 P.3d 533, 538. Plaintiffs may recover damages under the Utah Constitutional if (1) the provision violated is self-executing, (2) the plaintiffs suffered a flagrant violation of their constitutional rights; (3)

---

[13] While Weber County's Motion argued Plaintiffs' federal claims are time-barred as well, Weber County conceded at oral argument that this challenge only goes to the state law claims.

establish that existing remedies do not redress their injuries; and (4) establish that equitable relief is inadequate to protect their rights or redress their injuries. *See id.* at ¶¶ 21–25.

Plaintiffs bring their Sixth Claim for Relief for a violation of Article I, Section 7 (due process) and the Seventh Claim for Relief for a violation of Sections 1 and 15 (right to free expression and assembly) of the Utah the Constitution. (*See* Am. Compl. 23-24.) Section 7 states: "No person shall be deprived of life, liberty or property, without due process of law." Utah Const. art. I, § 7. Sections 1 and 15 state, in relevant part: "All men have the inherent and inalienable right . . . to assemble peaceably," and "No law shall be passed to abridge or restrain the freedom of speech or of the press." Utah Const. art. I, §§ 1, 15. The Plaintiffs seek damages for both of these claims.

The Utah Supreme Court has found Article I, Sections 1 and 7 to be self-executing. *Jensen ex rel. Jensen v. Cunningham*, 2011 UT 17, ¶ 62, 250 P.3d 465, 482 (Article I, § 1); *Spackman*, 2000 UT 87, ¶ 27 (Article I, § 7). At least one court in this district has found that Article I, Section 15 is not self-executing, *see Bauchman By & Through Bauchman v. W. High Sch.*, 900 F. Supp. 254, 271 (D. Utah 1995) (holding the establishment clause, free exercise clause, free speech provisions and provisions relating to nonsectarian schools under Utah Constitution were not self-executing), *aff'd sub nom. Bauchman for Bauchman v. W. High Sch.*, 132 F.3d 542 (10th Cir. 1997), though this court's reading of the analysis in *Jensen* suggests that Section 15 is self-executing, *see* 2011 UT 17, ¶¶ 59–64 (stating that, to be self-executing, a constitutional provision must articulate "a rule sufficient to give effect to the underlying rights and duties intended by the framers" and finding both Sections 1 and 14 to be self-executing). The court need not decide whether the Utah Supreme Court would agree that Section 15 is self-executing because Plaintiffs also bring their Seventh Claim under Section I. For the purposes of

this motion, the court will assume that Plaintiffs' free expression and assembly claims under the Utah Constitution fulfill the first *Spackman* requirement that they are based on self-executing constitutional provisions. Moreover, the alleged violations of these sections appear to be "flagrant" and equitable relief is "wholly inadequate" to redress at least the free speech and assembly injuries, if not the due process injuries. *See Spackman*, 2000 UT 87, ¶ 25 n.11 (noting that procedural due process claims may "be particularly amenable to redress through equitable means").

Addressing the existing remedies element is more difficult. In the abstract, Plaintiffs appear to have a fully adequate remedy in their § 1983 claims, but the *Spackman* court expressly declined to "reach the question of whether existing federal law remedies should preclude a state court from awarding damages for a state constitutional tort." *Id.* at ¶ 24 n.10. This and other courts in this District have since looked at the issue and concluded that where a plaintiff's federal remedies fully redress the state constitutional violation, the state constitutional claims should be dismissed. *See Hoggan v. Wasatch Cty.*, No. 2:10-cv-01204-DS, 2011 WL 3240510, at *2 (D. Utah July 28, 2011) (unpublished) (holding that "Plaintiff's state constitutional claims [under Article I, Sections 7, 9, and 14 of the Utah Constitution] are encompassed in her § 1983 claims and can be fully redressed by that remedy"); *Cavanaugh v. Woods Cross City*, No. 1:08-cv-32-TC-BCW, 2009 WL 4981591 at *6 (D. Utah Dec. 14, 2009) (unpublished), *aff'd*, 625 F.3d 661 (10th Cir. 2010) (holding that plaintiffs "cannot state a claim for damages under the Utah Constitution [Article I, Sections 7, 9, and 14] because their injuries can be fully redressed through their 42 U.S.C. § 1983 claim"); *Nielson v. City of South Salt Lake*, No. 2:06-cv-335-CW, 2009 WL 3562081 at *9 (D. Utah Oct. 22, 2009) (unpublished) (holding that "[t]he state constitutional claims [of due process, cruel and unusual punishment, unreasonable search and

seizure, and slavery] do not provide for any further redress than [plaintiff] can obtain under §

1983"). Plaintiffs contend that the state and federal constitutional rights are not identical, (Dkt.

No. 65 at 28-29), but the crucial issue is not whether the two constitutions have "different

contours," but whether existing remedies redress the plaintiffs' *injuries*. *Cavanaugh*, 2009 WL

4981591 at *6 n.8.

At this stage, however, the court cannot say with certainty that damages for claims will

fully redress the Plaintiffs' injuries and that damages under the state constitution would be

inappropriate. Both *Nielson* and *Cavanaugh* were decided at summary judgment, after discovery

clarified the scope of the municipalities' alleged unconstitutional actions and the plaintiffs'

injuries. As another court in this district stated while addressing the same issue on a motion to

dismiss:

> The court is well aware that it must "use [its] common law remedial power
> cautiously and in favor of existing remedies." That determination, however, must
> be made with a precise understanding of the nature of a plaintiff's injuries and the
> remedies available to address them. The court can have only a general
> understanding of the plaintiff's injuries at this point in the process, and therefore
> any firm determination of this issue is premature.

*P.J. ex rel. Jensen v. Utah*, No. 2:05-cv-739-PGC, 2006 WL 1702585, at *15 (D. Utah June 16,

2006) (unpublished) (quoting *Spackman*, 2000 UT 87, ¶ 24). Accordingly, the court denies

Weber County's motion to dismiss Plaintiffs' state constitutional claims at this time. The

question of whether § 1983 provides a complete remedy for a state constitutional claim remains

an "open question in Utah." *P.J. ex rel. Jensen*, 2006 WL 1702585, at *14 (citing *Spackman*,

2000 UT 87, ¶ 24 n.10). Further discovery and litigation will sharpen the court's understanding

of Plaintiffs' injuries and focus this inquiry considerably, while avoiding premature dismissal of

Plaintiffs' claims under the state constitution.

*2. Utah Tort Claims*

Weber County argues that the UGIA's notice-of-claim provision bars Plaintiffs' state tort claims. Plaintiffs assert that they filed a notice of claim with Weber County in November 2014, so the UGIA's one-year notice of claim provision does not bar this case. (*See* Dkt. No. 65 at 30.) Weber County does not raise any defects in the notice of claim, but the parties present difficult questions of when Plaintiffs' knew or should have known that their claims against Weber County arose. Weber County argues that Plaintiffs should have been on notice of a constitutional injury from the day each was served with the gang injunction. In stark contrast, Plaintiffs argue that the relevant statute of limitations has not started to run at all because they were not parties to the nuisance suit or Utah Supreme Court's decision voiding the injunction, and Weber County has never formally notified them that the injunction has been voided. Ultimately, the court need not resolve this issue because the court finds Weber County is immune to the state tort law claims under the UGIA.

The UGIA is a "single, comprehensive chapter govern[ing] all claims against governmental entities or against their employees or agents arising out of the performance of the employee's duties, within the scope of employment, or under color of authority." *Peak Alarm*, 2013 UT 8, ¶¶ 16, 20 (quoting Utah Code § 63G–7–101(2)(b)). The UGIA provides a general grant of immunity for governmental entities and employees with express and specific waivers of that immunity. "To avoid immunity, a plaintiff must bring suit pursuant to an exception to the UGIA's general grant of immunity." *Peak Alarm Co. v. Salt Lake City Corp.*, 2010 UT 22, ¶ 29, 243 P.3d 1221, 1235.

Utah courts apply a three-part test to determine whether a governmental entity is immune from suit under the UGIA: "(1) whether the activity undertaken is a governmental function; (2)

whether governmental immunity was waived for the particular activity; and (3) whether there is an exception to that waiver." *Peck v. State*, 2008 UT 39, ¶ 8, 191 P.3d 4, 7 (quoting *Blackner v. Dep't of Transp.*, 2002 UT 44, ¶ 10, 48 P.3d 949).

Plaintiffs primarily argue that Weber County's unconstitutional behavior, as alleged in the Amended Complaint, does not constitute a "government function." The UGIA provides immunity for "all functions of government, no matter how labeled." Utah Code Ann. § 63G-7-101(2)(a). The Act defines a "government function" as "each activity, undertaking, or operation of a governmental entity," including "each activity, undertaking, or operation performed by a department, agency, employee, agent, or officer of a governmental entity" and "a governmental entity's failure to act." *Id.* § 63G-7-101(5)(a)–(c). Considering the expansive scope of this definition, the court finds that Weber County's actions to obtain, service, and enforce the nuisance injunction in this matter constitute governmental functions under the plain terms of the statute.

Regarding any possible waivers of immunity for specific actions, the court cannot determine whether Plaintiffs allege intentional or negligent wrongful injunction and abuse of process, and so the court analyses both. For negligence claims, the UGIA expressly disclaims any waiver of immunity for an entity's or employee's negligent abuse of process or violation of civil rights. *See Bauchman*, 900 F. Supp. 254, 271 n.24 (D. Utah 1995) (discussing immunity for negligent violations of civil rights). The statute does not waive immunity for "any injury proximately caused by a negligent act or omission of an employee committed within the scope of employment, if the injury arises out of or in connection with . . . abuse of process . . . or violation of civil rights." Utah Code Ann. § 63G–7–201(4)(b).

Likewise, the UGIA includes no discernable waiver of immunity or exception for intentional torts. *See Jensen v. W. Jordan City*, No. 2:12-CV-736-DAK, 2016 WL 4256946, at *12 (D. Utah Aug. 11, 2016) (unpublished) (holding that "there are no provisions in the Act waiving immunity for intentional tort causes of action"); *Atiya v. Salt Lake Cty.*, 852 P.2d 1007, 1011 (Utah Ct. App. 1993) (finding no waiver for intentional torts). Thus, Weber County is immune to Plaintiffs' wrongful injunction claim, whether construed as intentional or negligent action, because there is no waiver for intentional torts and the injury arises out or occurred in connection with a civil rights violation. Moreover, Weber County is immune to Plaintiffs' abuse of process claim, whether intentional or negligent, because the UGIA expressly disavows an immunity waiver for such a claim in negligence and, again, includes no waiver for intentional torts.[14]

In sum, the court will dismiss the Plaintiffs' state tort claims against Weber County as barred by the UGIA.

## CONCLUSION

In sum, the court **GRANTS** in part and **DENIES** in part Weber County's Motion for Judgment on the Pleadings, (Dkt. No. 60). The court **DISMISSES** Plaintiffs' Eighth and Ninth Claims for Relief against Weber County with prejudice.

---

[14] An exception to this immunity exists for an individual employee's fraud or willful misconduct. An employee acting within the scope of employment, or under color of authority, may be held personally liable if the employee "acted or failed to act through fraud or willful misconduct." Utah Code Ann. § 63G-7-202(3)(c)(i). The Amended Complaint pleads the Ninth Claim for Relief, abuse of process, against individual doe defendants. Because these defendants have not been identified or appeared, the court does not address this exception at this time.

DATED this 4th day of August, 2017.

BY THE COURT:

Clark Waddoups
United States District Judge