John Mejia (Bar. No. 13965)
Leah Farrell (Bar. No. 13696)
ACLU of Utah Foundation, Inc.
355 N. 300 W.
Salt Lake City, UT  84013
phone: (801) 521-9862
email: aclu@acluutah.org

Randall Richards (Bar No. 4503)
Richards & Brown PC
938 University Park Blvd, Suite 140
Clearfield, UT  84105
phone: (801) 773-2080
email:Randy@richardsbrownlaw.com

Attorneys for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
## NORTHERN DIVISION

| | |
|---|---|
| **LELAND KIM MCCUBBIN, JR. and DANIEL JOSEPH LUCERO,**<br><br>Plaintiffs,<br><br>vs.<br><br>**WEBER COUNTY, OGDEN CITY, CHRISTOPHER ALLRED, in his official capacity, and DOES 1-10**<br><br>Defendants. | **Opposition to Weber Defendants' Motion for Summary Judgment**<br><br>Consolidated Case Nos. 1:15-cv-132 & 1:15-cv-133 |

Plaintiffs in this consolidated action oppose the motion for summary judgment (the "Motion") made by Defendants Weber County and the Weber County Attorney in his official capacity (together, "Weber") for the reasons herein and for the reasons set forth in the briefs incorporated herein.

## INTRODUCTION

In their Motion, Weber ignores many undisputed facts and legal precedents (including the law of the case) that do not coincide with their legal theories, and they ask the Court to do the same.  The Court should decline to do so.   Even based only on the carefully selected facts and

1

law that Weber chooses to acknowledge, however, a finding of liability against Weber on Plaintiffs' claims is well supported. Moreover, a thorough consideration of all of the undisputed facts and of on-point law only provides further support for Weber's liability to Plaintiffs.

Plaintiffs note that they incorporate herein the all of the arguments they made in support of their Motion for Partial Summary Judgment, both in their opening brief and their reply briefs against both Defendants.

### RESPONSE TO WEBER'S STATEMENT OF UNDISPUTED FACTS

Plaintiffs incorporate herein their replies to Weber's Facts 1-45 in their Reply to Weber's opposition brief in which Weber asserted those facts. Additionally, Plaintiffs respond to Weber's Fact 9, which they did not address in their reply because it was not material to the issues there, as follows:

**Weber's Fact 9**: Weber County has never kept a database or any sort of list of Ogden Trece gang members nor has Weber County ever had the ability to put a person on the Ogden Trece Database or remove a person from the list. OPD developed a list of Ogden Trece members. Weber County law enforcement officials and the Weber County Attorney's Office believed that substantial scrutiny was implemented and brought to bear by OPD to ensure that persons on the Ogden Trece list were current and active gang members. (Allred Decl. ¶ 10).

**Plaintiffs' Response**: Plaintiffs dispute that "Weber County has never kept a database or any sort of list of Ogden Trece gang members," as Weber's jail investigator started and maintained a gang file from about 2009 to 2013. As explained below, Weber still has that file and it appears that they may be currently maintaining it.

Gary Worthen, Weber's jail investigator from 2009 to about 2013, testified that while he worked as the investigator at the Weber jail, he could "look up any inmate and I'll have a full history of their [Weber] jail records and it will tell me any gang involvement." Worthen Depo., Doc. No. 156-3, at p. 13 line 17-18 (filed under seal). Mr. Worthen further explained that he

2

"started tracking gang – gangs in the jail… I'd check the booking logs and I'd see people with tattoos, with admitted gang involvement… after their court I would photograph those stuff and document that stuff *for our records* and turn it over to OPD [Ogden police]." Id. at p. 14 lines 4-12 (emphasis added). In response to a question of whether "Weber County keep[s] its own independent records of any kind indicating gang membership or affiliation," Mr. Worthen respond that "I was trying to start a gang unit in the jail… And that's why I started those files. And before I retired the state was trying to make a gang database that would start out statewide." Id. at p. 76 line 24- 77 line 8. Mr. Worthen brought to his deposition at least one Weber jail record in which a person was alleged to be a member of Ogden Trece. See id. at p. 57 line 5- p. 58, line 22. As of July 2017, Mr. Worthen's "files about gangs are in the current [Weber] jail investigator's office," id. at p. 84, lines 4-6, which caused Mr. Worthen to conclude that Weber "may" be continuing to "maintain that list." Id. at p. 78 lines 23-25.

After looking for documents that Weber produced that fit Mr. Worthen's description of that file ("all my folders with my handwriting," id. at p. 79, lines 4-8), it is clear that Weber did not produce that file to Plaintiffs, despite Plaintiffs' request for such documents. Because Weber did not produce that file, and still incorrectly deny its existence to this Court, a negative inference can be drawn that they did not so because they have negative files on Plaintiffs.

Plaintiffs respond and object to Weber's "Statement of Additional Material Facts" in the present brief as follows:

**Weber's Fact No. 46:** No efforts or actions were taken by Weber County to enforce the Ogden Trece injunction or to prosecute a violation of the injunction after the Utah Supreme Court entered its order vacating the injunction order on about October 18, 2013. Weber County absolutely will not seek a gang injunction order that is exactly like the previous gang injunction. To the contrary, the County is always looking for ways to improve law enforcement effectiveness and would pursue changes in an injunctive order that would be more beneficial to the public and law enforcement agencies. However, there are presently no specific plans to

3

pursue a gang injunction nor have there been since the Utah Supreme Court's decision vacating the injunctive orders. (2nd Allred Decl. ¶ 27).

**Plaintiffs' Response:** Plaintiffs deny that Weber County took no "efforts or actions" to prosecute violations of the Injunction after it was vacated, as it is undisputed that Weber County extensively opposed Plaintiffs' PCRA petitions to vacate their convictions for violating the Injunction. Weber County did so successfully against Mr. Lucero's petition, which also sought to vacate all convictions of everyone prosecuted.

Plaintiffs object to the remaining statements about Weber not seeking an injunction that is "exactly like" the previous one, and about seeking a "more beneficial" injunction, and about not having "specific plans," as vague and ambiguous. Weber does not deny that its representatives have repeatedly publicly talked about their intention to bring another injunction that is substantially the same as the one at issue here.

**Weber's Fact No. 4:** Weber County does not have specific plans for another gang injunction. They have talked about it. If they were to file another injunction petition, they would have to basically start over and evaluate the gang and start from scratch and make sure that their structure is similar. It would be a different injunction in some ways. (Weber County Defs.' Ex. 15 - Allred Depo. 85:1-22).

**Plaintiffs' Response:** Plaintiffs object to this statement as it is vague as to what the terms "specific plans" and "different" in "some ways" mean. Weber does not deny that its representatives have publicly talked about their intention to bring another injunction that is substantially the same as the one at issue here.

**Weber's Fact No. 48:** Weber County has no plans to ever serve the Plaintiffs with a future gang injunction or to name them as parties in a future gang injunction lawsuit. In addition, Weber County would instruct any agency not to serve a proposed defendant with a gang injunction if there is a reasonable doubt that the person is not an active and present gang member. (2nd Allred Decl. ¶ 28).

**Plaintiffs' Response:** Plaintiffs cannot confirm or deny Weber's asserted plans about them. Plaintiffs do not dispute that Weber would be able to give instructions to any employee or

4

partner/agent agency who would be served with an injunction; the record supports a finding that Weber had such a relationship with Ogden in this case, and Weber's practice is to use Ogden as its partner and/or agent for serving the Injunction. Plaintiffs further object that this statement is vague as to what the term "active and present gang member" means, as explained further below.

**Weber's Fact No. 49:** Weber County continues to contemplate a potential future injunction against the Ogden Trece or other gangs sometime in the future, but no definite plans, actions, or steps have been taken toward actually filing a petition and obtaining an injunctive order of any kind against any gang. (2nd Allred Decl. ¶ 29).

**Plaintiffs' Response:** Plaintiffs deny that no "actions or steps" have been taken toward filing a petition, as Weber representatives have repeatedly informed the public that they intend to do so, successfully defended a PCRA action maintaining convictions for violating the prior injunction, and has kept and possibly continued making gang files through the Weber jail.

**Weber's Fact 50:** If a new gang injunction is to be filed against Ogden Trece sometime in the future, it would absolutely not be the same injunction that was originally filed for several reasons. First, Weber County could never guarantee that a judge would enter the same injunction. Second, since the original Trece injunction was obtained by a Utah State District Court in September 2010, one Utah Supreme Court decision has given at least some clarity as to what needs to change in terms of service of the gang. Third, there have been very few judicial decisions, but before a new injunction would be pursued by Weber County, the County would review all decisions rendered around the United States and have them analyzed by attorneys to determine if other procedures could be implemented into a future Ogden Trece injunction. Weber County would incorporate and include possible modifications as found by the caselaw. (2nd Allred Decl. ¶ 30).

**Plaintiffs' Response:** Plaintiffs object that this is not a statement of undisputed facts but a string of legal assertions and analysis.

**Weber's Fact No. 51:** Specifically, the Ninth Circuit Court of Appeals' decision in *Vasquez v. Rackauckas* 734 F.3d 1025 (9th Cir. 2013) did not come to Weber County's attention until after the Utah Supreme Court had vacated the injunctive orders. Although this case is not precedent in Utah state or federal Courts, the County Attorney's Office would nonetheless review it for purposes of determining what changes Weber County might potentially make to a future gang injunction in Utah. (2nd Allred Decl. ¶ 31).

**Plaintiffs' Response:** Plaintiffs object that this is not a statement of undisputed facts but is legal analysis. Moreover, Weber has represented to the Court that it understands *Vasquez* as not necessarily mandating pre-deprivation process in gang injunction cases.

**Weber's Fact No. 52:** If Weber County at some future date decides to attempt to pursue a gang injunction against Ogden Trece through the courts, it would do more review of state and federal court decisions throughout the country to see if there are any helpful changes that could be incorporated in the pursuit of a new injunctive order. (2nd Allred Decl. ¶ 32).

**Plaintiffs' Response:** Plaintiffs object that this is a vague statement as to what is meant by "helpful."

**Weber's Fact No. 53:** In any possible future request for a state injunctive order, Weber County would request a gang injunction with more procedural protections for both the person being served and for protection of the officers and would seek to provide additional clarity on some points that were implied in the prior injunctive orders. (2nd Allred Decl. ¶ 33).

**Plaintiffs' Response:** Plaintiffs object that this is a vague statement.

**Weber's Fact No. 54:** For example, Weber County by practice would not agree to have any person served with the injunction unless Weber County could prove beyond a reasonable doubt that the person being served and prosecuted was in fact an Ogden Trece member. Weber County would seek to have this information specified in the injunctive order. (2nd Allred Decl. ¶ 34).

**Plaintiffs' Response:** With this assertion, Plaintiffs contradict their representations to the Court that they had no input into who was served with the Inunction. That is, Weber here asserts that Weber had a "practice" of not "agreeing" to Ogden making service in certain circumstances, indicating that they had the ability to withhold their agreement. While Weber has tried to spin their involvement in preparing the list of people to serve as just advice, a reasonable inference can reasonably be made that Weber had a degree of control of who was served.

Moreover, Plaintiffs dispute that Weber County had a "practice" as described here based on Weber's own representatives. For example, Branden Miles, a prosecutor for Weber, testified that Weber did not generally keep track of who Ogden was serving with the injunction. (See

6

Miles Depo., Doc. No. 156.5, p. 67 lines 10-13 (filed under seal)).  Rather, according to Mr. Miles, his office typically found out who Ogden had served only after someone had been referred to his office for prosecution.  (Id. at lines 12-16).

Moreover, Plaintiffs dispute this fact because Weber has not defined what they mean by "member."   It is undisputed that Ogden considers someone a "member" if they meet Ogden's criteria, regardless of whether the person (or the gang) considers himself or herself a member of the gang.  Weber has never explained how they define what a Trece "member" is, calling into question any assertions about how they treated "membership" and giving Plaintiffs grounds to dispute.

**Weber's Fact No. 55:** In addition, it is currently Weber County's policy that it would seek to provide additional procedures for all persons served with a future gang injunction to more clearly clarify that they may dispute whether the injunction should apply to them. Although it is Weber County's position that this was inherent in the prior gang injunction, it is another area where additional clarity would be added. Other procedures and more clarity would most certainly be sought from the court in any future gang injunctive orders. (2nd Allred Decl. ¶ 35).

**Plaintiffs' Response**:  Plaintiffs object as this is a vague statement.  Plaintiffs cannot confirm or deny Weber's purported intentions.

**Weber's Fact No. 56:** Based upon the fact that Plaintiff McCubbin opted out of the Trece gang on about April 24, 2012, he is not considered an Ogden Trece member by Weber County and would not be served with any future injunction against the Ogden Trece by Weber County. (2nd Allred Decl. ¶ 36).

**Plaintiffs' Response:**  Plaintiffs deny this assertion in part.  Mr. McCubbin did not "opt out" of the Trece gang on about April 24, 2012; he jumped out of the gang in 2008.  In April 2012, Mr. McCubbin followed the "opt out" provision of the Injunction and was dismissed without prejudice, despite never having been served or named in the suit.  Weber's assertion that following the Injunction's "opt out" provision is the same as "opting out" of the gang is an important indication as to what Weber's definition of gang membership actually is; you are a

7

member if Ogden served you.  Plaintiffs cannot confirm what Weber presently believes about Mr. McCubbin's membership or their future plans to serve him, however, Weber's failure to produce its jail investigator's gang file leads to an inference that puts this assertion into dispute.

**Weber's Fact No. 57:** Plaintiff Lucero claims he never was an Ogden Trece member. Weber County has never had any personal knowledge whether he was a Trece member or whether he is not a member now apart from his claims in this present lawsuit. In any event, Mr. Lucero would never be included in any future injunction if Weber County could not prove beyond a reasonable doubt that he was a current and active Trece member. If he is not a gang member, he will not be served by Weber County. (2nd Allred Decl. ¶ 37).

**Plaintiffs' Response:**  Plaintiffs do not deny that Mr. Lucero asserts that he was never a member of the Ogden Trece.  Weber's statement about not having any knowledge about his membership or non-membership apart from this action contradicts another of Weber's representations to the Court in this action.  Specifically, Weber has asserted in many instances that they prosecuted violation only in cases of people who they believed to be members of the Trece gang.  (See, e.g., Fact 19 of Weber's Opp'n Brief.)  Despite having prosecuted Mr. Lucero, however, Weber now disclaims ever having any knowledge about Mr. Lucero's purported membership in the Trece apart from this action. This contradiction is grounds to dispute both of Weber's contradictory statements.

The above statement, however, gives ground to a reasonable inference that Weber prosecuted Mr. Lucero for violating the Injunction without any particular investigation into his membership status at all and simply followed a policy and practice of relying on and/or ratifying Ogden's choices of whom to serve and arrest and prosecuting them based only Ogden's service. Based on Weber's inability to recall exactly who they reviewed for possible service, moreover, there is also a reasonable inference that someone from Weber approved service of Mr. Lucero.

**Weber's Fact No. 58:** Weber County has and had, during the relevant time of this suit, no control over what other government agencies do or do not do and what procedures they may or may not provide in terms of serving any state court order, including the injunctive orders at

issue in this case. For example, Weber County has no control over the law enforcement agencies or the attorneys or officers in the various city governments throughout Weber County. (2nd Allred Decl. ¶ 38).

**Plaintiffs' Response:** Plaintiffs deny. Weber does not deny that it was involved in training Ogden police officers in how to serve the Injunction, which is a form of controlling how Ogden officers undertook that process. Moreover, Weber has not denied giving input about who should or should not be served with the Injunction, including specific advice as to specific individuals. In any event, the undisputed facts support a conclusion that Weber and Ogden acted as partners, or that Ogden was acting as Weber's agent, in serving the Injunction. Among many other things, Weber consulted with Ogden on the list of who to serve and Weber continuously ratified Ogden's service on people by prosecuting them, including the Plaintiffs. Weber also said above that they had a policy of who they would not "agree" to Ogden serving certain people, making clear that they had, at a minimum, Weber believed it had direct input into Ogden's decisions about who to serve.

## Plaintiffs' Additional Fact

**Additional Fact:** Of those served with and prosecuted for violating the Injunction, the vast majority were racial and/or ethnic minorities. This fact is reflected in the records reflecting service produced by Defendants, which include the race and ethnicity as recorded by police, and in the records reflecting criminal prosecutions located and compiled by Plaintiffs. Plaintiffs are presently working on a summary exhibits based on these documents which will summarize the percentages, but can presently represent to the Court that the representation of racial and ethnic minorities among those served and prosecuted is extremely high. Plaintiffs will file a supplement with those exhibits and a short analysis of them and other issues as soon as possible.

# ARGUMENT

## I. Plaintiffs Can Show Municipal Liability Against Weber on All Claims

### A. Plaintiffs Have Standing

As on many previous occasions, Weber once again asks the Court to accept that Weber is not liable to Plaintiffs because, according to Weber, someone directly employed by Weber did not literally hand Plaintiffs the Injunctions or specifically advise Ogden that Plaintiffs should be served and arrested.

In again making this argument, Weber once again ignores its own policies and practices that logically lead to Plaintiffs' service and arrests, and makes an impermissible inference in their own favor. In terms of Weber's actions and decisions, among other things: Weber decided to pursue and obtain the Injunction in partnership with Ogden; Weber drafted the provisions of the Injunction that made its effects immediate on people like Plaintiffs; Weber knew that Ogden had a gang database that Ogden was going to use to decide who to serve, and took steps to assist Ogden in that process, such as consulting on specific individuals; Weber allowed its own employee, Mr. Worthen, to directly rely on the list Ogden created to himself effect service of the Injunction on dozens of occasions-- while Mr. Worthen did not directly serve Plaintiffs, Weber's allowing him to use Ogden's list showed Ogden that Weber was comfortable adopting that list "as is" and allowing its employees, partners, and agents to use it to serve people; Weber gave Ogden advice about who to serve, and gave training to Ogden officers on how to serve it; and, at a minimum, Weber ratified Ogden's service and and arrest of Plaintiffs by prosecuting Plaintiffs for violating the Injunction, and by opposing Plaintiffs' efforts to vacate those convictions.

It is reasonable to infer that Weber's policies and practices listed above directly caused the harm to Plaintiffs here. After all, there would not have been an Injunction with the

draconian, immediate restrictions imposed on Plaintiffs in the first place had Weber not decided to team up with Ogden and pursue it. It is also reasonable to believe that Ogden would not have allowed its officers to serve the Injunction without the approval of Weber to do so, and Weber showed Ogden its approval by training Ogden officers and consulting them about the list. And so on. Weber is therefore liable for all of these independent actions and decisions that lead to Plaintiff's deprivations and harm.

Moreover, Weber asks the Court to infer that Weber's inability to recall who Ogden asked them to consult on for service means that they did not approve serving Plaintiffs. While Weber now categorically denies that they approved serving Plaintiffs, what they actually said in deposition was that they did not specifically remember who they were consulted on. (See, e.g., Smith Depo. at p. 65, lines 6-15). This fact leads to a reasonable inference that Ogden specifically asked someone from Weber about whether it was appropriate to serve Plaintiffs in particular and Weber agreed. While Plaintiffs need not prove this level of specificity, Weber's general approval and involvement in creating the lists is enough, that particular act of approving Plaintiffs can be inferred.

Weber tries to make much of its purportedly undisputed "policy" of telling Ogden that they were only allowed to serve "active and present" members. First, Weber does not ever explain what they mean by "active and present" members. It certainly does not require that the person have committed any crime for the gang. (See Allred Depo., Doc. 156.2, at p. 84 lines 22-25.) Rather, the evidence easily supports a conclusion that by "active and present" member, Weber simply means a person who meets Ogden's criteria for imputed gang membership, whether or not the person or the gang consider that person a member or even acted to achieve some improper goal. It is undisputed that these criteria included various non-criminal indicators

related to association and expression. As it is probably the case that Weber has adopted this definition, it would not have mattered to Weber whether or not Plaintiffs were in reality members of the Trece, only that Ogden had imputed membership. Once that membership was imputed, the person was a "member" for five years, no matter what.

In light of this reality, Weber's alternative reality scenario in which Weber would be absolved because under their purported "policy" they would have told Ogden not to serve Plaintiffs had Weber been consulted is not plausible. In any event, Weber's argument about this "policy" is based on a hypothetical set of facts in which they demanded to approve everyone to be served and applied a careful set of standards based on actual, not imputed, membership. This set of facts did not actually happen. Ogden was not a rogue actor in serving and arresting Plaintiffs who denied Weber the chance to protect Plaintiffs, nor was Weber the victim of Plaintiffs' supposed lack of diligence in trying to defend their own rights. Rather, the undisputed facts support a conclusion that Ogden and Weber worked closely together in all aspects of serving and enforcing the Injunction, whether as partners or as principal/agents, making Ogden's actions attributable to Weber, in addition to Weber being responsible for their own policies and practices. It is reasonable to conclude that those policies and practices included embracing and adopting as Weber's own Ogden's dangerous definition of who is a "gang member" worthy of life-altering restrictions.

Because Plaintiffs come before the Court asking that Weber be held liable for their own policies and practices that directly harmed Plaintiffs, they have standing. Because Plaintiffs do not purport to reverse any legal error the state court made in the Nuisance Suit (which has already been vacated by the Utah Supreme Court in any event), *Rooker-Feldman* does not apply. *See Vasquez v. Rackauckas*, 734 F.3d 1025, 1026 (9th Cir. 2013).

### B. Plaintiffs' Prospective Claims Are Not Moot

First of all, Plaintiffs have asked for injunctive relief in the form of Weber no longer listing them as gang members in their files. Weber's refuted denial that they have any such files- they are sitting in the Weber jail investigator's desk- supports a conclusion that Weber's files list Plaintiffs as gang members. That claim for relief is not even arguably moot and should continue.

Moreover, the Court has already explained at length in a prior order why Plaintiffs' claims for injunctive relief regarding the injunction is not moot. (See Doc. 81, Order, at pp. 18-24.) In their latest argument otherwise, Weber states that the Court should now look at the facts and not the complaint. But Weber does not explain how the facts and the complaint are any different. Most on point, Weber does not deny that Weber's latest verbatim quotes to the media, reported to people in the Ogden market, indicated that Weber intended to seek "essentially… the same" injunction. Allred Depo., Doc. No. 122-16, at p. 135 line 20 to p. 136 line 5 (filed under seal). Weber admits that they have never retracted those public statements. Id. at p. 171 line 22- p. 173 line 9.

The Court has already concluded that such statements suffice (among other things that have not changed from complaint to facts) to defeat mootness. Instead of denying that they made such statements, Weber argues that now that the case is at summary disposition, the Court should consider that maybe Weber was being insincere in its statements to the public or the newspaper was spinning. While it may be that Weber was misrepresenting its intentions, a reasonable person could conclude that Weber meant exactly what they said.

Weber also makes various vague statements about not having specific plans, or not bringing the exact injunction again, or making helpful changes to the injunction, or considering some unspecified procedural protections to protect served people. While these generalized and

vague statements may sound reassuring to Weber, they offer no protection whatsoever for Plaintiffs, who are the parties whose liberties were infringed for years due to Weber's actions. Weber does not commit to any specific change in course they would make in bringing another injunction suit, leading Plaintiffs to understandably worry that Weber will keep its promise and bring another substantially similar injunction. Indeed, the level of vagueness and generality Weber engages in around its future plans leads to a reasonable conclusion that Weber is trying to preserve the ability to obtain an injunction as close as possible to the one at issue here. In fact, i*n their very brief in favor of summary judgment*, Weber continues to insist that "there is nothing unconstitutional about the gang injunction if the persons served are in fact active and present gang members and perhaps on probation or parole or are already convicted felons." (Weber's MSJ, Doc. No. 156 at p. 17.) Weber's unwillingness to commit to anything but broadly worded changes, while to this day continuing to assert that everything about the injunction was appropriate as long as the person being served fit a label and deserved enough opprobrium, keeps this controversy alive. Especially because Plaintiffs have reason to believe that Weber considers them to meet the category of people who can be properly subjected to the injunction here, there is an acute need for Plaintiffs to obtain the protection of a Court order.

Finally, Plaintiffs have repeatedly answered Weber's frivolous argument that in pleading guilty to violating the Injunction, Plaintiffs waived the right to bring a civil action against Weber. Plaintiffs incorporate those arguments herein.

### C. Weber Was Not a State Actor

Weber's attempt to argue around the Court's ruling that Weber was not acting as the State in pursuing the Injunction or prosecuting Plaintiffs for violating it falls flat. As Plaintiffs understood the Court's Order, Weber would have needed to show that the State was somehow

actively involved in those decisions to try to claim that they acted on the State's behalf in making them.  See generally Doc. 81, Order, at pp. 27-32.  Weber, however, makes no attempt to show that the decision to pursue the Injunction and press criminal charges against Plaintiffs had anything to do with the State at all.  Instead, Weber essentially repeats its bare legal argument, which the Court has already rejected.

### D. Plaintiffs Have Shown Municipal Liability

#### 1. Weber's Policies and Procedures Violated the Constitution

Weber's contention that Plaintiffs' rights were not violated by Weber is simply a restatement of their argument above that they did nothing wrong.  Plaintiffs have already explained above Weber's many actions that one could reasonably conclude lead to Plaintiffs being immediately subject to criminal prosecution for exercising a host of their protected rights, among other violations Weber caused them.

#### 2. Weber Had Various Policies and Procedures that Lead to the Violations

Weber's denial that their policies and procedures did not violate Plaintiffs' rights does not even attempt to meet the facts of this case, but instead is a long narrative in which Weber recites various facts, many in dispute, and reads inferences in their own favor that forgive them any liability.  In general, Weber: blames the Nuisance Suit court for granting the order Weber pursued, drafted, and won; relies on the disputed, vague, non-existent policy where Weber hypothetically would have objected to Ogden serving Plaintiffs; makes an impermissible inference that Plaintiffs' guilty pleas meant that Plaintiffs assented to the violations of their civil rights; ignores Weber's extensive cooperation with Ogden in compiling the list of people to serve, including perhaps Plaintiffs; and ignores their own ratification of Ogden's decisions about who to serve and arrest by filing charges against Plaintiffs and others.

These arguments amount to no more than an incredible amount of fruitless finger-pointing about who other than Weber was responsible. Rather than repeat the many policies and procedures Weber undisputedly pursued here that support a finding of liability, Plaintiffs will incorporate their prior arguments herein.

### 3. Weber Was at a Minimum Deliberately Indifferent

Inexplicably, Weber continues to ignore precedent and insist that "deliberate indifference" is always needed to show municipal liability, when it really is but one type of behavior that qualifies. Plaintiffs have repeatedly shown affirmative policies and procedures Weber adopted, explained above, that make Weber liable.

Even if some form of indifference also needed be present in addition to voluntary actions, however, Plaintiffs have pointed to facts could be used to that meet this standard. For example, it could be reasonably found that Weber used Ogden as a partner and/or agent to serve the Injunction and Weber was deliberately indifferent to the fact that Ogden served people without any pre-deprivation process. Because Weber drafted the Injunction and the terms of the Injunction did not provide for such process, this indifference is not credibly denied by Weber. Other examples include Weber's indifference to Ogden using a definition of gang membership that imputed membership to serve (one could also conclude that Weber adopted that definition) and Weber's indifference to its own prosecutors adopting Ogden's improper definition of gang member in prosecuting cases for violating the Injunction.

### 4. Weber's Policies and Practices "Directly Caused" Plaintiffs' Harm

Weber engaged in a plethora of independent behavior that directly caused harm to Plaintiffs. To name but two instances, this behavior included pursuing and obtaining the Injunction that deprived Plaintiffs of their rights and prosecuting them for violating it.

**II.     Plaintiffs Were Entitled to a Pre-Deprivation Hearing**

Weber simply adopts arguments in this section, Plaintiffs follow suit in adopting their arguments the other way.

**III.    Plaintiffs Conspiracy Claim is Cognizable**

Weber argues that there was no racial animus by anyone from Ogden or Weber, despite having failed to assert any undisputed facts supporting this argument. Rather than raise a proper chance for Plaintiffs to contest their purported facts on this topic, Weber cites within their argument section to some of their representatives denying that race was a factor. Boiled down, their assertion is that they did not personally believe that race was ever used as a factor. Their support is that they understood Ogden's express criteria about gang membership to be the sole factors used by everyone from Weber and Ogden in making decisions about who to serve with the Injunction and who to prosecute for violating it. Weber, however, acknowledges not making any effort to ensure that Defendant's representatives were ever expressly told that they were not allowed to directly consider race and ethnicity or let race or ethnicity to inform how they applied those factors. (See, e.g., Miles Depo. at p. 39, line 21- p. 40, line 6,)

This failure to expressly prohibit any use of race or ethnicity could reasonably be seen as a tacit agreement to allow targeting of racial and ethnic minorities for disproportionate service with Injunction, and for disproportionate prosecution for violating it. The statistics starkly support this conclusion. While Weber contends that the Trece are a multi- racial and ethnic gang, virtually all of the people Ogden and Weber served with and prosecuted for violating the Injunction were racial and/or ethnic minorities. As Plaintiffs are still in the process of compiling those statistics, they will seek leave at a later date to file them and make argument about them in soon-to-be-filed supplemental brief.

### IV.   Plaintiffs' Utah Constitutional Claims Are Cognizable

Weber again disregards the Court's prior ruling (*see* Doc. 81 at pp. 46-49) and re-argues the *Spackman* applies here without attempting to show how any undisputed facts from this case apply to that analysis. At this stage, Plaintiffs have presented undisputed evidence that would support a finding that Weber violated their rights under the Utah constitution, and the Court has preliminarily found that *Spackman* is not a bar. It is therefore up to Weber to point to undisputed facts establishing that *Spackman* would apply to prevent Plaintiffs recovering, and to explain how those facts alter the Court's standing analysis. Beyond restating their non-prevailing legal arguments, Weber makes no attempt to do so. Summary judgment on that basis should therefore be denied.

Weber's argument about the statute of limitations barring their constitutional claim is wrong and unsupported. Because the statute of limitations is an affirmative defense, Weber must establish when the statute began to accrue. Rather than point to any controlling law on this question, Weber simply assumes that the statute began to accrue when Plaintiffs were served with the Injunction. They offer no controlling precedent establishing that this is a proper accrual date; Plaintiffs contend that the accrual date was at earliest when the Utah Supreme Court remanded its order declaring the Injunction void. As Weber has done nothing to substantiate its limitations defense, and neither the Court nor the Plaintiffs are required to try to find precedent to support it, the Court should not credit this defense.

### V.   Plaintiffs Claims Are Not Barred by the Statute of Limitations

Plaintiffs extensively explained why their claims are not barred by the statute of limitations in their opposition to Ogden's motion for summary judgment, which they adopt herein. (See Doc. 135 at pp. 4-8). To cut right to the point, among other things, the limitations

period for Section 1983 claims did not begin to accrue until Plaintiffs were aware all of the facts giving rise to their claims.  Here, Plaintiffs did not know that the Nuisance Suit court's rulings that the Trece was properly served and that the Trece was a proper defender of Plaintiffs' interests in the Nuisance Suit were wrong at the time they were served.  Plaintiffs did not know that the court's ruling was wrong until late 2013, when the Utah Supreme Court vacated the entire case because of faulty service on the Trece.  The time around that ruling, therefore, was the earliest accrual date.  Moreover, the conspiracy claims do not begin to run until the last harm occurs.

## CONCLUSION

For the reasons stated herein, the Court should deny Weber's summary judgment motion

Respectfully submitted on April 13, 2018.

SIGNED

s/ John Mejia

| | |
|---|---|
| John Mejia (Bar. No. 13965) | Randall Richards (Bar No. 4503) |
| Leah Farrell (Bar. No. 13696) | Richards & Brown PC |
| ACLU of Utah Foundation, Inc. | 938 University Park Blvd, Suite 140 |
| 355 N. 300 W. | Clearfield, UT  84105 |
| Salt Lake City, UT  84013 | phone: (801) 773-2080 |
| phone: (801) 521-9862 | email:Randy@richardsbrownlaw.com |
| email: aclu@acluutah.org | |

## CERTFICATE OF SERVICE

I certify that I served a copy of the foregoing brief to counsel for all Defendants via the Court's CM/ECF system.

s/John Mejia

April 13, 2018