IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| LELAND KIM MCCUBBIN, JR. and DANIEL JOSEPH LUCERO,<br><br>                    Plaintiffs,<br><br>vs.<br><br>WEBER COUNTY, CHRISTOPHER ALLRED, in his official capacity, and DOES 1-10<br><br>                    Defendants. | **MEMORANDUM DECISION & ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 1:15-cv-132<br><br>Judge Clark Waddoups |

## Introduction

Before the court are Plaintiffs Leland Kim McCubbin, Jr. and Daniel Joseph Lucero's Motion for Partial Summary Judgment, (ECF No. 93) and Weber County and Christopher Allred's Motion for Summary Judgment (ECF No. 156). As explained below, the court GRANTS Plaintiffs' Motion. The court GRANTS in part and DENIES in part Defendants' Motion for Summary Judgment.

## Factual Background

### Weber County Decision to Seek a Gang Injunction

Dee Smith (Mr. Smith) was appointed as Weber County's attorney in May of 2009. (Smith Depo., ECF No. 94-4 at 5: 5.) Sometime after his appointment, Mr. Smith received an e-mail from the director of the Utah Prosecution Council. (*See* Smith Depo., ECF No. 94-4 at 6: 10–12.) The e-mail had information about gang injunctions. (Smith Depo., ECF No. 94-4 at 6: 17.)

According to Mr. Smith, Weber County was "dealing with a significant gang problem"

at that time and was "looking for solutions." (*See* Smith Depo., ECF No. 94-4 at 7: 8–10.) Chris Allred (Mr. Allred), the current Weber County Attorney, was in Weber County's "civil division at that time." (*See* Smith Depo., ECF No. 94-4 at 7: 8–18.)

Sometime in the fall of 2009 or in early 2010, Mr. Smith and Mr. Allred spent approximately one month "examining" and "researching" gang injunctions. (*See* Smith Depo., ECF No. 94-4 at 7: 17–21.) After Mr. Smith and Mr. Allred "concluded [that a gang injunction] may be something that would work in [their] community," Mr. Smith "talked with Lieutenant Scott Conley," an Ogden City lieutenant "over the gang unit at that time" about a gang injunction. (*See* Smith Depo., ECF No. 94-4 at 8:13–19.) Mr. Smith eventually talked to Ogden City's police chief at that time, John Greiner, about the idea of a gang injunction. (*See* Smith Depo., ECF No. 94-4 at 9: 8–10.) According to Mr. Smith, the Ogden City police chief "was interested in" a gang injunction and thought it "would be a good idea." (Smith Depo., ECF No. 94-4 at 10: 1–3.) According to Mr. Smith, he eventually met with the former mayor of Ogden, May Godfrey, who indicated that the city was "willing" "to assist with" the gang injunction. (*See* Smith Depo., ECF No. 94-4 at 11:6–9.)

In addition, Dee Smith met with County "Commissioner Dearden" about the gang injunction, but the County Commission "didn't vote on it," and did not formally approve the gang injunction. (*See* Smith Depo., ECF No. 94-4 at 20: 3–8; *see also* Smith Depo., ECF No. 94-4 at 20: 12–14 ("So the commission, to [Dee Smith's] knowledge, never had a formal vote" on the gang injunction). Further, at Mr. Smith's deposition, the following line of questioning occurred:

> Q. Okay. So why didn't you take the prospect of bringing the [gang injunction] suit before the full county commission?

A. Because it was -- it was the county attorney's action. It was -- I was an elected official, it was **my decision** that my – that's what we would do.

(Smith Depo., ECF No. 94-4 at 21 (bold added).)

Ogden Trece Nuisance Suit

On August 20, 2010, Weber County filed a lawsuit against the Ogden Trece gang, in an action titled *Weber County v. Ogden Trece*, Case No. 100906446 (the "Nuisance Suit"). (ECF No. 93 at 4; *See also* ECF No. 94-2 at 1.) "It brought this action against Ogden Trece as an unincorporated association." *Weber Cty. v. Ogden Trece*, 2013 UT 62, ¶ 7, 321 P.3d 1067, 1070–71. "Weber County did not name any individual as a defendant in the Nuisance Suit." (ECF No. 93 at 8; ECF No. 113 at 5.) Weber County sought an injunction "under a public nuisance theory pursuant to Section 76–10–806 of the Utah Code, which empowers a county attorney 'to institute an action in the name of the county . . . to abate a public nuisance.'" *Trece*, 2013 UT 62 ¶ 2 (quoting Utah Code Ann. § 76–10–806). "The district court entered a temporary restraining order that same day." *Trece*, 2013 UT 62 ¶ 7. The state district court did not hear any opposition to the motion. Weber County served the nuisance suit personally on five alleged Trece members, mailed process to twelve others, and attempted to serve the Trece itself by publication. *Trece*, 2013 UT 62 ¶¶ 8–10.

"On September 14 and 27, 2010, the [state] district court held an evidentiary hearing on [Weber] County's request to convert the temporary restraining order to a preliminary injunction." *Trece*, 2013 UT 62 ¶ 11. The state district court "heard testimony from two Ogden police officers who testified about the criminal and nuisance activity of Trece." *Id*. It appears that one of those officers, Anthony Powers, testified for Weber County as an expert on the Trece gang. (*See* Powers Depo., ECF No. 94-15 at 193: 18–19 ("I had already testified as an expert previously in second district court.").)

"Following the hearing, the [state] district court converted the temporary restraining order to a preliminary injunction . . . ." *Trece*, 2013 UT 62 ¶ 11. The Preliminary Injunction applied to an area desginated as the "Safety Zone," "a twenty-five square-mile area encompassing most of the city of Ogden." *Trece*, 2013 UT 62 ¶ 16. The Preliminary Injunction provided, in part:

1. Defendant Ogden Trece and all members of defendant Ogden Trece, are enjoined and restrained from engaging in or performing, directly or indirectly, any of the following activities in the Safety Zone:

a. **Do Not Associate**: Driving, standing, sitting, walking, gathering or appearing, anywhere in public view or anyplace accessible to the public, with any known member of Ogden Trece, but not including: (1) when all individuals are inside a school attending class or on school business, and (2) when all individuals are inside a church, provided however that this prohibition against associating shall apply to all claims of travel to or from any of those locations;

b. **No Intimidation**: Confronting, intimidating, annoying, harassing, threatening, challenging, provoking, assaulting any person known to be a witness to any activity of Ogden Trece, known to be a victim of any activity of Ogden Trece, or known to have complained about any activity of Ogden Trece.
…
d. **No Graffiti or Graffiti Tools**: Damaging, defacing, spraying, scratching, affixing, inscribing, or marking any public property or private property of another, or possessing any spray paint container, felt tip marker, or other graffiti tools anywhere in public view or anyplace accessible to the public;
…
f. **Stay Away From Alcohol**: Anywhere in public view or any place accessible to the public, except on properly licensed premises, (1) possessing an open container of an alcoholic beverage, (2) knowingly remaining in the presence of anyone possessing an open container of an alcoholic beverage, or (3) knowingly remaining in the presence of an open container of an alcoholic beverage;

g. **No Trespassing**: Being present on or in any property not open to the general public, except (1) with the prior written consent of the owner, owner's agent, or the person in lawful possession of the property, or (2) in the presence of and with the voluntary consent of the owner, owner's agent, or the person in lawful possession of the property;

h. **Obey Curfew:** Being present in public view, in a public place or in any place accessible to the public, between the hours of 11 p.m. on any date and 5 a.m. of the following day, unless (1) going directly to, returning directly from, or actively

engaged in a legitimate business trade, profession or occupation requiring the enjoined person's presence, (2) going directly to, returning directly from, or actively engaged in a lawful, non-gang related entertainment event, school activity or religious service, or (3) actively involved in a legitimate emergency, such as a fire, natural disaster, automobile accident or situation that requires immediate action to prevent serious bodily injury or loss of life. For purpose of this provision, "entertainment event" means an amusement activity that occurs at a commercial establishment and includes only events for which admission is charged, such as movies, plays, public performances or sporting events; and

i. **Obey All Laws:** Failing to obey all laws (1) which prohibit violence and threatened violence, including murder, rape, robbery, assault, (2) which prohibit interference with the property rights of others including trespass, theft, driving or taking a vehicle without the owner's consent, and vandalism, or (3) which prohibit the commission of acts which create a nuisance including the illegal sale of controlled substances and blocking the sidewalk.

(ECF No. 94-5 at 2–4.)

The Preliminary Injunction also contained an "'Opt Out' Provision." (ECF No. 94-5 at 5.)

The Opt Out Provision provided, in part:

Any person . . . who has been served with this injunction or any subsequent injunction entered in this action (hereinafter, "Gang Injunction") may move this Court under this opt-out provision or any subsequent opt-out provision approved by this Court to be dismissed from this action. This Gang Injunction shall not be enforceable against a Served Person who is dismissed under this Opt Out Provision. The terms of the current Opt-Out Provision are as follows:

**Requirements**: Plaintiff agrees not to object to a Served Person's motion to be dismissed under this provision, so long as the dismissal is to be without prejudice and with each side to bear its own costs and fees, and so long as the motion satisfies the following requirements:

**Proper Notice**: A motion under this provision shall be made on proper notice, properly served on plaintiff's counsel, and shall not be made on shortened time;

**Not/No Longer a Gang Member:** Served Person must declare that he/she is a reformed, former Ogden Trece gang member, that he/she is not active with Ogden Trece and he/she has renounced the Ogden Trece gang and gang life. This declaration regarding Ogden Trece and gang life is an essential part of this provisions; and

**Proof Required:** (A) Served person must declare that he/she has not been arrested for the past three years, not including any time spent incarcerated, which must be true: (8) Served Person must declare that he/she has not been documented by law enforcement for the past three years to have been in the company or association of any known active member of Ogden Trece, other than an immediate family member, which must be true; ( C) Served Person must declare that he/she has not obtained any new Ogden Trece or Centro City Locos gang-related tattoos for the past three years, which must be true; and (D) Served Person must declare that he/she is gainfully employed and has so been employed consistently for a period of one year, which must be true.

(ECF No. 94-5 at 6–7.) The Preliminary Injunction also contained a "Personal Service Required" provision that provided: "[n]o person shall be subject to the provisions of this Order unless that person has been previously served with this Order . . . ." (ECF No. 94-5 at 7.)

<u>The Ogden Gang Unit Determined Gang Membership</u>

The determination of whom to serve with the Preliminary Injunction was made primarily by the Ogden gang unit. (*See* Smith Depo., ECF No. 94-4 at 26: 3–5.) Dee Smith testified that the gang unit determined who would be served with a copy of the Preliminary Injunction "based on their intelligence and based on who the active members of the gang were." (Smith Depo., ECF No. 94-4 at 26: 3–5.) The gang unit had two basic requirements in order to serve an individual with the injunction.

First, an individual had to be on Ogden's gang intelligence list. (Young Depo., ECF No. 94-3 at 89: 22–24 (**Q. "**to your understanding . . . to be served with a gang injunction, you had to be on the gang intelligence list." **A.** "Yes.").) In order to be on the gang intelligence list, the individual had to meet two of eight possible criteria for general gang membership. (Young Depo., ECF No. 94-3 at 90: 1–3[1] (**Q.** "To be on the gang intelligence list, you had to meet at leas[t] two criteria?" **A.** "Yes.").) The eight criteria were the following:

---

[1] *See also* Young Depo., ECF No. 94-3 at 6: 7–15 ("It's a form to actually document a gang contact in the field. It's two pages. It may end up just being a contact with an individual who wasn't documented as a gang member. There's a list of questions. If two of those are checked affirmatively they are eligible to be placed on the gang intelligence

1. Admits to criminal street gang membership
2. Is identified as a gang member by a parent/guardian
3. Is identified as a gang member by a documented reliable informant
4. Resides/frequents a gang's area, adopts their style of dress, hand signs, or tattoos, and associates with known gang members
5. Is identified as a gang member by an informant of previously untested reliability and such identification is corroborated by independent information
6. Was arrested with identified gang members for offenses consistent with usual criminal street gang activity
7. Is identified as a criminal street gang member by physical evidence such as photographs or other documentation
8. Was stopped in the company of known criminal street gang members more than two times.

(ECF No. 94-19 at 1.)

Second, the Ogden gang unit had to be satisfied that the individual was specifically a member of the Trece gang—not just any gang. It is undisputed that "[i]n compiling the list of individuals to be served with the Preliminary Injunction, Ogden gang detectives, primarily Anthony Powers, went through a group of files of individuals the Ogden police considered to be active Ogden Trece gang members according to Ogden's criteria . . . ." (ECF No. 93 at 10; *see also* ECF No. 113 at 5–6.) Anthony Powers testified that the Ogden gang unit had a set of criteria to determine who was a Trece member. (*See* Powers Depo., ECF No. 94-15 at 52: 19–22.[2]) Powers testified that this criteria was distinct from the criteria for general gang membership. (*See* Powers Depo., ECF No. 94-15 at 53: 5–15.[3]) It is unclear what this criteria was, however.

_____

list. If only one is checked they're eligible to be documented as a gang associate.").

[2] At his deposition, when asked if "Ogden City had a set of criteria for who they would consider a Trece member," Anthony Powers answered "yes." (*See* Powers Depo., ECF No. 94-15 at 52: 19–22.)

[3] Powers Depo., ECF No. 94-15 at 53: 1–15 (**Q.** "Okay. So Ogden City independently put together a list of what they thought a Trece member could be or who you could say is a Trece member, right?" **A.** "They put together—the

Committing a crime was not necessary to be placed on the gang intelligence list.[4] (*See* Young Depo., ECF No. 94-3 at 87: 8–9 ("No, you don't have to commit a crime to be on the gang intelligence list.").) Nor was actual membership in the Trece gang required to be served with the injunction—only satisfaction of Ogden's criteria. (*See* Young Depo., ECF No. 94-3 at 89–90; *see also* Powers Depo., ECF No. 94-15 at 52: 19–25.)

Weber Aided Ogden In Determining Whom to Serve

At Mr. Allred's deposition, the following line of questioning occurred:

> Q. And so the preliminary injunction was granted on September 28, 2010; is that correct?
>
> A. That sounds right.
>
> Q. What was the plan for serving individuals with the preliminary injunction?
>
> A. Do you mean with the lawsuit or copies of the injunction?
>
> Q. I mean copies of the injunction.
>
> A. So the plan was Ogden City would identify who members of the gang were based on their database and their criteria that they had established as gang members. And then they were to serve, primarily Ogden City was to serve their identified members of the gang with the injunction as it was necessary for them to be served in order for it to be binding on them.
>
> Q. Did Weber County give any direction to the Ogden City Police as to what kind of discretion they could use in serving people?
>
> A. Yeah. We **would have given them some legal advice** in terms of being certain that they only served members that were clearly established in **their gang database as gang members**.
>
> Q. And do you recall how Ogden decided how members were clearly established?

---

criteria to become a gang member, those eight boxes, that actually came out of the department of—or the California Department of Corrections. And so it's a standard that's used by a lot of different police departments . . . Sorry. But that's for any gang member, *not specifically to Ogden Trece*.") (emphasis added).)

[4] It is unclear from the evidence whether a person had to have been convicted to be deemed to have "committed a crime."

A. Yeah. They maintain a gang database, as I understand it, based on some federal regulations in the CFR, I believe. I don't know what section. But that provides criteria for establishing gang members. And I believe they relied on that information to establish who they felt were members to be on their gang database.

(*See* Allred Depo., ECF No. 94-16 at 38–39 (bold added).)

<u>Service of Injunction and Further State Court Proceedings</u>

Two days after it issued, on September 30, 2010, police officers from the Ogden Police Department served Mr. Lucero with the Preliminary Injunction. (ECF No. 93 at 7; ECF No. 94-10.)

On October 12, 2010, Lieutenant Scott Conley sent an e-mail to Ogden City police officers, stating that "County Attorney Dee Smith and I will be attending briefings to instruct you on the proper service methods/protocol on the Ogden Trece Gang Injunction." (ECF No. 94-8 at 1.) He also stated that "[a]ny other Law Enforcement Agency who is interested in serving these documents may also attend one of these scheduled training times." (ECF No. 94-8 at 1.) The e-mail included briefing times for October 13, October 14, and October 18, 2010. (*See* ECF No. 94-8 at 1.) At his deposition, Mr. Smith did not remember attending these briefings, but stated that he was "sure [he] did" attend them. (*See* Smith Depo., ECF No. 94-4 at 7:8–18.)

On October 13, 2010, an alleged Trece gang member, Jesse Aeschlimann, through counsel, moved the state district court to "set a hearing to determine whether [he] is a gang member" and to "determine whether or not the injunction violates the State and Federal Constitutions.[5]" He noted that he had not been served "or given notice of the proceedings prior to the entry of the preliminary injunction or its service upon" him. *Trece*, 2013 UT 62, ¶ 12.

A little less than two months after it was issued, on November 22, 2010, police officers

---

[5] This filing is publicly available on Utah's state court filing system, Xchange.

from the Ogden Police Department served Mr. McCubbin with the Preliminary Injunction.[6] (ECF No. 93 at 7; *see also* ECF No. 94-9.)

On January 12, 2011, Weber County responded to Jesse Aeschlimann's Motion for Hearing, arguing that he "should not be permitted to intervene either as of right, or as permissive intervener." Weber County also addressed Mr. Aeschilmann's "primary argument" "that the preliminary injunction is unconstitutional because the opt-out provision 'does not meet constitutional due process requirements.'" Weber County argued that "Aeschilmann is only subject to the injunction as long as he is a member of the enjoined gang," and argued that "the county does not dispute that Aeschlimann . . . has the right to seek a hearing before this court to determine whether he is a gang member." Weber County also argued that it would not be impossible for Aeschlimann to comply with the opt-out provision.

On April 4, 2011, the state district court ruled "that the injunction was not unconstitutional." (ECF No. 94-18 at 2.) On April 20, 2011, it entered an order holding that Jesse Aeschilimann "should not be permitted to intervene as a matter of right or as a permissive intervenor." (ECF No. 94-18 at 2.[7]) The state court also held that "Jesse Aeschlimann does have the right to seek a hearing before this court to determine if he is a member of Ogden Trece." (ECF No. 94-18 at 2.)

On or around December 2, 2011, Ogden brought two misdemeanor charges against Mr. McCubbin. (*See* ECF No. 93 at 7; ECF No. 110 at 6; ECF No. 94-12 at 1.) The first charge was

---

[6] Eventually 238 individuals were served with the preliminary injunction, of those 96 were prosecuted for violating the terms of the injunction. (ECF No. 175-1.)

[7] *See also Ogden Trece*, 2013 UT 62, ¶ 13 ("The district court ruled that because the gang as an entity had been sued and the constitutional arguments had 'already been dealt with,' individuals subsequently served with the injunction did not have a right to intervene or otherwise appear in the case or to challenge the terms of the injunction. It reasoned that due process had been satisfied because 'law enforcement is required to serve the injunction on gang members, thus placing them on notice of the injunction.'")

for violating the Preliminary Injunction. (*See* ECF No. 93 at 7; ECF No. 110 at 6; ECF No. 94-12 at 1.) The second charge was for intoxication. (*See* ECF No. 93 at 7; ECF No. 110 at 6; ECF No. 94-12 at 1.) When Mr. McCubbin pled guilty to violating the gang injunction on December 5, 2011, the intoxication charge was dismissed. (*See* ECF No. 110 at 6; ECF No. 94-12 at 1.) Mr. McCubbin received a 60 day sentence to be suspended if he paid a $500 "fine" "in full." (ECF No. 94-12 at 3.)

On or around December 27, 2011 the State of Utah brought four charges against Mr. McCubbin. (*See* ECF No. 94-13 at 1.) Mr. McCubbin was charged with [1] assault against a police officer; [2] interference with arresting officer; [3] violation of order enjoining a public nuisance; and [4] attempted criminal trespass. (ECF No. 94-13 at 1.) The prosecuting agency was Weber County. (ECF No. 94-13 at 1.) Mr. McCubbin pled no contest to charges 2–4 and was sentenced 180 days on each of these charges, to run concurrent with each other. (*See* ECF No. 94-13 at 4.) The first charge was dismissed. (*See* ECF No. 94-13 at 4.)

On August 20, 2012, the state district court issued an Order Granting Permanent Injunction ("Permanent Injunction"). (*See* ECF No. 94-6.) The Permanent Injunction was substantially similar to the Preliminary Injunction. (*Compare*, ECF No. 94-5 *with* 94-6.)

On or around October 11, 2012, the State of Utah brought five charges against Mr. Lucero. (*See* ECF No. 107-6.) Mr. Lucero was charged with [1] possession or use of a controlled substance; [2] failure to disclose identity; [3] no valid license; [4] interference with arresting officer; and [5] violation of order enjoining a public nuisance. (ECF No. 107-6.) The publicly available Information from this case reveals that Weber County was the prosecuting agency. On July 16, 2013, Mr. Lucero entered a guilty plea to charges four and five. (ECF No. 107-6 at 1.) The other three charges were dismissed without prejudice. (ECF No. 107-6. At 1.)

On October 18, 2013, the Utah Supreme Court issued an opinion holding that because the Trece gang was the only defendant named in the nuisance suit, and because "Trece was not properly served," "the [state] district court lacked jurisdiction over the only named defendant," so "the Injunction [was] void." *Weber Cty. v. Ogden Trece*, 2013 UT 62, ¶ 60, 321 P.3d 1067, 1079.

On September 19, 2014, Mr. McCubbin, in state court, filed a petition for relief under the Post-Conviction Remedies Act, Utah Code Section 78B-9-101. Mr. McCubbin argued that he was "entitled to an order vacating his two class B misdemeanor convictions for violating the Injunction because the Injunction was held to be void by the Utah Supreme Court on October 18, 2013." The state district court ultimately "vacated his convictions." (*See* ECF No. 93 at 18; ECF No. 113 at 10.)

On October 28, 2014, Mr. Lucero filed a petition to have his conviction for violating the injunction set aside under Utah's post-conviction remedies act. "Weber successfully opposed the petition on the ground that the petition had been filed a few weeks late, and successfully opposed all of Mr. Lucero's attempts to invoke exceptions to the statute of limitations." (ECF No. 93 at 18; ECF No. 113 at 10.)

## Standard

Summary judgment is proper when the moving party demonstrates that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A material fact is one that may affect the outcome of the litigation. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "Once the moving party meets this burden, the burden shifts to the

nonmoving party to demonstrate a genuine issue for trial on a material matter." *Id.* The

nonmoving party may not rest solely on allegations on the pleadings, but must instead designate

"specific facts showing that there is a genuine issue for trial." *Id.* at 324. The court must "view

the evidence and draw reasonable inferences therefrom in a light most favorable to the

nonmoving party." *Commercial Union Ins. Co. v. Sea Harvest Seafood Co.*, 251 F.3d 1294, 1298

(10th Cir. 2001).

<u>**Analysis**</u>

In their Amended Consolidated Complaint, Plaintiffs brought ten causes of action against

the Weber County Defendants: [1] 42 U.S.C. Section 1983 Violation of Procedural Due Process;

[2] 42 U.S.C. Section 1983 Violation of Substantive Due Process; [3] 42 U.S.C. Section 1983

Violation of First Amendment Right to Free Association; [4] 42 U.S.C. Section 1983 Violation

of First Amendment Right to Free Expression; [5] 1985(3) Conspiracy; [6] Violation of Utah

Constitution Right to Due Process; [7] Violation of State Constitutional Right to Free

Expression; [8] State Law Wrongful Injunction; [9] Abuse of Process; and [10] Declaratory

Judgment that any attempt to serve Plaintiffs in the future with an injunction identical to the one

issued by the state court would violate their civil rights. (Amended Consolidated Complaint

(ACC) ¶¶ 142–188, ECF No. 50 at 19–26.) The court subsequently dismissed Plaintiffs' eighth

and ninth claims against Weber County. (*See* ECF No. 81 at 52.)

In their Motion for Partial Summary Judgment, Plaintiffs "move for summary judgment

on the question of liability for their First Claim for Relief against Weber County . . . ." (ECF No.

93 at 1.) In their Motion for Summary Judgment, the Weber County Defendants "move . . . for

Summary Judgment on all claims." (ECF No. 156 at 1.)

I.    <u>Monetary Damages</u>

Before addressing the parties' arguments, the court first addresses a preliminary matter—whether Plaintiffs are seeking monetary damages against the Weber County Defendants.

In their Amended Consolidated Complaint, Plaintiffs "pray for . . . an award of monetary damages . . . from each Defendant not named in his official capacity for each violation they have caused Plaintiffs . . . ." (ACC ¶ B, ECF No. 50 at 26.) At oral argument on the Motion for Judgment on the Pleadings held on May 24, 2017, Plaintiffs' counsel clarified that Plaintiffs are suing Weber County for money damages.[8]

What's more, the Weber County Defendants believe the Plaintiffs are seeking monetary damages. In their Motion for Summary Judgment, the Weber County Defendants have made arguments from which the court can infer that they interpret the Amended Consolidated Complaint to seek monetary damages. For example, in their argument relating to standing, the Weber County Defendants argued that "[t]his lack of standing applies to both **monetary** and injunctive relief claims . . . ." (ECF No. 156 at 11 (bold added).) Further, they argued that "Weber County is shielded from **monetary** damages, declaratory and injunctive relief for Plaintiffs['] remaining federal claims . . . ." (ECF No. 156 at 14 (bold added).) At oral argument on the Motions for Summary Judgment, the court confirmed that the Weber Defendants interpret the Amended Consolidated Complaint to seek monetary damages.[9]

---

[8] Plaintiffs' counsel stated: "the only person that [Plaintiffs] sued in his official capacity was the Weber County Attorney and that was not for damages. So we *did* sue Weber County and Ogden City for damages. So the intent there was not to say, you know, we're only seeking an injunction against those two when in fact the intent was the opposite. We were trying to make clear that we were seeking damages against Ogden City and Weber County."

[9] The court: "As I understand your argument here, it is at least as to your claim for injunctive relief, it is constitutionally moot because there is no threat."

Defendants' Counsel: "Absolutely."

The court holds that Plaintiffs have adequately pleaded a request for monetary damages from the Weber County Defendants. The court turns to the parties' arguments.

## II. Article III Standing Relating to the 'Fairly Traceable' Element

"Standing is a threshold issue in every case before a federal court . . . because the standing issue implicates a federal court's subject-matter jurisdiction." *Cornhusker Cas. Co. v. Skaj*, 786 F.3d 842, 851 (10th Cir. 2015) (emphasis in original removed) (internal quotation marks omitted) (citation omitted). Weber Defendants argue that Plaintiffs cannot show standing requirements as to Weber County "because Weber County's actions are not the cause of any of their alleged constitutional deprivations." (ECF No. 156 at 8.) Weber Defendants argue that Plaintiffs cannot show "a causal connection between Plaintiffs' injury and Weber County's conduct" because "Weber County did not serve or arrest the Plaintiffs and did not render legal advice or input as to whether they should be served or arrested." (*See* ECF No. 156 at 8) (citation omitted). Weber Defendants further argue that Weber County "never had input on who was being served and when." (ECF No. 156 at 8–9.) They further argue that "[t]his lack of standing applies to both monetary and injunctive relief claims since it shows that Weber County did not take action that could make it liable to the Plaintiffs for the harms they suffered." (ECF No. 156 at 11.)

The principle that plaintiffs must have standing to bring a case is rooted in Article III, which limits the federal courts' exercise of judicial power to cases and controversies. *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650, 198 L. Ed. 2d 64 (2017); *see* U.S.

---

The court: "There would continue to be jurisdiction in the court however, because of the damage claim."

Defendants' Counsel: "Yea, you still look at that issue separately, absolutely." (Oral argument 19:34—19:55)

Const. art. III, § 2, cl. 1. To demonstrate Article III standing, a plaintiff must plausibly allege (1) an injury in fact, (2) fairly traceable to defendants' conduct, (3) that is redressable by a favorable judicial ruling. *Rector v. City and Cty. of Denver*, 348 F.3d 935, 942 (10th Cir. 2003).

Weber County's arguments go to the second element for standing which requires that the alleged injury be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976)) (alterations in the original). A fairly traceable connection must be more than "an attenuated connection," *Robbins v. U.S. Dep't of Housing & Urban Dev.*, 72 F. Supp. 3d 1, 7 (D.D.C. 2014), but need not rise to the level of proximate cause. *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1156 (10th Cir. 2005) (citing *Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1273 (11th Cir. 2003)). Indeed, "even harms that flow indirectly from the action in question can be said to be 'fairly traceable' to that action for standing purposes." *Focus on the Family*, 344 F.3d at 1273.

Plaintiffs' alleged injuries are fairly traceable to Weber County. Sometime in the fall of 2009 or in early 2010, Dee Smith, the former Weber County attorney, together with Chris Allred, spent approximately one month "examining" and "researching" gang injunctions. (*See* Smith Depo., ECF No. 94-4 at 7:17–21.) Dee Smith spoke with "Lieutenant Scott Conley," an Ogden City lieutenant "over the gang unit at that time" about a gang injunction. (*See* Smith Depo., ECF No. 94-4 at 8:13–19.) Dee Smith also spoke to Ogden's police chief (*See* Smith Depo., ECF No. 94-4 at 9:8–10) and Ogden's mayor (Smith Depo., ECF No. 94-4 at 10:1–3) about the gang injunction. Weber County is the entity that filed the lawsuit seeking an injunction against Ogden Trece. *Weber Cty. v. Ogden Trece*, 2013 UT 62, ¶ 7, 321 P.3d 1067, 1070–71. Dee Smith also attended briefings in which he instructed Ogden police officers on how to serve the injunction.

Further, "Weber County" was the "Prosecuting Agency" that charged Mr. McCubbin with violating the gang injunction. (*See* ECF No. 94-13.) Additionally, the publicly available Information from this case reveals that Weber County was the prosecuting agency that charged Mr. Lucero with violating the gang injunction. What's more, Mr. Allred's deposition testimony reveals that Weber County was aware of Ogden's criteria for gang membership, and reveals that the Weber County Attorney's office gave the Ogden police input in terms of whom to serve. (*See* Allred Depo., ECF No. 94-16 at 39: 4–8.)

Plaintiffs' injuries flow directly from Weber County's actions. Plaintiffs' injuries are more than fairly traceable to the County. Plaintiffs have standing to bring this action against the Weber County Defendants.

III.     Mootness

In this section of their Motion for Summary Judgment, the Weber Defendants make three arguments: (A) the Weber County Defendants argue that Plaintiffs' claim for injunctive relief to remove them from Weber County's gang database is effectively moot because Weber County has never had a gang database; (B) the Defendants argue that Plaintiffs' claim for prospective relief relating to a future injunction is moot due to Chris Allred's voluntary cessation of the challenged conduct; and (C) Defendants argue that by pleading guilty to violating the gang injunction, Plaintiffs waived the right to bring a civil action against Weber County.

A.     Weber County Defendants' Arguments Relating to Gang Member Files

In their first claim for relief, Plaintiffs alleged that they are "presently recorded on a non-public gang database as members or associates of a criminal organization, despite their non-membership or association." (Am. Compl. ¶ 145, ECF No. 50 at 19.) They further allege that they are "entitled to an injunction against all Defendants requiring the[m] [to] remov[e] their

names from the jointly maintained Weber and Ogden database." (Am. Compl. ¶ 149, ECF No. 50 at 20.) The Weber County Defendants argue that "there is no evidence that [the Plaintiffs] are so listed at this point in time." (ECF No. 176 at 7.) They further argue that "Weber never possessed such a database and does not now." (ECF No. 176 at 7; *see also* ECF No. 113 at 12 ("Weber County has never kept a database or any sort of list of Ogden Trece gang members . . . .").)

Plaintiffs dispute the Weber Defendants' factual position. (*See* ECF No. 167 at 2.) Plaintiffs point to the deposition of Gary Worthen, "Weber's jail investigator from 2009 to about 2013 . . . ." (ECF No. 167 at 2.) Mr. Worthen testified that he "was trying to start a gang unit in the jail." (Worthen Depo. 77:4, ECF No. 156-3 at 20.) Mr. Worthen also testified that he "started those [gang] files." (Worthen Depo. 77:6, ECF No. 156-3 at 20.) At the deposition, Plaintiffs' counsel asked Mr. Worthen: "So your files about gangs are in the current [Weber] jail investigator's office?" (Worthen Depo. 84:4–5, ECF No. 156-3 at 22.) Mr. Worthen responded "yes." (Worthen Depo. 84:6, ECF No. 156-3 at 22.)

After this deposition, Mr. Allred submitted a third declaration. Mr. Allred submitted this declaration under penalty of perjury. (ECF No. 178 at 3.) In this declaration, he wrote that "[w]hile Gary Worthen may have maintained a handwritten gang list of some jail gang members with his work at the Jail, I was not aware that this list had even existed until I began preparing for depositions in this lawsuit. It is my understanding that this was solely maintained by Mr. Worthen." (3rd Allred Decl. ¶ 39, ECF No. 178 at 1.) He further provided "[t]o my knowledge there is not any official or unofficial list, database, or handwritten notes related to gang membership that Weber County owns, possesses, or controls." (3rd Allred Decl. ¶ 40, ECF No. 178 at 2.) Mr. Allred also represented that "[n]obody at the Weber County Attorney's Office ever used any gang information from a database or otherwise, that was owned or controlled by

Weber County, for any purpose, including in deciding who to serve with the Injunction." (Third Allred Decl. ¶ 41, ECF No. 178 at 2.)

Similarly, Dee Smith also submitted a declaration under penalty of perjury. (*See* ECF No. 116 at 6.) Mr. Smith represented that "Weber County has never kept a database or any sort of list of Ogden Trece gang members nor has Weber County ever had the ability to put a person o[n] the Ogden Trece Database or remove a person from that list." (Smith Decl. ¶ 7, ECF No. 116 at 3.)

At this stage of the proceedings, the court must "view the evidence and draw reasonable inferences therefrom in a light most favorable to the nonmoving party." *Commercial Union Ins. Co. v. Sea Harvest Seafood Co.*, 251 F.3d 1294, 1298 (10th Cir. 2001). Plaintiffs are the nonmoving party on this issue. Drawing reasonable inferences from the evidence in a light most favorable to Plaintiffs, there is a dispute of fact regarding whether Weber County possesses files regarding membership—based solely on Mr. Worthen's deposition testimony. Considering only the evidence that the parties submitted in this case, the Weber County Defendants are not entitled to summary judgment on this issue.

The court has additional reasons to deny the County Defendants' Motion on this issue. The Weber County Defendants' primary position throughout this litigation has been that it does not possess, and that it has never possessed, *any* gang database or list. (*See* ECF No. 176 at 7 ("Weber **never** possessed such a database and does not now. Mootness is not really the correct word for this situation because they **never had a gang database**." (bold added).) Chris Allred, the Weber County attorney, submitted multiple declarations under penalty of perjury representing this position.

Again, Chris Allred submitted a declaration, under penalty of perjury, that "to his

knowledge," "there is not any official or unofficial list, database, or handwritten notes related to gang membership that Weber County owns, possesses, or controls." (3rd Allred Decl. ¶ 40, ECF No. 178 at 2.) And, under penalty of perjury, Mr. Allred also represented that "[n]obody at the Weber County Attorney's Office **ever** used any gang information from a database or otherwise, that was owned or controlled by Weber County, **for any purpose**, including in deciding who to serve with the Injunction." (Third Allred Decl. ¶ 41, ECF No. 178 at 2 (bold added).) The court has reason to question Mr. Allred's representations.

"Federal Rule of Evidence 201 authorizes a federal court to take judicial notice of adjudicative facts at any stage of the proceedings, and in the absence of a request of a party." *Zimomra v. Alamo Rent-A-Car, Inc.*, 111 F.3d 1495, 1503 (10th Cir. 1997) (citations omitted).[10] The Tenth Circuit has "described adjudicative facts as 'simply the facts of the particular case.'" *United States v. Iverson*, 818 F.3d 1015, 1030 (10th Cir. 2016) (citation omitted). "When a court finds facts concerning the immediate parties who did what, where, when, how, and with what motive or intent the court is performing an adjudicative function, and the facts are conveniently called adjudicative facts." *Id.* (quoting *United States v. Gould*, 536 F.2d 216, 219 (8th Cir. 1976)).

Further, "a court may take judicial notice of its own records as well of those of other courts, particularly in closely-related cases." *Hutchinson v. Hahn*, 402 F. App'x 391, 394–95 (10th Cir. 2010) (citing *St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979) ("it has been held that federal courts, in appropriate circumstances, may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue."). Additionally, a court "may take

---

[10] *See* Fed. R. Evid. 201(c-d) ("The court may take judicial notice [of adjudicative facts] on its own" "at any stage of the proceeding.").

judicial notice of the contents of an agency's website." *See, e.g., Coleman v. Dretke,* 409 F.3d 665, 667 (5th Cir. 2005) (taking judicial notice of Texas agency's website).

As discussed below, the court takes judicial notice of adjudicative facts that directly contradict Weber County's position—and Chris Allred's representations—that Weber County has never maintained a gang list/database.

On May 29, 2019, the court held an evidentiary hearing in a criminal case. (1:19-cr-18, ECF No. 17.) Dee Smith appeared on behalf of the Government. (*See* 1:19-cr-18, ECF No. 17.) According to the docket in 1:19-cr-18, Mr. Smith's employer is the "Weber County Attorney's Office." In this criminal case, Mr. Smith called Remick Underwood to the stand for direct examination. (*See* 1:19-cr-18, ECF No. 20 at 4.) Mr. Underwood testified that he has worked as an agent with "Adult Probation and Parole" since either February or March of 2016. (*See* 1:19-cr-18, ECF No. 20 at 11.)

"Prior to [his] employment with Adult Parole and Probation," Mr. Underwood "was employed at the **Weber County** Sheriff's Office." (1:19-cr-18, ECF No. 20 at 11 (bold added).) Mr. Underwood testified that he was "employed at the Weber County Sheriff's Office" for "eight years." (1:19-cr-18, ECF No. 20 at 11.) Mr. Smith then asked Mr. Underwood: "and what position did you hold at the sheriff's office?" (1:19-cr-18, ECF No. 20 at 11.) Mr. Underwood answered that he "was a corrections officer and then a detective for investigations for the **gang unit** there." (1:19-cr-18, ECF No. 20 at 11 (bold added).) Mr. Underwood then testified that he was familiar with the defendant in the criminal case because he "was a corrections officer at the **Weber County Jail**," and "had a lot of dealings with [the defendant] when [Mr. Underwood] used to work in different sections, various sections of the jail." (1:19-cr-18, ECF No. 20 at 12 (bold added).)

Mr. Smith then asked Mr. Underwood: "You indicated that you were a detective with the **gang unit** at the sheriff's office. Was that part of your assignment inside of the jail or was that outside of the jail?" (1:19-cr-18, ECF No. 20 at 12 (bold added).) Mr. Underwood then answered: "Inside of the jail. So I worked on establishing the gang unit inside of the jail where we would **<u>document</u> all of the gang members** inside of the jail and create a—basically a **hierarchy of the different gangs**." (1:19-cr-18, ECF No. 20 at 12 (emphases added).) Mr. Smith then asked Mr. Underwood: "Okay. Through **that assignment** and your current assignment are you familiar with some of the **documented gangs** that operate in Weber County?" (1:19-cr-18, ECF No. 20 at 12 (bold added).) Mr. Underwood answered: "I am." (1:19-cr-18, ECF No. 20 at 12.)

After hearing Mr. Underwood's testimony that appeared to contradict Chris Allred's declaration, the court performed a search on Google, using the search term "weber county jail gang unit." The first result from that search yielded a webpage maintained by Weber County Sheriff's Office titled "Jail investigations." This page provides, in relevant part:

> Jail Investigations entails investigating gangs, assaults, drug offenses, thefts, criminal mischief and various other crimes committed by the inmates at the 12th street and Kiesel Correctional Facilities . . .
>
> Our unit coordinates with various local, state and federal agencies, to include the Joint Terrorism Task Force and Homeland Security, to share intelligence information. Gangs are a growing concern in Weber County. Gang intelligence information obtained in the Correctional Facility is useful for investigations inside the jail and to outside agencies. **The investigators use jail intelligence information to <u>document</u> inmates as gang members**. The investigators provide outside city, county, state, and federal agencies **<u>as well as the Weber County Attorney's Office</u>** with intelligence information to assist them with ongoing investigations. The information gathered by these investigators has been extremely valuable to agencies investigating criminal activity committed **<u>by gang members</u>** and to the **prosecutors who try these cases within <u>our</u> court system**.[11]

---

[11] http://www.webercountyutah.gov/sheriff/corrections/jail_investigations.php (bold added) (last visited September 27, 2019); *see also*

Chris Allred submitted his third declaration, under penalty of perjury, on May 11, 2018.
Dee Smith's witness at the criminal hearing, Remick Underwood, testified that he worked at the
Weber County Sheriff's Office for a period of approximately eight years. This eight year period
was prior to February or March of 2016. Mr. Underwood testified that when he worked at the
Weber County Jail, he "**document[ed] all of the gang members** inside of the jail and create[d] a
. . . a **hierarchy of the different gangs**." (1:19-cr-18, ECF No. 20 at 12 (emphases added).) If
Mr. Underwood worked at the Weber County Jail for an eight year period prior to 2016, and if it
is true that he "documented" gang members to create a "hierarchy of the different gangs," it is
hard to understand how Mr. Allred could have submitted a declaration in 2018, under penalty of
perjury, representing to this court that "there is not any official or unofficial list, database, or
handwritten notes related to gang membership that Weber County owns, possesses, or controls."
(3rd Allred Decl. ¶ 40, ECF No. 178 at 2.) The Weber County Sheriff's Office's website's
representation that its "investigators use jail intelligence information to **document** inmates as
gang members" also contradicts Chris Allred's representation that Weber County does not posses
a gang list. Further, the Sheriff's Office's website's representation that its investigators "provide"
"the Weber County Attorney's Office with [jail] intelligence information to assist them with
ongoing investigations" also appears to contradict Chris Allred's representation that "[n]obody at
the Weber County Attorney's Office **ever** used any gang information from a database or
otherwise, that was owned or controlled by Weber County, **for any purpose** . . . ." (Third Allred
Decl. ¶ 41, ECF No. 178 at 2 (bold added).)

　　　　The adjudicative facts that this court takes judicial notice of under Rule 201 of the

https://web.archive.org/web/20160921142759/http://www.webercountyutah.gov/sheriff/corrections/jail_investigatio
ns.php (indicating that this text was present on Weber County Sheriff's Office's website as early as September
2016—long before Chris Allred submitted his third declaration) (last visited September 27, 2019).

Federal Rules of Evidence provide this court with further reason to deny the Weber County Defendants' Motion for Summary Judgment on the gang database issue.

B. <u>Weber County's Arguments Relating to Voluntary Cessation</u>

Weber Defendants argue that "[s]ince there is currently no injunction or order against the Plaintiffs, they have no injury to redress and lack standing and all prospective relief is moot." (ECF No. 156 at 11.) In their first claim for relief, Plaintiffs allege that they are "entitled to a declaratory judgment against all Defendants that enforcing an injunction drafted identically to the injunction at issue would be a violation of Plaintiffs' rights as protected by the Fifth and Fourteenth Amendments . . . ." (Am. Compl. ¶ 148, ECF No. 50 at 19–20.) Plaintiffs allege that they are entitled to the same relief in their third claim for relief (Am. Compl. ¶ 160, ECF No. 50 at 21); their fourth claim for relief (Am. Compl. ¶ 165, ECF No. 50 at 22); and their fifth claim for relief. (Am. Compl. ¶ 170, ECF No. 50 at 23.)

Additionally, in their sixth claim for relief, Plaintiffs argue that "they are entitled to a declaratory judgment that an injunction drafted identically to the injunction at issue here would be a violation of their rights as protected by Article I, Section 7 of the Utah Constitution." (Am. Compl. ¶ 175, ECF No. 50 at 24.) They also allege, in their seventh claim for relief, that "they are entitled to a declaratory judgment that an injunction drafted identically to the injunction at issue here would be a violation of their rights as protected by Article I, Sections 1 and 15 of the Utah Constitution." (Am. Compl. ¶ 180, ECF No. 50 at 24.)

"A suit becomes moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Brown v. Buhman*, 822 F.3d 1151, 1165 (10th Cir. 2016) (citation omitted). "No matter how vehemently the parties continue to dispute the lawfulness of the conduct that precipitated the lawsuit, the case is moot if the dispute is no longer

embedded in any actual controversy about the plaintiffs' particular legal rights." *Id*. (citation omitted) (internal quotation marks omitted). "The crucial question is whether granting a present determination of the issues offered will have some effect in the real world." *Id*. at 1165–66 (citation omitted) (internal quotation marks omitted).

The mootness doctrine has exceptions "notwithstanding the seeming extinguishment of any live case or controversy." *Id*. at 1166. Relevant here, a defendant's "voluntary cessation of challenged conduct does not ordinarily render a case moot because a dismissal for mootness would permit a resumption of the challenged conduct as soon as the case is dismissed." *Id*. (quoting *Knox v. Serv. Employees Int'l Union, Local 1000*, 567 U.S. 298, 307, 132 S. Ct. 2277, 2287, 183 L. Ed. 2d 281 (2012)). "A defendant's voluntary cessation may moot a case, however, if the defendant carries 'the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur.'" *Id*. (citation omitted); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 170, 120 S. Ct. 693, 145 L. Ed. 2d 610 (2000) ("The heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to recur lies with the party asserting mootness.").

"But the burden is not insurmountable, especially in the context of government enforcement." *Id*. at 1167. "'In practice, this heavy burden frequently has not prevented governmental officials from discontinuing challenged practices and mooting a case.'" *Id*. at 1167. (citation omitted). "Most cases that deny mootness following government officials' voluntary cessation 'rely on *clear showings* of reluctant submission by governmental actors and a desire to return to the old ways.'" *Id*. (citation omitted); *see also Citizen Ctr. v. Gessler*, 770 F.3d 900, 908 (10th Cir. 2014) ("[A] defendant's voluntary cessation moots a case when a challenged regulation is repealed and the government does not openly express intent to reenact

it.").

In order to resolve the Weber County Defendants' Motion, this court must decide whether the Weber Defendants have met their heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to recur. The Tenth Circuit's decision in *Brown v. Buhman* is instructive.

In *Brown*, the Plaintiffs were a "plural family" formerly residing in Utah. *See Brown*, 822 F.3d at 1156. They were featured on a reality television show in which they "discussed their religious beliefs in polygamy and defended their polygamist lifestyle." *Id*. The day after the first episode of that show aired, the police department of the city in which the family lived announced it would investigate the family for violations of Utah's bigamy statute. *See id*. "Fearful they would be criminally prosecuted, the [family] moved to Nevada . . . ." *Id*. The County Attorney for Utah County was subsequently "quoted in a . . . media report as saying that despite the [family's] move, his office would not rule out the possibility of prosecution." *Id*.

The family then "filed a 42 U.S.C. § 1983 action" seeking "declaratory relief" and a "permanent injunction enjoining" the Utah County Attorney's office from enforcing "Utah's bigamy statute" against them. *See Brown*, 822 F.3d at 1155. After the Plaintiffs filed their suit, the Utah County Attorney's office adopted a new policy regarding bigamy prosecutions. *Id*. The policy was to not prosecute polygamists under Utah's criminal bigamy statute "for just the sake of their practicing polygamy." *Id*. at 1157. After adopting this policy, the Utah County Attorney filed a motion to dismiss the family's § 1983 suit as "constitutionally moot." *Id*. at 1159. "The motion was based on a second declaration [the Utah County Attorney] had signed . . . in which he announced he had" adopted the new policy. *Id*. In this declaration, the Utah County Attorney wrote that "'the criminal case against the Browns is closed and no charges will be filed against

them for bigamy unless new evidence is discovered which would comport with the [new policy] pertaining to the prosecution of bigamy crimes.'" *Id*. (citation omitted).

The Tenth Circuit held that the Utah County Attorney's "declaration rendered the [family's] case constitutionally moot." *Id*. at 1178. The Tenth Circuit's "mootness analysis proceed[ed] in three" steps. *See Brown*, 822 F.3d at 1169. At the second step, the Tenth Circuit held that the family did not face a credible threat of prosecution, in part, because there was no reasonable expectation that the County Attorney would violate the new policy. *See Brown*, 822 F.3d at 1170. On this point, the Tenth Circuit provided, in relevant part:

> [the County Attorney] . . . declared under penalty of perjury that the Browns will not be prosecuted unless they engage in criminal conduct beyond that proscribed by the Statute. To find this "voluntary cessation is a sham for continuing possibly unlawful conduct," *Rio Grande Silvery Minnow,* 601 F.3d at 1118 (quotation omitted), we would have to conclude the highest-ranking law enforcement official in Utah County had engaged in deliberate misrepresentation to the court.
>
> We see no basis for this conclusion. Close scrutiny of the relevant facts does not suggest [the County Attorney] is attempting to deceive the court. *See Am. Civil Liberties Union of Mass. v. U.S. Conference of Catholic Bishops,* 705 F.3d 44, 56 (1st Cir.2013) ("We understand [the voluntary cessation] exception to mootness to be highly sensitive to the facts of a given case.").

*Brown* 822 F.3d at 1170. The Tenth Circuit further provided:

> we see no basis to question [the County Attorney's] bona fides after he publicly adopted under penalty of perjury and submitted to the federal court the same prosecution policy that the chief law enforcement officer of the state had previously adopted. The risk that [the County Attorney would] revoke or ignore the . . . Policy under these circumstances is minimal at best, and certainly not enough to sustain a live case or controversy.

*Id*. at 1171.

In their Opposition, Plaintiffs pointed to "Weber's latest verbatim quotes to the media . . . indicat[ing] that Weber intended to seek 'essentially . . . the same' injunction" as evidence that their suit is not moot. (*See* ECF No. 167 at 13 (quoting Allred Depo., 134:13–135:25, ECF No.

122-16 at 35[12].) Mr. Allred's "quotes to the media" provide that he "anticipate[d] issuing a new gang injunction" and "said it would be almost identical to the first injunction." (Allred Depo. 134:16–19, ECF No. 122-16 at 35.) Plaintiffs appear to invite the court to infer that Mr. Allred's statements constitute "clear showing of reluctant submission" and evidence of "a desire to return to the old ways." *Brown*, 822 F.3d at 1167.

But Mr. Allred's statements to the media are very similar to the Utah County Attorney's statements to the media in *Brown* that the Tenth Circuit ultimately held were insufficient to constitute "clear showings of reluctant submission by [the Utah County Attorney] and a desire to return to the old way." *Id*. at 1178.

Like the Utah County Attorney in *Brown*, Mr. Allred has, since making statements to the media, submitted a declaration to the court relevant to the issue of mootness. Mr. Allred submitted this declaration "under penalty of perjury." (2nd Allred Decl., ECF No. 157 at 4.) In this declaration, Mr. Allred provided that "Weber County absolutely will not seek a gang injunction order that is exactly like the previous gang injunction." (2nd Allred Decl. ¶ 27, ECF No. 157 at 2.) And in its Reply, the Weber County Defendants stated that "a substantially similar injunction will not be implemented in the future." (ECF No. 176 at 8.) Mr. Allred further provided that "Weber County has no plans to **ever** serve the Plaintiffs with a future gang

---

[12] **Q. "**And skipping to Plaintiffs' 1038. This is one of those statements we were talking about earlier, public statements. It says, '*Allred said he anticipates issuing a new gang injunction and is waiting on data from Ogden police to help draft it. Allred said it would be **almost identical to the first injunction**.*' And there's a quote by you directly, '*It will essentially be the same. We might tweak it a little bit, add some provisions or take some provisions out*,' Allred said. '*The Supreme Court gave us direction on what they want to see as far as service goes, so we don't count on having that problem at all anymore.*' I think I understood you to say you might have sort of evolved in your thinking on that. Is that accurate as to what you said at the time?

**A.** That's probably pretty similar, yeah. I really did want to bring the gang injunction back. Especially, initially, after we got the [Utah] Supreme Court decision back because it focused on service. We felt like that gave us enough information to know how to go about clarifying that. But as we talked and as time went on, as I continued to be involved in a lawsuit with the ACLU, we have slowed things down a little bit during that time. (Allred Depo., ECF No. 94-16 at 134:13–135:12. (emphases added).)

28

injunction or to name them as parties in a future gang injunction lawsuit." (2nd Allred Decl. ¶ 28, ECF No. 157 at 2 (emphasis added).)

But unlike the County Attorney in *Brown*, this court has a reason to question Chris Allred's bona fides. As discussed at length above, Chris Allred submitted multiple declarations under penalty of perjury representing that Weber County *never* possessed any gang database/list. And, as discussed at length above, the court has serious reason to question that representation. "Close scrutiny of the relevant facts" may suggest that Chris Allred "is attempting to deceive the court." *Brown*, 822 F.3d at 1170. At this time, the court has reason to question Chris Allred's credibility. The court cannot, at this time, take Mr. Allred at his word that he will not seek a substantially similar injunction. Nor can the court, at this time, accept Mr. Allred's representation that he would not serve the plaintiffs in this case with a future injunction. At this time, the court cannot conclude that Weber County has met its heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to recur. The court therefore DENIES the County's Motion for Summary Judgment on this issue.

The court will allow the Weber County Defendants an opportunity to respond to the court's concerns, however. If they choose, the court will hold an evidentiary hearing on the issue of mootness. At this hearing, Chris Allred may elect to testify under oath. He will be subject to cross examination. If Mr. Allred can adequately explain the apparent contradiction between his sworn representations and the Rule 201 evidence, the court may hold that Weber County has met its heavy burden.

C. <u>Weber County Defendants' Arguments Relating to Plaintiffs Having Pled Guilty</u>

In their Motion for Judgment on the Pleadings, the Weber County Defendants argued that "Plaintiffs **waived** all Constitutional claims when" they pled "guilty." (ECF No. 60 at 18

(emphasis added).) They further argued that "[a]ny such plea constitutes an express **waiver** of any constitutional defects in the charges, conviction, arrest, and sentencing and it is an admission of fact that they did not sustain a constitutional injury." (ECF No. 60 at 18–19 (emphasis added).) In response to this argument, the Plaintiffs argued that "[t]hese arguments are complete fabrications not based on any actual language from the plea agreements or any legal precedent, and the Court should reject them on their face." (ECF No. 65 at 18.) In their Motion for Summary Judgment, Defendants again argue that the Plaintiffs "**waived** their constitutional rights and any prior procedural defects when they pled to the offenses." (ECF No. 156 at 13 (emphasis added).)

The Weber County Defendants overlook *Haring v. Prosise,* 462 U.S. 306, 103 S.Ct. 2368, 76 L.Ed.2d 595 (1983). "In *Haring,* a criminal defendant pled guilty in state court and then brought a section 1983 action based on an allegedly illegal search that had led to the state criminal proceedings." *Slayton v. Willingham*, 726 F.2d 631, 633 (10th Cir. 1984). The district court in *Haring* "granted summary judgment for defendants on the ground that [the criminal defendant's] guilty plea . . . barred his § 1983 claim." *Haring*, 462 U.S. at 309. "The [district] court reasoned that [the criminal defendant's] failure to assert his [constitutional] claim in state court constituted a waiver of that right precluding its assertion in any subsequent proceeding." *See id*.

The question for the Supreme Court was whether the criminal defendant's "§ 1983 action to redress an alleged [constitutional] violation [was] barred by the judgment of conviction entered in state court following his guilty plea." *Id*. at 312. The petitioners in that case made two basic arguments. First, that "under principles of collateral estoppel" the criminal defendant's "conviction would bar his subsequent civil challenge to police conduct, and that a federal court

must therefore give the state judgment the same effect under 28 U.S.C. § 1738." *Id*. Second, that the criminal defendant waived any claim involving an antecedent constitutional violation by pleading guilty in the state court. *See id*. at 319.

The Weber County Defendants did not raise issues related to collateral estoppel, and what effect, if any, this court must give the state judgments under 28 U.S.C. § 1738. The court declines to address this issue since Defendants did not raise it. The court instead discusses the issue that the Weber County Defendants did raise—waiver.

The Supreme Court in *Haring* "reject[ed] the view, argued by petitioners and accepted by the District Court, that by pleading guilty [the criminal defendant] 'waived' any claim involving an antecedent [constitutional] violation." *See Haring*, 462 U.S. at 319. This was because the criminal defendant's constitutional "claim [was] the crux of his § 1983 action which directly challenge[d] the legality of police conduct" and was "irrelevant to the constitutionality of his criminal conviction." *Id*. at 322. The Supreme Court ultimately "conclude[d] that respondent's conviction in state court does not preclude him from now seeking to recover damages under 42 U.S.C. § 1983 for an alleged Fourth Amendment violation that was never considered in the state proceedings." *Haring*, 462 U.S. at 323.

Here, Plaintiffs do not challenge the constitutionality of their convictions, but instead challenge the legality of the Weber County Defendants' conduct. Like the Court in *Haring*, this court rejects the Weber County Defendants' arguments that Plaintiffs waived their claims under § 1983 by pleading to violations of the injunction.

Further, the state district court that issued the injunction lacked jurisdiction to enter the injunction in the first instance, so the injunction was void. The court holds that this is an alternative basis to deny Defendants' Motion for Summary Judgment on this issue.

IV.    Weber Defendants' Argument that they "Acted as State Agents"

In their Motion for Judgment on the Pleadings, the Weber Defendants previously argued that "this Court is required to dismiss all federal claims against . . . [the] two Weber County Defendants—[Weber County and County Attorney Christopher Allred]—with prejudice based solely upon Eleventh Amendment Immunity" because "Utah law clarifies that a prosecutor acts on behalf of the state." (ECF No. 60 at 13–14.)

This court rejected that argument and noted that "one court in this district has previously concluded that a Utah county attorney is not a state officer under Utah law." (ECF No. 81 at 31 (citing *Allison v. Utah Cty. Corp.*, 335 F. Supp. 2d 1310, 1316–17 (D. Utah 2004) as "holding that, based on its analysis of Utah law relating to the county attorney position, a county attorney was 'properly classified as a county officer, rather than a state officer.'").) The court found "persuasive *Allison's* conclusion that a Utah county attorney is not a state officer" and "decline[d] to construe Mr. Allred's prosecutorial acts in this case so broadly as to convert the serving and enforcing of a County-obtained nuisance injunction as action on behalf of the state . . . ." (ECF No. 81 at 31.)

In their Motion for Summary Judgment, Weber Defendants state that "[b]ased upon this Court's ruling on the second motion for judgment on the pleadings, Weber County is only asserting Eleventh Amendment immunity on behalf of Weber County as it relates to prosecuting Plaintiffs for violations of state law and the state injunctive orders." (ECF No. 156 at 13–14.) It appears that Weber Defendants are attempting to assert Eleventh Amendment immunity for Weber County, but not for Mr. Allred in his official capacity as the Weber County Attorney. (*See* ECF No. 156 at 13–14.) But in deciding that Mr. Allred was not entitled to Eleventh Amendment immunity, the court already implicitly decided that Weber County was also not entitled to

Eleventh Amendment immunity because "a suit against a[n] . . . official in his official capacity is the same has suing the particular . . . agency." *Cf. Allison*, 335 F. Supp. 2d at 1316. The court rejects Weber Defendants' argument.

V.     Weber Defendants' Arguments Relating to Municipal Liability

Weber County Defendants argue that "Weber County is not liable to the Plaintiffs based upon 'municipal liability.'" (ECF No. 156 at 15.) Plaintiffs bring their First, Second, Third, and Fourth claims for relief under 42 U.S.C. § 1983. (ACC ¶¶ 142–65, ECF No. 50 at 19–22.)

Section 1983 provides a remedy against "any person" who, under color of state law, deprives another of rights protected by the Constitution. 42 U.S.C. § 1983. In *Monell v. New York City Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court held that municipalities and other local government entities were included amongst those persons to whom § 1983 applies. *Monell*, 436 U.S. at 690. The Court indicated, however, that municipalities may not be held liable under section 1983 "unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Id.* at 691, 98 S.Ct. 2018. "[A] municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." *Id.* Rather, "it is when execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible under § 1983." *Id.*

Thus, "to establish municipal liability, a plaintiff must show [A]) the existence of a municipal policy or custom, and [B]) that there is a direct causal link between the policy or custom and the injury alleged." *Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) (quoting *Hinton v. City of Elwood,* 997 F.2d 774, 782 (10th Cir.1993)).

A. Official Policy or Custom

"Section 1983 was passed to curb violations of constitutional rights by local authorities under color of law, and acts pursuant to **policy** or custom undoubtedly qualify." *Simmons v. Uintah Health Care Special Dist.*, 506 F.3d 1281, 1284 (10th Cir. 2007) (bold added). "[T]he [Supreme] Court in *Pembaur* . . . establish[ed] that actions taken by a municipality's final policymakers . . . represent acts of 'official policy' giving rise to municipal liability." *Simmons*, 506 F.3d at 1285 (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481, 106 S. Ct. 1292, 1298, 89 L. Ed. 2d 452 (1986)). "And this makes sense. An act by a municipality's final policymaking authority is no less an act of the institution than the act of a subordinate employee conforming to a preexisting policy or custom." *Simmons*, 506 F.3d at 1285.

In *Pembaur*, the Supreme Court "left open the question of how to determine who is a 'final policymaker.'" *Randle v. City of Aurora*, 69 F.3d 441, 447 (10th Cir. 1995). But the Supreme Court in *Praprotnik* "explained that 'final policymaking authority' is a legal issue to be determined by the court based on state and local law." *Id*. (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124, 108 S. Ct. 915, 924, 99 L. Ed. 2d 107 (1988)); *see also Milligan-Hitt v. Bd. of Trustees of Sheridan Cty. Sch. Dist. No. 2*, 523 F.3d 1219, 1224 (10th Cir. 2008) ("The judge, not the jury, should determine who exercises final policymaking authority in a municipality.").

"In deciding whether an official is a final policymaker, '[the Tenth Circuit is] interested only in delegations of *legal power*.'" *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1189 (10th Cir. 2010) (citations omitted). "Three factors help [courts] decide whether an individual is legally a final policymaker for a municipality: '(1) whether the official is meaningfully constrained by policies not of that official's own making; (2) whether the official's

decisions are final—*i.e.,* are they subject to any meaningful review; and (3) whether the policy decision purportedly made by the official is within the realm of the official's grant of authority.'" *Id*. at 1189–90 (quoting *Randle v. City of Aurora,* 69 F.3d 441, 448 (10th Cir.1995)). As explained below, in order to examine whether the County Attorney was a final policymaker, this court must examine the relationship between Weber County's three member county commission and the County Attorney.

In Utah, "each county . . . operate[s] under one of" four possible "forms of county government," one of which is a "county commission form." Utah Code Ann. § 17-52a-103(1)(a). At his deposition, Dee Smith testified that at the time he sought the gang injunction, Weber County was governed by a "county commission," a "three-person commission in Weber County." (*See* Smith Depo., ECF No. 94-4 at 20:20–21.) Under Utah law, "[a] county commission consisting of three members shall govern each county operating under the county commission form of government." Utah Code Ann. § 17-52a-201(2). The court therefore assumes that Weber County was operating under the "county commission form of government" during the relevant period.

As discussed above, "Weber County . . . obtained [the] permanent injunction against Trece and its members under a public nuisance theory pursuant to section 76–10–806 of the Utah Code . . . ." *Weber Cty. v. Ogden Trece*, 2013 UT 62, ¶ 2, 321 P.3d 1067, 1070. The statute provides, in relevant part:

> The county attorney of the county where the public nuisance exists, upon direction of the county executive, or city attorney of the city where the public nuisance exists, upon direction of the board of city commissioners, or attorney general, upon direction of the governor, **or any of the above attorneys <u>without the necessity of direction</u>**, is empowered to institute an action in the name of the county, city, or state, as the case may be, to abate a public nuisance.

Utah Code Ann. § 76-10-806 (emphases added). "County executive" means "the county commission, in the county commission . . . form of government established under Title 17, Chapter 52a, Changing Forms of County Government." Utah Code Ann. § 68-3-12.5.

The Utah Statute under which Dee Smith sought the gang injunction is section 76–10–806 of the Utah Code. That statute unambiguously provides that a county attorney may "institute an action in the name of the county" "without the necessity of" the county commission's "direction." Dee Smith's decision to seek the injunction was therefore unquestionably "within the realm of [his] grant of authority" as County attorney. *Randle*, 69 F.3d at 448. Dee Smith's decision to seek the injunction was also final—the county commission did not review his decision. As discussed above, Dee Smith testified that the county commission never formally approved the gang injunction prior to the County filing suit. (*See* Smith Depo., ECF No. 94-4 at 20:3–8.) In other words, Dee Smith's decision was not "subject to any meaningful review." *Randle*, 69 F.3d at 448. Finally, Weber County has put forward no evidence that Dee Smith was "meaningfully constrained by policies not of" his own making. *See id*. All three of the *Randle* factors weigh in favor of this court holding that Dee Smith, as the Weber County Attorney, was the Weber County policymaker.[13]

---

[13] In addition, Dee Smith met with County "Commissioner Dearden" about the gang injunction, but the County Commission "didn't vote on it," and did not formally approve the gang injunction. (*See* Smith Depo., ECF No. 94-4 at 20:3–8; *see also* Smith Depo., ECF No. 94-4 at 20:12–14 ("So the commission, to [Dee Smith's] knowledge, never had a formal vote" on the gang injunction). Further, Mr. Smith's deposition, the following line of questioning occurred:

> Q. Okay. So why didn't you take the prospect of bringing the suit before the full county commission?
>
> A. Because it was -- it was the county attorney's action. It was -- I was an elected official, it was **my decision** that my -- that's what we would do.

(Smith Depo., ECF No. 94-4 at 21 (bold added).)

B. Link Between Policy and Constitutional Injury

"To establish the causation element, the challenged policy or practice must be 'closely related to the violation of the plaintiff's federally protected right.'" *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 770 (10th Cir. 2013). (citation omitted). "This requirement is satisfied if the plaintiff[s] show[ ] that 'the municipality was the moving force behind the injury alleged.'" *Id*. (quoting *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 404, 117 S. Ct. 1382, 1388, 137 L. Ed. 2d 626 (1997)). Thus, Plaintiffs "must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Brown*, 520 U.S. at 404, 117 S.Ct. 1382.

The court proceeds in two steps. First, the court examines Plaintiffs' alleged constitutional injuries and then addresses whether Weber County caused these injuries.

1. Violation of Procedural Due Process

Plaintiffs "move for summary judgment on the question of liability for their First Claim for Relief against" the Weber County Defendants. (ECF No. 93 at 1.) In their first claim for relief, Plaintiffs argue that the Weber County Defendants, "acting under color and authority of law, deprived Plaintiffs of liberty and property interests without due process of law." (ACC ¶ 143, ECF No. 50 at 19.)

The Due Process Clause states, "No State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "Absent an emergency, an individual generally must be provided some kind of process before he is deprived of one of these protected interests." *McDonald v. Wise*, 769 F.3d 1202, 1210 (10th Cir. 2014). Courts "examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State . . . the second examines whether

the procedures attendant upon that deprivation were constitutionally sufficient." *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460, 109 S. Ct. 1904, 1908, 104 L. Ed. 2d 506 (1989).

a. <u>Liberty Interest</u>

"A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' . . . ." *Wilkinson v. Austin*, 545 U.S. 209, 221, 125 S. Ct. 2384, 2393, 162 L. Ed. 2d 174 (2005). Plaintiffs argue that the Weber County Defendants interfered with at least two of their liberty interests—freedom of association and freedom of movement. Freedom of association and movement are "liberty interests protected by the Due Process Clause . . . ." *See Vasquez v. Rackauckas*, 734 F.3d 1025, 1042 (9th Cir. 2013).

<u>Freedom of Association</u>

Plaintiffs argue that the Preliminary and Permanent Injunctions' "do not associate" clauses "thoroughly impinged" both their freedom of intimate association and their freedom of expressive association. (*See* ECF No. 93 at 19–20.)

Plaintiffs specifically argue that the injunctions interfered with their right to associate with family members. (*See* ECF No. 93 at 20.) "The right to intimate association was first recognized by the Supreme Court in *Roberts v. United States Jaycees,* 468 U.S. 609, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984). . . ." *Matusick v. Erie Cty. Water Auth.*, 757 F.3d 31, 57 (2d Cir. 2014). The right to intimate association concerns "the choice to 'enter into and maintain certain intimate human relationships without undue intrusion by the State . . . .'" *Id*. at 57 (quoting *Jaycees*, 468 U.S. at 617–18). "Included in that category are 'family relationships, which by their nature, involve deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctly personal aspects of one's life.'" *Trujillo v. Bd. of Cty. Comm'rs of Santa Fe Cty.*, 768

F.2d 1186, 1188 (10th Cir. 1985) (quoting *Jaycees*, 468 U.S. at 620). "Many courts have recognized liberty interests in familial relationships other than strictly parental ones." *Id.* "Moreover, the freedom of intimate association protects associational choice as well as biological connection." *Id.*

Plaintiffs also argue that the Preliminary and Permanent Injunctions interfered with their freedom of expressive association. (*See* ECF No. 93 at 19–20.) "[T]he First Amendment . . . implicitly protects the . . . freedom to expressive association." *Grace United Methodist Church v. City Of Cheyenne*, 451 F.3d 643, 658 (10th Cir. 2006). Indeed, the Supreme Court has long understood that the First Amendment protects the "right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Jaycees*, 468 U.S. at 622.

The Preliminary Injunction contained a "Do Not Associate" provision that enjoined "all members of defendant Ogden Trece" from "[d]riving, standing, sitting, walking, gathering or appearing, anywhere in public view or anyplace accessible to the public, with any known member of Ogden Trece . . . .[14]" (ECF No. 94-4 at 2–4.) The Permanent Injunction Contained a "Do Not Knowingly Associate" provision that was substantially similar to the Preliminary Injunction's. (*See* ECF No. 94-6 at 2.) Thus, the injunctions prohibited anyone subject to its terms from associating with any known member of Ogden Trece—including family members— anywhere in public view or any place accessible to the public. The injunctions therefore "burden[ed] the constitutionally protected freedom of 'intimate association,' . . . by barring association with family members in public places such as . . . parks, libraries, stores, and

---

[14] The "Do Not Associate" provision did not include "(1) when all individuals are inside a school attending class or on school business, and (2) when all individuals are inside a church, provided however that this prohibition against associating shall apply to all claims of travel to or from any of those location."

restaurants . . . if in 'public view.'" *See Vasquez v. Rackauckas*, 734 F.3d 1025, 1043 (9th Cir.

2013). The Do Not Associate provisions also interfered with Plaintiffs' right to expressive

association by not including exceptions for individuals to engage in protected First Amendment

activity such as political demonstrations or "otherwise 'associating with others in pursuit of the

wide variety of socia,  economic . . . and cultural ends' 'protected by the First Amendment.'"

*Vasquez*, 734 F.3d at 1043 (quoting *Jaycees,* 468 U.S. at 622).

Freedom of Movement

Plaintiffs argue that the County Defendants denied their "free right of movement to

Plaintiffs when they were served with the injunctions." (ECF No. 93 at 20.) "Citizens have a

fundamental right of free movement, 'historically part of the amenities of life as we have known

them.'" *Nunez by Nunez v. City of San Diego*, 114 F.3d 935, 944 (9th Cir. 1997) (quoting

*Papachristou v. City of Jacksonville*, 405 U.S. 156, 163, 92 S. Ct. 839, 844, 31 L. Ed. 2d 110

(1972). The Preliminary Injunction established a curfew prohibiting "being present in public

view" "between the hours of 11 p.m. on any date and 5 a.m." unless one of three exceptions

applied. (*See* ECF No. 94-5 at 4.) The Permanent Injunction's Curfew provision was identical to

the Preliminary Injunction's. (*Compare*, ECF No. 94-5 at 4 *with* 94-6 at 4.) And as discussed

above, the injunctions prohibited Plaintiffs from "[d]riving, standing, sitting, walking, gathering

or appearing, anywhere in public view or anyplace accessible to the public, with any known

member of Ogden Trece . . . ." (ECF No. 94-5 at 2.) "These provisions directly interfered with an

individual's fundamental right of free movement . . . ." *Vasquez*, 734 F.3d at 1042.

Because the County Defendants' decision to restrict Plaintiffs' constitutionally protected

liberty interests constituted interference "by the State," the court turns to whether "the

procedures attendant upon that deprivation were constitutionally sufficient." *Thompson*, 490 U.S. at 460.

    b.  <u>Inadequate Process</u>

"In procedural due process claims, the deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process of law.*" *Zinermon v. Burch*, 494 U.S. 113, 125, 110 S. Ct. 975, 983, 108 L. Ed. 2d 100 (1990) (emphasis in original). "The constitutional violation actionable under § 1983 is not complete when the deprivation occurs; it is not complete unless and until the State fails to provide due process." *Id*. at 126. "Therefore, to determine whether a constitutional violation has occurred, it is necessary to ask what process the State provided, and whether it was constitutionally adequate." *Id*. This inquiry requires the court to examine the procedural safeguards built into the procedure effecting the deprivation, and any remedies for erroneous deprivations. *See id*.

The Supreme Court has often said that due process "is a flexible concept that varies with the particular situation." *Id*. at 127. To determine what procedural protections the Constitution requires in a particular case, the court weighs several factors:

> First, the **private interest** that will be affected by the official action; second, the **risk of an erroneous deprivation** of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the **Government's interest**, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 903, 47 L. Ed. 2d 18 (1976) (bold added). "Applying this test, the [Supreme] Court usually has held that the Constitution requires some kind of a hearing *before* the State deprives a person of liberty or property." *Zinermon*, 494 U.S. at 127 (emphasis in original). But in some circumstances, the Supreme Court has held that a

postdeprivation hearing may satisfy due process. For example, "in situations where a predeprivation hearing is unduly burdensome in proportion to the liberty interest at stake . . . or where the State is truly unable to anticipate and prevent a random deprivation of a liberty interest . . . ."[15] *Id.* at 132. As explained below, the court holds that Plaintiffs were entitled to predeprivation process.

## Private Interest

It follows from the court's discussion above regarding Plaintiffs' liberty interests that Plaintiffs' private interests are very strong. The injunctions substantially burdened the liberty of those subjected to them. As discussed above, the injunctions prohibited association between suspected gang members without exception for immediate family members. And, as discussed above, the Do Not Associate provisions also interfered with Plaintiffs' right to expressive association by not including exceptions for individuals to engage in many protected First Amendment activities. In other words, "[t]he scope of conduct covered by the [Preliminary Injunctions] [was] wide, intruding considerably on the daily lives of those subject to it." *C.f.*, *Vasquez*, 734 F.3d at 1045. Further, the Preliminary Injunction applied to "a twenty-five square-mile area encompassing most of the city of Ogden," *Trece*, 2013 UT 62 ¶ 16, a very large geographical area. The first *Mathews* factor weighs heavily in favor of Plaintiffs.

---

[15] In *Parratt v. Taylor*, 451 U.S. 527 (1981) the Supreme Court held that an adequate postdeprivation state judicial remedy may satisfy a procedural due process claim arising from a "random and unauthorized" deprivation of **property**. The Supreme Court, in *Zinermon v. Burch*, 494 U.S. 113 (1990) held that the *Parratt* doctrine applies to random and unauthorized deprivations of **liberty** as well as property. The Court in *Zinermon* also held that the conduct of officials who have authority to act in a particular area and provide pre-deprivation process is not "random and unauthorized." *See Zinermon*, 494 U.S. at 138–39. The County Defendants have not argued that their conduct falls into the *Parratt/Zinermon* line of cases that may excuse liability for the absence of predeprivation due process. Nor could they. The Weber County attorney was a final policy maker who could have provided predeprivation process.

**Risk of Erroneous Deprivation**

In applying the second *Mathews* factor this court addresses (1) "the fact-intensive nature of assessing whether an individual is an active gang member or participant;" (2) "the adequacy of the procedures Weber County used in making that determination;" and (3) "the sufficiency of post-deprivation remedies." *Vasquez*, 734 F.3d at 1045.

Difficulty in Determining Gang Membership

Like most gangs, determining an individual's possible membership in the Trece gang is a difficult task. Anthony Powers testified as an expert on the Trece gang for Weber County in the Nuisance Suit. (*See* ECF No. 93 at 10; s*ee also* Powers Depo., ECF No. 94-15 at 193: 18–19 ("I had already testified as an expert previously in second district court.").) At his deposition for this case, Powers testified that there are two ways for an individual to become a member of the Trece gang. (*See* Powers Depo., ECF No. 94-15 at 52.)

First, any individual who did not already have a family member in the gang would need to "be jumped in." (*See* Powers Depo., ECF No. 94-15 at 52.) "Jumping into" a gang is a process through which a "prospective gang member is physically assaulted by other gang members" as an initiation. *See e.g., Meza v. Sherman*, No. 18-CV-00599-JD (PR), 2019 WL 1207304, at *2 (N.D. Cal. Mar. 14, 2019). Powers testified that a prospective member gets "jumped in for 13 seconds, there's not going to be weapons used, there's going to be multiple people," and the prospective member is "expected to fight back." (Powers Depo., ECF No. 94-15 at 248: 1–5.)

Second, if a prospective member had a family member already in the gang, "they wouldn't have to be jumped in," but they "would have to make the decision to become" a part of the gang by engaging "in the same pattern of criminal activity" as current members. Powers testified that in order to be an active member of the gang, an individual would have to be "in

good standing." (*See* Powers Depo., ECF No. 94-15 at 51: 23.) Powers testified that an individual who engages in a "pattern of criminal activity" by getting "out there and . . . putting in work," and "establishing their street cred" would remain in good standing with the Trece gang. (*See* Powers Depo., ECF No. 94-15 at 52: 10–18.)

Powers testified that a Trece member could leave the gang by being "jumped out" of the gang in the same manner as being "jumped in" to join the gang. (*See* Powers Depo., ECF No. 94-15 at 247: 1–25.) Powers also testified that active Trece members would sometimes have a "O13" tattooed on the back of their shaved head, while an inactive member would likely "start growing their hair out." (*See* Powers Depo., ECF No. 94-15 at 146: 1–18.) He also testified that it was common for former members to cover up their gang tattoos. (*See* Powers Depo., ECF No. 94-15 at 147: 7–8.)

Based on the evidence presented to the court, the court concludes, like the court in *Vasquez*, that determining whether an individual is an active Ogden Trece member "presents a considerable risk of error." *C.f., Vasquez*, 734 F.3d at 1046. Jumping into the gang represents one method of identifying the precise moment of an individual's initiation into the gang.[16] But because family members of active Ogden Trece members do not have to be "jumped in" to join the gang, "[d]istinguishing an individual's social association with a gang member on a familial . . . –i.e. non-gang related basis, from an association with the gang as an organization is . . . a nuanced task." *C.f., Vasquez*, 734 F.3d at 1046. Further, it is difficult, if not almost impossible, for an outsider to accurately determine at what point an active member is no longer in "good standing" with the gang. A member may decide to formally leave the gang by "jumping out."

---

[16] Even this method requires the development of reliable facts by the entity charged with making the determination. The availability of such reliable evidence seems improbable in most cases which increases the risk of error as a practical matter.

Presumably, however, a member could simply stop associating with the gang, choose to stop being an active member, and avoid the "jump out" beating. As in *Vasquez*, the "fleeting nature of gang membership, and the lack of objective criteria in making the assessment," "heighten the need for careful factfinding." *Id*. As discussed below, the Ogden gang unit, with Weber's approval, unilaterally determined an individual's membership in the Trece gang. With virtually no participation by those individuals being classified as Trece gang members, the risk of error of Ogden gang unit's determinations as to gang membership was considerable.

Adequacy of Procedures

In this case, the determination of whom to serve with the Preliminary Injunction was made primarily by the Ogden gang unit. (*See* Smith Depo., ECF No. 94-4 at 26: 3–5.) Dee Smith testified that the gang unit determined who would be served with a copy of the Preliminary Injunction "based on their intelligence and based on who the active members of the gang were." (Smith Depo., ECF No. 94-4 at 26: 3–5.) Weber County has not pointed this court to any evidence demonstrating specifically why Mr. Lucero and Mr. McCubbin were served with the injunction. The evidence supports that generally, the gang unit had two basic requirements in order to serve an individual with the injunction.

First, an individual had to be on Ogden's gang intelligence list. (Young Depo., ECF No. 94-3 at 89: 22–24 (**Q.** "to your understanding . . . to be served with a gang injunction, you had to be on the gang intelligence list." **A.** "Yes.").) In order to be on the gang intelligence list, the individual had to meet two of eight possible criteria for general gang membership. (Young Depo., ECF No. 94-3 at 90: 1–3.) [17]

_____

[17] *See also* Young Depo., ECF No. 94-3 at 6: 7–15 ("It's a form to actually document a gang contact in the field. It's two pages. It may end up just being a contact with an individual who wasn't documented as a gang member. There's a list of questions. If two of those are checked affirmatively they are eligible to be placed on the gang intelligence list. If only one is checked they're eligible to be documented as a gang associate.").

Second, the Ogden gang unit had to be satisfied that the individual was specifically a member of the Trece gang—not just any gang. It is undisputed that "[i]n compiling the list of individuals to be served with the Preliminary Injunction, Ogden gang detectives, primarily Anthony Powers, went through a group of files of individuals the Ogden police considered to be active Ogden Trece gang members according to Ogden's criteria . . . ." (ECF No. 93 at 10; *see also* ECF No. 113 at 5–6.) Anthony Powers testified that the Ogden gang unit had a set of criteria to determine who was a Trece member. (*See* Powers Depo., ECF No. 94-15 at 52: 19–22.[18]) Powers testified that this criteria was distinct from the criteria for general gang membership. (*See* Powers Depo., ECF No. 94-15 at 53: 5–15.[19]) It is unclear what this criteria was, however.

Committing a crime was not necessary to be placed on the gang intelligence list. (*See* Young Depo., ECF No. 94-3 at 87: 8–9 ("No, you don't have to commit a crime to be on the gang intelligence list.").) Nor was actual membership in the Trece gang required to be served with the injunction—only satisfaction of Ogden's criteria. (*See* Young Depo., ECF No. 94-3 at 89–90; *see also* Powers Depo., ECF No. 94-15 at 52: 19–25.)

The court finds that the Ogden gang unit undertook a unilateral determination, based on highly subjective criteria, to determine upon whom to serve the gang injunction. Ogden's witnesses effectively admitted that actual Trece membership was not required to be served—only satisfaction of Ogden's criteria. Ogden's procedures for determining gang membership were

---

[18] At his deposition, when asked if "Ogden City had a set of criteria for who they would consider a Trece member," Anthony Powers answered "yes." (*See* Powers Depo., ECF No. 94-15 at 52: 19–22.)

[19] Powers Depo., ECF No. 94-15 at 53: 1–15 (**Q.** "Okay. So Ogden City independently put together a list of what they thought a Trece member could be or who you could say is a Trece member, right?" **A.** "They put together—the criteria to become a gang member, those eight boxes, that actually came out of the department of—or the California Department of Corrections. And so it's a standard that's used by a lot of different police departments . . . Sorry. But that's for any gang member, *not specifically to Ogden Trece*.") (emphasis added).)

inadequate. Based on the deposition testimony of Chris Allred and Dee Smith, the court also finds that Weber County was aware of Ogden's criteria and provided legal advice to Ogden regarding whom to serve with the injunction. There is no evidence that the County acted to require clear and objective criteria or reliable evidence be used in making the gang membership determination.

Post-Deprivation Remedies Wholly Inadequate

"In situations where the State feasibly can provide a predeprivation hearing before [depriving an individual of liberty,] it generally must do so regardless of the adequacy of a postdeprivation" remedy. *See Zinermon v. Burch*, 494 U.S. 113, 132 (1990). But, as discussed above, "postdeprivation remedies might satisfy due process" "in situations where a predeprivation hearing is unduly burdensome in proportion to the liberty interest at stake . . . ."

Offering alleged gang members an opportunity to challenge their status as members of the Trece gang—prior to being served with and subjected to the terms of the Preliminary Injunction—would not have been unduly burdensome in proportion to the liberty interests at stake. Weber County has not articulated any need for quick action that would justify its decision to not offer a predeprivation remedy. Nor has Weber County shown that permitting the Plaintiffs to have engaged in the conduct prohibited by the injunctions would have presented any imminent safety hazard. The court holds that Weber County was required to provide a predeprivation hearing to Plaintiffs prior to serving them with the Preliminary Injunction.

But even assuming "that the deprivation of liberty interests that Plaintiffs . . . suffered could conceivably have been remedied by some form of postdeprivation procedure," the court holds, in the alternative, that Weber County "provided no such adequate process." *C.f. Vasquez*, 734 F.3d at 1048. Based on the evidence presented to this court, Weber County appears to have

offered two distinct forms of postdeprivation process. First, as in Jesse Aeschliman's case, Weber County took the position that those individuals served with the injunction were entitled to a hearing to determine whether they were in fact a member of Ogden Trece. Second, an individual served with an injunction could opt-out of the injunction under the terms of the opt-out provision. Both forms of postdeprivation process were inadequate.

Affording a petitioning individual a postdeprivation hearing to determine gang membership effectively placed the burden on the petitioning individual to demonstrate that he was *not* an active gang member. Until the individual proved that he is not a gang member, he would have been subjected to the terms of the injunction, and his constitutionally protected liberty interests would have already been violated. This form of postdeprivation process was wholly inadequate. The opt-out provision was similarly inadequate.

**Government's Interest**

"Here, the operative question is not whether [Weber] has a significant interest in combating gang violence . . . but rather whether they have a significant interest in failing to provide a pre-deprivation process through which an individual can challenge [Weber's] allegations of his active gang membership." *Vasquez v. Rackauckas*, 734 F.3d 1025, 1052 (9th Cir. 2013) (internal quotation marks omitted) (citation omitted). Plaintiffs argue that "Defendants have not produced any documents showing any contemporaneous analysis they undertook to consider any additional fiscal or administrative burdens they might have faced if they had provided additional or substitute processes." (ECF No. 93 at 28.) In their Opposition to Plaintiffs' Motion, the County Defendants do not address their interest in failing to provide a pre-deprivation process. Weber County has established no administrative, fiscal, or other substantial

burden in providing some procedure for Plaintiffs to challenge Weber's gang membership determination before they were subjected to the injunctions' terms.

Summary of *Mathews* Factors

All the *Mathews* factors weigh in favor of Plaintiffs. Plaintiffs' liberty interests in their freedom of movement and association were weighty. The risk of erroneous deprivation was high. A predeprivation hearing would not have been unduly burdensome in proportion to the Plaintiffs' liberty interests. As discussed above, the court holds that Weber County was required to provide Plaintiffs with an opportunity to challenge their gang member status *prior* to being served and subjected to the terms of the injunctions. But even assuming that the deprivation of liberty interests that Plaintiffs suffered could conceivably have been remedied by some form of postdeprivation procedure, the court holds, in the alternative, that Weber County provided no such adequate process. Finally, Weber has not established any governmental interest justifying the failure to provide adequate predeprivation process. Weber County violated Plaintiffs' rights under the Due Process Clause of the federal Constitution.

2. Direct Causal Link

"[I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to [a] municipality." *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 404, 117 S. Ct. 1382, 1388, 137 L. Ed. 2d 626 (1997). "The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Id*. (emphasis in original). "Where a plaintiff claims that a particular municipal action *itself* violates federal law, or directs an employee to do so, resolving these issues of fault and causation is straightforward." *Id*. (emphasis in original). "[T]he conclusion that the action taken or directed by the municipality or its authorized decisionmaker itself violates federal law will also determine

that the municipal action was the moving force behind the injury of which the plaintiff complains." *Id.* at 405.

As discussed above, Weber County, through the County Attorney, conceived of and sought the injunction. And the County Attorney knew that those individuals served with the injunction would be designated as gang members by the Ogden gang unit. Further, the County Attorney knew that those individuals would not be given an opportunity to challenge their status as gang members *prior* to be served with the injunction. Weber County's choice to deprive Plaintiffs of their liberty interests without providing adequate due process was a decision that itself violated federal law. There is therefore a "direct causal link between" Weber County's policy "and the injury alleged." *Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 782 (10th Cir. 1993).

Plaintiffs have established municipal liability. Plaintiffs' Motion for Summary Judgment on their First Cause of Action, violation of procedural due process under the due process clause of the Fourteenth Amendment, (ECF No. 93) is GRANTED. Defendants' Motion for Summary Adjudication of Plaintiffs' Second, Third, and Fourth claims is DENIED.

VI.    § 1985

Plaintiffs' Fifth Claim for Relief is titled "1985(3) Conspiracy." (ECF No. 50 at 22.) Plaintiffs allege that "Weber . . . participated in [a] . . . conspiracy by way of policy or practice that knowingly allowed their representatives to select individuals as gang members or associates and for service with the past and imminent injunctions based in part on ethnic prejudice." (Am. Compl. ¶ 168, ECF No. 50 at 23.)

Section 1985 prohibits a conspiracy to interfere with civil rights. *See* 42 U.S.C. § 1985. More specifically, and relevant here, § 1985(3) provides a cause of action where "two or more

persons" conspire to deprive "either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws" and "do, or cause to be done, any act in furtherance of the object of such conspiracy." *Id.*

"The essential elements of a § 1985(3) claim are: (1) a conspiracy; (2) to deprive plaintiff of equal protection or equal privileges and immunities; (3) an act in furtherance of the conspiracy; and (4) an injury or deprivation resulting therefrom." *Tilton v. Richardson*, 6 F.3d 683, 686 (10th Cir. 1993) (citing *Griffin v. Breckenridge*, 403 U.S. 88, 102–03 (1971)). Additionally, "[t]he language requiring intent to deprive of equal protection, or equal privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin*, 403 U.S. at 101; *see also Babbar v. Ebadi*, 216 F.3d 1086 (10th Cir. 2000) (unpublished) ("With respect to the discriminatory motive, a plaintiff must establish that a class-based or racially discriminatory motive lurks behind the conspiratorial activities.")."The focus of the racial animus inquiry is the government actor's 'intent, motive, or purpose.'" *Jones v. Norton*, 809 F.3d 564, 578 (10th Cir. 2015). "To avoid summary judgment, Plaintiffs must point to 'specific, nonconclusory evidence' that the Defendants' actions were 'improperly motivated.'" *Id*; *see also Babbar*, 216 F.3d at *9 ("To survive a motion for summary judgment in a § 1985 conspiracy case, [the Tenth Circuit] ha[s] stated unequivocally that a plaintiff must establish a genuine issue of material fact as to class-based or racially discriminatory motives underlying conspiratorial activities.").

Defendants argue that "the Section 1985 conspiracy claim should be dismissed" because "Plaintiffs are unable to show" that the Weber Defendants were "improperly motivated by a racially discriminatory animus . . . ." (ECF No. 156 at 29.) Plaintiffs concede that "Weber is correct that to prove a conspiracy, Plaintiffs need to show that ethnic and/or racial animus was

behind Defendants' actions . . . ." (ECF No. 175 at 4.) But Plaintiffs argue that "[t]he facts . . . support a reasonable conclusion that ethnic animus did motivate Weber and Ogden, precluding judgment in Weber's favor on that claim." (ECF No. 175 at 5.)

Plaintiffs cite to two pieces of evidence in support of their argument. (*See* ECF No. 175 at 5–6.) First, Plaintiffs argue that "the statistics show that the overwhelming majority of individuals Defendants selected for service and prosecution with the Injunction—between 76% and 83%--were of Hispanic ethnicity . . . ." (ECF No. 175 at 5.) Second, Plaintiffs argue that "[i]t is undisputed that neither Ogden nor Weber prohibited officers from using ethnicity in determining who to select for service with the Injunction." (ECF No. 175 at 5; *see also* ECF No. 167 at 17 ("Weber . . . acknowledges not making any effort to ensure that Defendant's representatives were ever expressly told that they were not allowed to directly consider race and ethnicity . . . .") (citing Miles Depo., ECF No. 156-5 at 39:21–40:6).) Here, Plaintiffs cite the deposition of Branden Miles, a Weber County attorney. The cited portion of that deposition provides:

> **Q.** I'm asking, did you say, 'It's prohibited to consider ethnicity or race'?
>
> **A.** I guess if you're asking did I ever utter the words to them, 'Do not consider race as a part of this,' I don't recall every saying specifically, 'Don't consider race as a factor.' We specifically always pointed to, 'These are the factors we're looking at, that is what the criteria is to apply, and that's the only thing we can prove in court. So this is what we want and this is all you're guided by.'

(Miles Depo. ECF No. 156-5 at 39:21–40:6.)

Nothing in the deposition that Plaintiffs cited reveals that the Defendants were motivated by racial or ethnic animus. Nor do Plaintiffs' statistics alone reveal that that Defendants were motivated by racial or ethnic animus. Plaintiffs have not cited the court any authority that would support finding racial animus based only on a statistical disparity. On this record, Plaintiffs have

not pointed the court to any specific, nonconclusory evidence of race-based animus required to avoid summary judgment on a conspiracy claim. The court therefore GRANTS Defendants' Motion for Summary Judgment on Plaintiffs' Fifth Claim.

VII.    State Constitutional Claims

In their Sixth Claim for Relief, Plaintiffs allege that they were "deprived . . . of liberty and property without due process of law in violation of Article 1, Section 7 of the Utah Constitution." (Am. Compl. ¶ 172, ECF No. 50 at 23.) In their Seventh Claim for Relief, Plaintiffs allege that they were "deprived . . . of their right to free expression and assembly in violation of Article I, Sections 1 and 15 of the Utah Constitution." (Am. Compl. ¶ 177, ECF No. 50 at 24.) Plaintiffs seek damages for both of these claims. (*See* Am. Compl. ¶¶ 174, 179, ECF No. 50 at 23.)

Weber Defendants argue that "before any analysis of whether Plaintiffs are entitled to monetary damages for an alleged violation of the Utah Constitution, it must be determined whether their claims are rooted in self-executing clauses of the Utah Constitution." (ECF No. 156 at 29.) Weber Defendants concede that "both Article I, Section 1 and Article I, Section 7 of the Utah Constitution are self-executing." (ECF No. 156 at 29.)  But they argue that Article I, Section 15 "is not self-executing," and appear to argue that, for this reason, the court can end its inquiry as to "Article I, Section 15 right there."  (*See* ECF No. 156 at 30.) In their Response, Plaintiffs completely fail to address Defendants' argument regarding Article I, Section 15. (*See* ECF No. 167 at 18.) Because Plaintiffs fail to address Defendants' argument that Article I, Section 15 is "not self-executing," the court concludes that they have waived that argument. The court therefore GRANTS Defendants' Motion for Summary Judgment as it relates to Article I, Section 15. Plaintiffs' Seventh Claim is DISMISSED.

Weber Defendants further argue that "even if all clauses are self-executing, Plaintiffs cannot recover monetary damages for any alleged constitutional violations because they cannot satisfy the three prong test of *Spackman ex rel. Spackman v. Bd. of Educ. of Box Elder Cty. Sch. Dist.*, 2000 UT 87, 16 P.3d 533." (ECF No. 156 at 30.) In *Spackman*, the Utah Supreme Court held "that *a plaintiff must establish*" three elements before he or she may recover monetary damages under the Utah Constitution. *See Spackman*, 2000 UT 87, ¶ 22 (emphasis added). "First, a plaintiff must establish that he or she suffered a 'flagrant' violation of his or her constitutional rights." *Id.* at ¶ 23. "Second, a plaintiff must establish that existing remedies do not redress his or her injuries." *Id.* at ¶ 24. "Third, a plaintiff must establish that equitable relief, such as an injunction, was and is wholly inadequate to protect the plaintiff's rights or redress his or her injuries." *Id.* at ¶ 25. Defendants argue that "Plaintiffs cannot satisfy any of these [elements] and so their Utah Constitutional claims should be dismissed." (ECF No. 156 at 30.)

Regarding the second element, Defendants argue that "Section 1983 is an adequate remedy to address their alleged injuries," and argue that "Plaintiffs have not argued any of their alleged Utah Constitutional injuries encompass more than what is protected in the Federal Constitution . . . ." (ECF No. 156 at 32.) Plaintiffs do not specifically respond to Defendants' argument that Section 1983 is an adequate remedy. (*See* ECF No. 167 at 18.) Instead, Plaintiffs argue that "[a]t this state, Plaintiffs have presented undisputed evidence that would support a finding that Weber violated their rights under the Utah Constitution, and the Court has preliminarily found that *Spackman* is not a bar. It is therefore up to Weber to point to undisputed facts establishing that *Spackman* would apply to prevent Plaintiffs recovering, and to explain how those facts alter the Court's standing analysis." (ECF No. 167 at 18.)

Plaintiffs misconstrue the court's previous order. This court previously stated that "[i]n

the abstract, Plaintiffs appear to have a fully adequate remedy in their § 1983 claims," and noted that "[t]his and other courts in this District have . . . concluded that where a plaintiff's federal remedies fully redress the state constitutional violation, the state constitutional claims should be dismissed." (ECF No. 81 at 48.) The court ultimately declined to dismiss Plaintiffs' state constitutional claims because, without discovery, "the court [could not] say with certainty that damages for claims will fully redress the Plaintiffs' injuries and that damages under the state constitution would be inappropriate." (ECF No. 81 at 49.) *Spackman* makes clear that the "*plaintiff* must establish that existing remedies do not redress his or her injuries." *Spackman*, 2000 UT 87, ¶ 24 (emphasis added). In failing to specifically respond to Defendants' arguments that Section 1983 is an adequate remedy to address their alleged injuries, Plaintiffs have failed to establish that they are entitled to monetary damages under the Utah Constitution. The court therefore GRANTS Defendants' Motion for Summary Judgment regarding Plaintiffs' sixth claim for monetary damages under the Utah Constitution.

VIII.    Statute of Limitations

Defendants argue that "Plaintiffs' suit is grounded in 42 U.S.C. § 1983, which has no federal statute of limitations," but argues that "federal courts have decided that Section 1983 claims should be governed by . . . general personal injury statute of limitations." (ECF No. 156 at 35.) Defendants argue that Plaintiffs § 1983 claims are subject to a four-year limitations period. (*See* ECF No. 156 at 35.) Plaintiffs argue that "the limitations period for Section 1983 claims did not begin to accrue until Plaintiffs were aware of all of the facts giving rise to the claims," and argues that "the earliest accrual date" was in "late 2013, when the Utah Supreme Court vacated the entire case because of faulty service . . . ." (ECF No. 18–19.) Defendants do not respond to Plaintiffs' argument. The court deems Defendants' argument waived.

## Conclusion

For the foregoing reasons, the court

1. **GRANTS** Plaintiffs' Motion for Summary Judgment (ECF No. 93) and

2. **GRANTS** in part and **DENIES** in part Defendants' Motion for Summary Judgment. (ECF No. 156).

    a. Defendants' Motion for Summary adjudication of Plaintiffs' first, second, third, and fourth claims is DENIED.

    b. Defendants' Motion for Summary adjudication of Plaintiffs' Fifth Claim is GRANTED.

    c. Defendants' Motion for Summary adjudication of Plaintiffs' Sixth Claim is GRANTED in part.

    d. Defendants' Motion for Summary adjudication of Plaintiffs' Seventh Claim is GRANTED.

    e. Defendants' Motion for Summary adjudication of Plaintiffs' Tenth Claim is DENIED.

Currently pending before the court is Plaintiffs' Motion for Sanctions against Weber Defendants, (ECF No. 168). As explained in detail above, the court has serious reason to believe that the Weber Defendants' counsel has knowingly submitted false declarations to this court. The court will set a hearing on Plaintiffs' Motion for Sanctions.

DATED this 27th day of September, 2019.

BY THE COURT:

CLARK WADDOUPS
United States District Judge